UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; and ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> UTICA PHYSICAL THERAPY INC.; ROSE PHYSICAL THEARPY, INC.; ROSE PAIN MANAGEMENT INC.; CRYSTAL CLEAR HEALTH MANAGEMENT INC.; BLUEBIRD TRANSPORTATION INC.; COMPUTERISED JOINT SURGERY LLC; MINI INVASIVE ORTHOPEDICS LLC; ADVANCED CENTRAL LABORATORY, LLC; STEFAN GLOWACKI, M.D., P.C.; MUKHLIS TOOMA; LOLO TOOMA; ARAK ISHAQ; SAM HAKKI, M.D.; and STEFAN GLOWACKI, M.D., <br><br> Defendants. | Civil Action No. _____ <br><br><br> **Demand for Jury Trial** |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

## I.    __INTRODUCTION__

1.    This is a case about physical therapy clinics, medical clinics, a diagnostic imaging company, a transportation company, a clinical urine drug testing laboratory, and the owners, agents, and representatives of the same who abused the unlimited benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking reimbursement under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.    Defendants Utica Physical Therapy Inc. ("Utica PT"), which is owned by Mukhlis Tooma and Lolo Tooma; Rose Physical Thearpy, Inc.[1] ("Rose PT"), which is controlled by Arak Ishaq ("Ishaq"); Rose Pain Management Inc. ("Rose Pain"); Crystal Clear Health Management Inc. ("Crystal Clear"), which is owned by Ishaq; Bluebird Transportation Inc. ("Bluebird"), which is owned by Ishaq; Computerised Joint Surgery LLC[2] ("Computerized Joint"), which is owned by Sam

---

[1] The Articles of Incorporation identify the company as "Rose Physical Thearpy, Inc."  The company also submitted bills and medical records to Allstate under the name "Rose Physical Therapy Inc."  For purposes of this Complaint, all references to "Rose PT" and/or "Rose Physical Therapy, Inc." refer to the incorporated entity Rose Physical Thearpy, Inc.

[2] Computerised Joint Surgery LLC and Computerised Joint Surgery PLC submitted bills and medical records to Allstate under the name "Computerized Joint Surgery, LLC."  For purposes of this Complaint, references to "Computerized Joint" and/or "Computerized Joint Surgery LLC" include both Computerised Joint Surgery LLC and Computerised Joint Surgery PLC.

Hakki, M.D. ("Hakki"); Mini Invasive Orthopedics LLC ("Mini Invasive"), which is owned by Hakki; Advanced Central Laboratory, LLC ("Advanced Central Labs"), in which Hakki has a financial interest; and Stefan Glowacki, M.D., P.C., which is owned by Stefan Glowacki, M.D. ("Glowacki"), conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.      The purpose of the fraudulent scheme devised and implemented by the defendants was to generate claims to, and collect payment from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had been involved in motor vehicle accidents.

4.      The defendants engaged in a fraudulent scheme to consistently bill Allstate for treatment or services that were never actually provided to patients and manufactured documents to make it appear as though patients received services when, in fact, no such services were provided.

5.      The rampant nature of the defendants' fraudulent billing is best summarized by a patient who testified that the defendants are "crooks" and that they are "not to be trusted."

6.      The defendants established a fraudulent network by incorporating and organizing entities purportedly providing different types of treatment or services,

and even used the identity of a deceased relative in an attempt to conceal their fraudulent activities.

7.      The defendants solicited patients and referred them to the other defendants through the use of *quid pro quo* arrangements and referrals for unnecessary treatment and services.

8.      The defendants consistently provided unlicensed treatment and services, if provided at all, including massage therapy, durable medical equipment ("DME"), and transportation services.

9.      The treatment, when provided, was done as part of a predetermined protocol consisting of unreasonable and unnecessary physical therapy, injections, application of P-Stim devices, urine drug testing, magnetic resonance imaging ("MRI") scans, and transportation services.

10.     The defendants also engaged in several fraudulent billing practices, including unbundling services so as to inflate the amount charged and upcoding office visits in order to charge more than the services actually provided.

11.     The defendants also charged excessive amounts that far exceeded reasonable and customary billing for services, including massage therapy, MRI scans, and medical transportation.

12.     Allstate's investigation of claims submitted to it by and on behalf of the defendants revealed treatment that was not tailored to the clinical needs of each patient, but rather was performed solely to generate profit for the defendants.

13.     Allstate reasonably relied to its detriment on the bills and medical documentation submitted to it by and on behalf of the defendants.

14.     Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

15.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

16.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in the payment of No-Fault benefits from Allstate to and on behalf of the defendants.

17.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract was the platform upon which the defendants perpetrated their fraudulent scheme.

18.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

19.   Allstate's claim for compensatory damages includes: (1) payments made by Allstate to Utica PT, Rose PT, Rose Pain, Crystal Clear, Bluebird, Computerized Joint, and Stefan Glowacki, M.D., P.C. in reliance upon the false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act; (2) treble damages; (3) statutory interest; (4) costs, including but not limited to the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants; and (5) attorney's fees.

20.   Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and pending bills submitted to Allstate whereas (1) the defendants billed Allstate for services that were not rendered; (2) the defendants billed Allstate for services and treatment that were not reasonably necessary; (3) the defendants billed Allstate for unlawful treatment that was designed and implemented solely to increase their profits; and (4) the defendants engaged in a pervasive pattern and practice of submitting false medical documentation through interstate wires and the U.S. Mail demanding payment from Allstate.

21.   As a result of the defendants' fraudulent acts, Allstate has paid in excess of $355,759 to them since 2011 related to the patients at issue in this Complaint.

## II.   **THE PARTIES**

### A.   **PLAINTIFFS**

22.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are each corporations duly organized and existing under the laws of the State of Illinois.

23.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

24.    At all times relevant to the allegations in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.   **DEFENDANTS**

#### 1.   **Utica Physical Therapy Inc.**

25.    Utica Physical Therapy Inc. is a Michigan corporation incorporated by Mukhlis Tooma on or about December 14, 2011.

26.    Utica PT's principal place of business is located in Utica, Michigan.

27.    Mukhlis Tooma is the President and a co-owner of Utica PT.

28.    Lolo Tooma is a co-owner of Utica PT.

29.    Utica PT billed Allstate for services that were not rendered and treatment that was medically unnecessary and unlawful (to the extent treatment was

rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 1.

### 2. Rose Physical Therapy, Inc.

30.     Rose Physical Therapy, Inc. is a Michigan corporation incorporated on or about July 7, 2015.

31.     Rose PT's Articles of Incorporation identify Younis Botani ("Botani") as its incorporator and Resident Agent despite his death on September 22, 2014 – nine and a half months before Rose PT's incorporation.

32.     Rose PT's principal place of business is located in Sterling Heights, Michigan.

33.     Ishaq is the manager and President of Rose PT.

34.     Rose PT billed Allstate for services that were not rendered and treatment that was medically unnecessary and unlawful (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 2.

### 3. Rose Pain Management Inc.

35.     Rose Pain Management, Inc. is a Michigan corporation incorporated on or about February 12, 2016.

36.    Rose Pain's Articles of Incorporation identify Botani as its incorporator and Resident Agent despite his death on September 22, 2014 – nearly seventeen (17) months before Rose Pain's incorporation.

37.    Rose Pain's principal place of business is located in Sterling Heights, Michigan.

38.    Rose Pain billed Allstate for services that were not rendered and treatment that was medically unnecessary and unlawful (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4.    Crystal Clear Health Management Inc.

39.    Crystal Clear Health Management Inc. is a Michigan corporation incorporated by Ishaq on or about March 10, 2015.

40.    Crystal Clear's principal place of business is located in Sterling Heights, Michigan.

41.    Ishaq is the owner, President, and Resident Agent of Crystal Clear.

42.    Crystal Clear allegedly provides imaging services to patients of Michigan medical providers, including Rose Pain, Mini Invasive, Computerized Joint, and Stefan Glowacki, M.D., P.C.

43.     Crystal Clear billed Allstate for diagnostic images that were unnecessary in relation to several patients at issue herein, including the patients set out in Exhibit 4.

### 5.     Bluebird Transportation Inc.

44.     Bluebird Transportation Inc. is a Michigan corporation incorporated by Ishaq on or about February 5, 2010.

45.     Bluebird's principal place of business is located in Sterling Heights, Michigan.

46.     Ishaq is the owner, President, and Resident Agent of Bluebird.

47.     Bluebird allegedly provides transportation services to patients of Michigan medical providers, including Utica PT, Rose PT, and Crystal Clear.

48.     Bluebird billed Allstate for transportation that was not rendered and transportation that was unnecessary in relation to several patients at issue herein, including the patients set out in Exhibit 5.

### 6.     Computerized Joint Surgery LLC

49.     Computerized Joint is a Florida limited liability company that was organized on or about May 22, 2014.

50.     Computerized Joint's principal place of business is located in Clinton Township, Michigan.

51.     Hakki is the sole member of Computerized Joint.

52.   Computerized Joint has no brick-and-mortar location; instead, the clinic operates out of the offices of other providers, including Mini Invasive and Rose Pain.

53.   Computerized Joint billed Allstate for services that were not rendered and treatment that was medically unnecessary and unlawful (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 6.

### 7.   Mini Invasive Orthopedics LLC

54.   Mini Invasive Orthopedics LLC is a Florida limited liability company that was organized on or about June 17, 2016.

55.   Mini Invasive's principal place of business is located in Madison Heights, Michigan.

56.   Hakki is the sole member of Mini Invasive.

57.   Mini Invasive billed Allstate for services that were not rendered and treatment that was medically unnecessary and unlawful (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 7.

### 8.   Advanced Central Laboratory, LLC

58.   Advanced Central Laboratory, LLC is a Florida limited liability company that was organized on or about November 9, 2015.

59.     Advanced Central Labs's principal place of business is located in Allen Park, Michigan.

60.     The Articles of Organization identify Sam Hackette—an alias for Hakki—as a manager of Advanced Central Labs.

61.     Advanced Central Labs allegedly provides drug testing for patients of Michigan medical providers, including Rose Pain, Computerized Joint, and Mini Invasive.

62.     Advanced Central Labs billed Allstate for testing that was medically unnecessary in relation to several patients at issue herein, including the patients set out in Exhibit 8.

### 9.     Stefan Glowacki, M.D., P.C.

63.     Stefan Glowacki, M.D., P.C. is a Michigan professional service corporation that was incorporated on or about August 31, 1979.

64.     Stefan Glowacki, M.D., P.C.'s principal place of business is located in Sterling Heights, Michigan.

65.     Glowacki is the owner, President, and Resident Agent of Stefan Glowacki, M.D., P.C.

66.     Stefan Glowacki, M.D., P.C. billed Allstate for treatment that was medically unnecessary and unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 9.

### 10. **Mukhlis Tooma**

67.     Mukhlis Tooma, also known as Mike Tooma, is a resident and citizen of the State of Michigan.

68.     Mukhlis Tooma is the listed organizer of Utica PT.

69.     At all times relevant to this Complaint, Mukhlis Tooma controlled and had an ownership interest in Utica PT.

70.     Upon information and belief, at all times relevant to this Complaint, Mukhlis Tooma controlled and had an ownership interest in Rose Pain.

### 11. **Lolo Tooma**

71.     Lolo Tooma is a resident and citizen of the State of Michigan.

72.     At all times relevant to this Complaint, Lolo Tooma controlled and had an ownership interest in Utica PT.

### 12. **Arak Ishaq**

73.     Arak Ishaq, also known as Eric Ishaq, is a resident and citizen of the State of Michigan.

74.     Ishaq is the listed organizer of Crystal Clear and Bluebird.

75.     Ishaq is the listed Resident Agent of Rose PT.

76.     At all times relevant to this Complaint, Ishaq controlled and owned Crystal Clear and Bluebird.

77.     At all times relevant to this Complaint, Ishaq managed Rose PT.

78.     Upon information and belief, at all times relevant to this Complaint, Ishaq controlled and had an ownership interest in Rose PT and Rose Pain.

### 13.   Sam Hakki, M.D.

79.     Sam Hakki, M.D. is a resident and citizen of the State of Michigan.

80.     Hakki is a licensed doctor of medicine in the State of Michigan.

81.     Hakki is the sole listed manager of Computerized Joint and Mini Invasive.

82.     Hakki rendered unlawful and medically unnecessary treatment to several of the patients at issue in this Complaint, including the patients listed in Exhibits 2, 3, 4, 6, 7, and 8.

### 14.   Stefan Glowacki, M.D.

83.     Stefan Glowacki, M.D. is a resident and citizen of the State of Michigan.

84.     Glowacki is a licensed doctor of medicine in the State of Michigan.

85.     Glowacki owns and controls Stefan Glowacki, M.D., P.C.

86.     Glowacki rendered unlawful and medically unnecessary treatment to several of the patients at issue in this Complaint, including the patients listed in Exhibits 1, 2, 4, 5, and 9.

III.    **JURISDICTION AND VENUE**

87.    Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.

88.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

89.    Allstate is a citizen of the State of Illinois for purposes of 28 U.S.C. § 1332.

90.    Mukhlis Tooma is a resident and citizen of the State of Michigan.

91.    Lolo Tooma is a resident and citizen of the State of Michigan.

92.    Ishaq is a resident and citizen of the State of Michigan.

93.    Hakki is a resident and citizen of the State of Michigan.

94.    Glowacki is a resident and citizen of the State of Michigan.

95.    Utica PT is a corporation organized under the laws of the State of Michigan.

96.    Utica PT's principal place of business is in Michigan.

97.    Thus, Utica PT is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

98.    Rose PT is a corporation organized under the laws of the State of Michigan.

99.    Rose PT's principal place of business was in Michigan.

100.   Thus, Rose PT is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

101.   Rose Pain is a corporation organized under the laws of the State of Michigan.

102.   Rose Pain's principal place of business was in Michigan.

103.   Thus, Rose Pain is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

104.   Crystal Clear is a corporation organized under the laws of the State of Michigan.

105.   Crystal Clear's principal place of business is in Michigan.

106.   Thus, Crystal Clear is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

107.   Bluebird is a corporation organized under the laws of the State of Michigan.

108.   Bluebird's principal place of business is in Michigan.

109.   Thus, Bluebird is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

110.   Computerized Joint is a limited liability company organized under the laws of the State of Florida.

111.   Computerized Joint's principal place of business is in Michigan.

112. Hakki is the sole member of Computerized Joint.

113. Hakki is a resident and citizen of the State of Michigan.

114. Thus, all members of Computerized Joint are citizens of and reside in the State of Michigan.

115. Mini Invasive is a limited liability company organized under the laws of the State of Florida.

116. Mini Invasive's principal place of business is in Michigan.

117. Hakki is the sole member of Mini Invasive.

118. Hakki is a resident and citizen of the State of Michigan.

119. Thus, all members of Mini Invasive are citizens of and reside in the State of Michigan.

120. Advanced Central Labs is a limited liability company organized under the laws of the State of Florida.

121. Advanced Central Labs's principal place of business is in Michigan.

122. Anwar Baker is a member of Advanced Central Labs.

123. Anwar Baker is a resident and citizen of the State of Michigan.

124. Mouneer Owen is a member of Advanced Central Labs.

125. Mouneer Owen is a resident and citizen of the State of Michigan.

126. Thus, all members of Advanced Central Labs are citizens of and reside in the State of Michigan.

127.    Stefan Glowacki, M.D., P.C. is a corporation organized under the laws of the State of Michigan.

128.    Stefan Glowacki, M.D., P.C.'s principal place of business is in Michigan.

129.    Thus, Stefan Glowacki, M.D., P.C. is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

130.    Thus, each defendant is completely diverse from Allstate for purposes of 28 U.S.C. § 1332.

131.    Further, the amount in controversy, exclusive of interest and costs, relative to each defendant exceeds $75,000, the sum set forth in 28 U.S.C. § 1332.

132.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    MICHIGAN'S NO-FAULT ACT

133.    Allstate underwrites automobile insurance in Michigan.

134.    Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.  Mich. Comp. Laws § 500.3107(1)(a).

135.    Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary

products, services, and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident.   Mich. Comp. Laws § 500.3107(1)(a).

136.   "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the product or service itself is not reasonably necessary." Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

137.   A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary and the charge for the service is reasonable.  Id.

138.   Claims for personal injury benefits under the No-Fault Act are available only if the benefits are for "accidental bodily injury" and only if those injuries "arise[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle . . . ."  Mich. Comp. Laws § 500.3105(1).

139.   Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of a motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of the loss sustained."  Mich. Comp. Laws § 500.3142(2).

140.   The Michigan No-Fault Act provides that "[a] physician, hospital, clinic or other person or institution" may only charge a "reasonable amount" for

personal injury protection (PIP) benefits for treatment/services which have been "lawfully render[ed]" to an injured person who has sustained bodily injury in an automobile accident.  Mich. Comp. Laws § 500.3157.

141.   "If the treatment was not lawfully rendered, it is not a no-fault benefit and payment for it is not reimbursable."  Cherry v. State Farm Mut. Auto. Ins. Co., 195 Mich. App. 316, 310 (1992).

142.   The Michigan No-Fault Act provides that an insurer "may be allowed by a court an award of reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation."   Mich. Comp. Laws § 500.3148(2).

143.   As alleged in this Complaint, the defendants violated Michigan's No-Fault Act by submitting and causing to be submitted bills to Allstate seeking reimbursement for services and treatment that were not actually provided, were not lawfully rendered, and were not reasonably necessary for the care, recovery, or rehabilitation of the defendants' patients.

## V.   BACKGROUND ON DEFENDANTS AND THEIR SCHEME

144.   The defendants established various corporate entities for the sole purpose of defrauding Allstate through *quid pro quo* arrangements and referrals.

### A.   TOOMA/ISHAQ ENTITIES

145.   Ishaq, Mukhlis Tooma, and Lolo Tooma coordinated as a family to form medical transportation and physical therapy companies as part of a scheme to maximize the amount that they could bill insurance companies, including Allstate.

146.   Ishaq is the brother of Lolo Tooma and the brother-in-law of Mukhlis Tooma.

147.   Ishaq resides at 39652 Dorian Drive in Sterling Heights.

148.   Mukhlis Tooma and Lolo Tooma reside next door at 39640 Dorian Drive in Sterling Heights.

149.   Ishaq formed Bluebird on or about February 5, 2010.

150.   Mukhlis Tooma and Lolo Tooma formed Utica PT on or about December 14, 2011.

151.   As discussed in more detail *infra*, Ishaq personally solicited motor vehicle accident victims to physical therapy treatment at Utica PT.

152.   Ishaq used Bluebird to transport the solicited individuals to a physician in order to obtain a prescription for physical therapy.

153.   Ishaq also used Bluebird to transport patients to and from Utica PT.

154.   Mukhlis Tooma also drove on behalf of Bluebird to transport patients to and from his clinic, Utica PT.

155.   Ishaq incorporated Crystal Clear, an MRI facility, on or about March 10, 2015.

156.   Ishaq, Mukhlis Tooma, and Lolo Tooma immediately enveloped Crystal Clear into their fraudulent network by having physicians provide unnecessary referrals for MRI scans.

157.   Ishaq and Mukhlis Tooma provided patients with transportation through Bluebird to Crystal Clear.

158.   Ishaq and Mukhlis Tooma expanded their scheme by using a deceased relative to incorporate Rose PT on or about July 7, 2015 in an attempt to conceal their identities and hide the scope of their fraudulent scheme.

159.   The Articles of Incorporation for Rose PT identify Botani as the incorporator and Resident Agent.

160.   Botani was the father of Ishaq and Lolo Tooma and the father-in-law of Mukhlis Tooma.

161.   Botani passed away on September 22, 2014.  *See* Exhibit 10.

162.   Botani therefore did not incorporate Rose PT almost ten (10) months after his death.

163.   On or about December 2, 2016, Ishaq filed the 2016 Annual Report for Rose PT.

164.   The 2016 Annual Report identifies Ishaq as the President of Rose PT.

165.   Despite initially naming Botani, Ishaq always managed and controlled Rose PT.

166.   Utica PT, Rose PT, Bluebird, Ishaq, Mukhlis Tooma, and Lolo Tooma also entered into a *quid pro quo* relationship with Stefan Glowacki, M.D., P.C. and Glowacki.

167.   Ishaq solicited patients and referred them to see Glowacki at Stefan Glowacki, M.D., P.C.

168.   Bluebird, Ishaq, and Mukhlis Tooma provided the patients with transportation to their appointments with Glowacki at Stefan Glowacki, M.D., P.C.

169.   In turn, Glowacki referred patients to Utica PT and Rose PT for unnecessary and unreasonable physical therapy treatment.

170.   Glowacki also provided patients with fraudulent and unnecessary disability certificates to enable the patients to continue receiving transportation from Bluebird, Ishaq, and Mukhlis Tooma.

171.   Ishaq and Mukhlis Tooma again used a deceased relative to further extend their fraudulent scheme: Botani allegedly incorporated Rose Pain on or about February 12, 2016 despite being dead for seventeen (17) months at this time.

172.   The Articles of Incorporation for Rose Pain identify Botani as the incorporator and Resident Agent.

173.   Botani allegedly signed the Rose Pain Articles of Incorporation on December 30, 2015.

174.   However, Botani passed away on September 22, 2014.  *See* id.

175.   Botani therefore did not incorporate Rose Pain almost seventeen (17) months after his death.

176.   Through the incorporation of Rose Pain, Ishaq, Mukhlis Tooma, and Lolo Tooma now owned a facility where a physician could directly provide physical therapy prescriptions (to defendants Utica PT and Rose PT) and disability certificates (to defendant Bluebird) as a part of their scheme.

177.   Ishaq, Mukhlis Tooma, and Lolo Tooma also entered into an agreement to have Hakki treat patients at Rose Pain.

178.   Ishaq, Mukhlis Tooma, and Lolo Tooma benefitted from Hakki seeing patients at Rose Pain because he then referred the patients to their clinics (i.e., Utica PT and Rose PT) for unnecessary and excessive physical therapy.

179.   Hakki benefitted from seeing patients at Rose Pain because it provided another facility location for him to provide unnecessary P-Stim treatment, perform unnecessary injections, and order unnecessary and excessive urine drug testing, as discussed *infra*.

### B.   HAKKI ENTITIES

180.   Hakki, personally and through members of his family, formed numerous entities as part of a design to mask the amount of treatment for which he billed insurers, including Allstate, by having the medical records show a variety of seemingly independent facilities providing treatment.

181.   Hakki formed Computerized Joint in Florida on or about May 22, 2014.

182.   Computerized Joint does not have a brick and mortar location.

183.   Rather, Hakki used Computerized Joint to bill for his services when he saw patients at various locations in the State of Michigan.

184.   Computerized Joint letterhead provides its address as 42383 Garfield Road Box 380560.  *See* Exhibit 11.

185.   This address belongs to a U.S. Postal Services office.

186.   "Box 380560" refers to a Post Office ("P.O.") Box.

187.   Hakki formed Mini Invasive in Florida on or about June 17, 2016.

188.   Hakki opened a practice in Madison Heights for Mini Invasive.

189.   As discussed in more detail *infra*, Hakki used Computerized Joint and Mini Invasive to fraudulently bill Allstate by making it appear as though the same patient received treatment at different clinics on the same date of service when in fact Hakki only rendered treatment a single time to the patient.

190.   Advanced Central Labs was formed in Florida on or about November 19, 2015.

191.   Advanced Central Labs's Articles of Organization identify four (4) Managers for Advanced Central Labs, all with an identical address.  *See* Exhibit 12.

192.   The provided address is 42383 Garfield Road Box 380560 – the same address as Computerized Joint.  *See* id and Exhibit 11.

193.   Advanced Central Labs's Articles of Organization identify Sam Hackette as a Manager.

194.   Hakki has testified that he uses Sam Hackette as an alias.

195.   Advanced Central Labs's Articles of Organization identify Mona Thamer as the Registered Agent.

196.   Mona Thamer is Hakki's wife.

197.   Hakki agreed with Mukhlis Tooma, Lolo Tooma, and Ishaq to treat patients through Rose Pain and refer them to receive MRIs at Crystal Clear and physical therapy at Rose Pain.

198.   Hakki also ordered unnecessary and excessive urine drug testing through Advanced Central Labs, as well as provided useless P-Stim treatment and performed unnecessary injections.

199.   Hakki's agreement with Mukhlis Tooma, Lolo Tooma, and Ishaq enabled him to use Rose Pain as yet another entity from which he could submit bills

for services that, to the extent rendered at all, were fraudulent, unnecessary, and unreasonable.

200.   For example, Mini Invasive mailed a bill to Allstate through the U.S. Mail for a purported follow-up visit on September 29, 2016.  *See* Exhibit 13.

201.   However, the medical record that was mailed to Allstate relating to the office visit on September 29, 2016 is on Rose Pain letterhead.  *See* Exhibit 14.

202.   The Mini Invasive bill and Rose Pain medical record exemplify that Hakki used his entities and Rose Pain interchangeably as a means to maximize the number of bills that the defendants submitted to Allstate seeking reimbursement under the Michigan No-Fault Act.

### C.   CRIMINAL AND DISCIPLINARY BACKGROUNDS OF INDIVIDUAL DEFENDANTS

203.   At least one defendant, Glowacki, participated in activities that resulted in multiple disciplinary proceedings in different jurisdictions.

204.   The Michigan Attorney General filed an Administrative Complaint against Glowacki on May 9, 2005 for "a violation of general duty, consisting of negligence to exercise due care" and for incompetence.

205.   Subsequently, Glowacki agreed to a Consent Order with the Disciplinary Subcommittee of the Michigan Bureau of Health Professions, Board of Medicine ("Board") on July 8, 2005, which became effective on September 21, 2005.

206.   Pursuant to the Consent Order, Glowacki was placed on probation for six (6) months and was required to complete a continuing education course, meet with a Board-approved physician to review his professional practice, and submit his records to the Board for review on a monthly basis.

207.   Furthermore, Glowacki agreed as part of the Consent Order that he would not perform surgery in the future and would not seek licensure in any other state.

208.   The New York Department of Health State Board for Professional Medical Conduct ("New York Board") ordered Glowacki to surrender his New York medical license on May 30, 2006.

209.   In the Statement of Charges, the New York Board stated that the disciplinary actions arose as a result of Glowacki pleading guilty to aggravated assault in Michigan on June 24, 2002.

210.   Glowacki was sentenced to two years' probation with conditions and the recommendation that he enroll in and complete a sex offender program.

211.   Glowacki testified that he surrendered his New York license:

Q.   Doctor, did you surrender your license in the State of New York –

A.   Yes.

Q.   -- as part of –

A.   Yes, I did.

28

> Q.    -- agreeing not to contest the professional charges against you?
>
> A.    Yes.

212.   The New York Board also included the six-month probation of Glowacki's Michigan medical license as grounds for him to surrender his license.

213.   Glowacki has confirmed in sworn testimony that he has repeatedly been sued for malpractice:

> Q.    Have you ever been sued for malpractice, Doctor?
>
> A.    Oh, yes, quite a few times.

## VI.    BILLING FOR SERVICES NOT RENDERED

214.   The defendants frequently billed Allstate for services that were not actually rendered to patients at issue in this Complaint.

215.   The defendants' pervasive pattern of interstate faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

216.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for treatment that never actually occurred are fraudulent.

217.   Therefore, Allstate is not required to compensate the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recoup any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

### A.   MASSAGE THERAPY NOT RENDERED

218.   Utica PT mailed bills to Allstate seeking payment for massage therapy treatment that was never rendered to patients at issue in this Complaint.

219.   Utica PT submitted bills to Allstate asserting that patients received treatment from an employee who was not employed by Utica PT on the dates of service identified in the bills.

220.   Furthermore, several patients at issue in this Complaint did not present to Utica PT on dates of treatment identified in the bills mailed to Allstate by Utica PT.

### 1.   Billing by Former Employee

221.   Utica PT submitted bills through the U.S. Mail to Allstate seeking payment for treatment purportedly rendered by a massage therapist who no longer worked at the clinic.

222.   Maria Steinhoff ("Steinhoff") testified that she worked at Utica PT for less than three months from November 2013 to January 2014:

Q.   And so, basically, you're saying you worked there November, December and January, so for about three months?

A.   No.  One week of November, the whole month of December, and maybe the whole month of January. I can't recall when he finally said we no longer need your services.

223.   Utica PT submitted bills through the U.S. Mail to Allstate for massage therapy purportedly provided by Steinhoff through December 2014.

224.   However, Steinhoff testified that she stopped working at Utica PT in January 2014.

225.   Steinhoff also testified that while she was employed at Utica PT, she worked part-time in the afternoons on Wednesdays, Thursdays, and Fridays.

226.   Utica PT submitted bills through the U.S. Mail to Allstate for massage therapy purportedly provided by Steinhoff on Mondays.

227.   Therefore, Utica PT sought reimbursement for massage therapy that was never rendered by Steinhoff.

228.   Allstate is not required to pay Utica PT for treatment that was not rendered to the patients at issue in this Complaint.

## 2.   Billing When Patient Not Present

229.   Utica PT engaged in a practice of billing Allstate claiming that patients received three (3) sessions of massage therapy per week, regardless of how many times the patient actually came to the clinic for treatment.

230.   Steinhoff testified that Donna Carter, the former Utica PT office manager, resigned from her position over Utica PT's billing for treatment not rendered to patients:

> Q.   So Donna was gone because she was fired before you were there?
>
> A.   She wasn't fired.  She decided to quit because she was working to [sic] such an unethical person.
>
> Q.   Did she relate to you any of the experiences that she had had that you would call unethical?
>
> A.   Okay.  Well, let's talk about this.  He, meaning Mike Tooma, wanted Donna to bill massage clients/patients regardless of how many massages they got a week at least three times a week is what came from her.  So whether I gave them each three massages a week, Wednesday, Thursday, Friday, or if they only got one or two, he wanted for her, Donna, to bill for three massages.
>
> Q.   Okay.
>
> A.   She was not willing to do that.  It's totally unethical, and, you know, insurance fraud.

231.   Utica PT engaged in a consistent practice of billing for massage therapy that was not rendered to patients.

232.   Allstate is not required to pay Utica PT for treatment that was never rendered to patients at issue in this Complaint.

### 3. Exemplar Claims

#### a. Patient J.A. (Claim No. 0326050457)[3]

233.  Patient J.A. was allegedly involved in a motor vehicle accident on May 8, 2014.

234.  J.A. presented to Stefan Glowacki, M.D., P.C. on June 16, 2014 for an initial evaluation with Glowacki and was provided with a disability certificate and a prescription for physical therapy.

235.  J.A. purportedly presented to Utica PT that same day, June 16, 2014, to initiate physical therapy and massage therapy.

236.  J.A. testified that she went to Utica PT for a limited period of time:

> Q.  Do you – can you give me some idea about how many visits you think you had of massage therapy at Utica PT?
>
> A.  I'm not 100 percent sure. My recollection, I went there maybe four to six times a month.
>
> Q.  And for about how many months?
>
> A.  Approximately two months. When I go there, I signed some documents, so that should reflect how many times I've been there.
>
> Q.  Okay. So regardless of the treatment that you got at PT, whether it's a massage or a heat pad, regardless of what the treatment is, you are indicating that you only treated with Utica four to six times a month for about two months.

---

[3] To protect the confidentiality of its insureds, Allstate refers to them throughout this Complaint by initials and claim numbers.

A.    Yes, that information is correct.

237.    Four (4) to six (6) visits per month for two (2) months results in a minimum of (8) and a maximum of twelve (12) treatment sessions for which Utica PT could bill Allstate with respect to J.A.

238.    Utica PT submitted bills through the U.S. Mail to Allstate seeking reimbursement for massage therapy that was purportedly rendered to J.A. over the course of 69 visits to Utica PT.

239.    These 69 visits purportedly occurred between June 16, 2014 and November 28, 2014.

240.    Utica PT identified Steinhoff as the treating provider for all 69 dates of service, even though Steinhoff testified that she stopped working at Utica PT five (5) months prior to J.A. initiating treatment.

241.    In other words, Steinhoff could not have provided this treatment to J.A.

242.    Utica PT submitted claims for payment and accompanying medical records relative to J.A. to Allstate through the U.S. Mail seeking reimbursement for treatment that was not provided, upon which Allstate relied in adjusting the claims.

243.    Allstate is not required to pay Utica PT for treatment that was never rendered to J.A.

### b.      Patient E.D. (Claim No. 0326050457)

244.   Patient E.D. was allegedly involved in a motor vehicle accident on May 8, 2014.

245.   E.D. presented to Premier Orthopedics on June 21, 2014 for an initial evaluation performed by Jiab Suleiman, D.O. ("Suleiman") and was provided with a prescription for physical therapy.

246.   E.D. presented to Utica PT on June 25, 2014 and purportedly received massage therapy from Steinhoff.

247.   Utica PT submitted bills to Allstate through the U.S. Mail for 82n visits during which massage therapy was allegedly provided to E.D.

248.   These 82 visits purportedly occurred between June 25, 2014 and December 31, 2014.

249.   Utica PT identified Steinhoff as the treating provider for all 82 dates of service for the purported treatment, even though Steinhoff testified that she stopped working at Utica PT five (5) months prior to E.D. initiating treatment.

250.   In other words, Steinhoff could not have provided this treatment to E.D.

251.   Utica PT submitted claims for payment and accompanying medical records relative to E.D. to Allstate through the U.S. Mail seeking reimbursement for treatment that was not provided, upon which Allstate relied in adjusting the claims.

252.   Allstate is not required to pay Utica PT for treatment that was never rendered to E.D.

### c.   Patient N.K. (Claim No. 0343127205)

253.   Patient N.K. was allegedly involved in a motor vehicle accident on September 26, 2014.

254.   N.K. presented to St. John Macomb Hospital following his motor vehicle accident.

255.   St. John Macomb Hospital did not prescribe physical therapy or massage therapy for N.K.

256.   N.K. presented to Trinity Medical Center, P.C. on October 27, 2014 for an initial evaluation performed by Victor Al-Matchy, M.D. ("Al-Matchy") and was provided with a prescription for physical therapy.

257.   Al-Matchy dated the physical therapy prescription September 30, 2014.

258.   However, Al-Matchy did not see N.K. until nearly one (1) month later, on October 27, 2014.

259.   Utica PT submitted bills to Allstate through the U.S. Mail purporting that N.K. initiated treatment on October 1, 2014.

260.   Utica PT submitted bills to Allstate through the U.S. Mail for thirty-five (35) visits during which therapy was allegedly provided to N.K.

261.   These thirty-five (35) visits purportedly occurred between October 1, 2014 and December 19, 2014

262.   Utica PT identified Steinhoff as the treating provider for all thirty-five (35) dates of service for the purported treatment, even though Steinhoff testified that she stopped working at Utica PT nine (9) months prior to N.K. initiating treatment (namely, in January 2014).

263.   In other words, Steinhoff could not have provided this treatment to N.K.

264.   Moreover, eleven (11) of the thirty-five (35) massage therapy treatments that purportedly took place between October 1, 2014 and December 19, 2014 occurred on a Monday.

265.   Steinhoff testified that she never worked at Utica PT on Mondays.

266.   In other words, even if Steinhoff worked at Utica PT, which she did not, she could not have provided treatment to N.K. on nearly one-third of his visits because she did not work on Mondays.

267.   Utica PT submitted claims for payment and accompanying medical records relative to N.K. to Allstate through the U.S. Mail seeking reimbursement for treatment that was not provided, upon which Allstate relied in adjusting the claims.

268.   Allstate is not required to pay Utica PT for treatment that was never rendered to N.K.

**B.**   **PHYSICAL THERAPY NOT RENDERED**

269.   Utica PT and Rose PT submitted bills to Allstate through interstate wires and the U.S. Mail seeking payment for physical therapy that was never rendered to patients at issue in this Complaint.

270.   Rose PT billed Allstate for treatment that was never rendered because the patients were incapable of presenting to Rose PT for treatment.

271.   Rose PT also submitted bills identifying a physical therapist who did not provide treatment to the patients at issue in this Complaint.

272.   Allstate is not required to pay Utica PT and Rose PT for treatment that was never rendered to the patients at issue in this Complaint.

**1.**   **Exemplar Claims**

**a.**   **Patient R.H. (Claim No. 150229401)**

273.   Patient R.H. was allegedly involved in a motor vehicle accident on September 30, 2015.

274.   R.H. presented to Orthopedic, P.C. on October 17, 2015 for an initial evaluation purportedly with Hakki and was provided with a prescription for physical therapy.

275.   R.H. presented to Rose PT to initiate physical therapy.

276.   Rose PT submitted a bill to Allstate through an interstate fax for treatment purportedly provided to R.H. on January 29, 2016.

277.   However, R.H. was incarcerated on January 29, 2016 and therefore could not have presented to Rose PT for treatment.

278.   The Wayne County Sheriff's Office "Inmate Activity Log" indicates that R.H. was admitted to prison at 7:37 p.m. on January 28, 2016.

279.   In a sworn deposition, R.H. confirmed that he was incarcerated in Wayne County Jail on January 29, 2016:

> Q.   You were at Wayne County from January 28 till February 2, 2016, and then they sent you to Macomb County because you have warrants out in Macomb County?
>
> A.   Yes.

280.   R.H. testified that he did not present to Rose PT on January 29, 2016 while he was incarcerated:

> Q.   You wouldn't have been attending physical therapy at Rose Physical Therapy when you were at Wayne County Jail or Macomb County Jail, would you?
>
> A.   No.

281.   Rose PT therefore submitted a bill for treatment that was never rendered because R.H. was incarcerated at the time of the billed-for treatment.

282.   Rose PT submitted bills using Current Procedural Terminology ("CPT") Codes, which are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

283.   Rose PT submitted bills to Allstate through interstate wires for treatment to R.H. that purportedly consisted of CPT Codes 97124 (*"massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)"*), 97140 (*"manual therapy techniques (eg, mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes"*), and 97110 (*"therapeutic procedure, 1 or more areas, each 15 minutes; therapeutic exercises to develop strength and endurance, range of motion flexibility"*).

284.   In describing his treatment protocol at Rose PT, R.H. never mentioned receiving manual therapy or performing therapeutic exercises.

285.   R.H. also testified that all of his physical therapists at Rose PT were female:

> Q.   Who was the therapist that you were treating with at Rose Physical Therapy?
>
> A.   There was [sic] a few of them.  I don't remember.
>
> Q.   Were they male or female?
>
> A.   Females.

286.   However, Rose PT submitted bills to Allstate identifying Nirav Patel ("Patel"), Rinku Prasad ("Prasad"), and Heril Sheth ("Sheth") as the treating providers.

287.   Patel, Prasad, and Sheth are all male.

40

288.   Therefore, Rose PT sought reimbursement for services rendered by persons who did not treat R.H.

289.   R.H. is used as an exemplar claim to identify the pattern utilized by Rose PT to bill for services that were never rendered.

### b.      Patient M.A. (Claim No. 0326050457)

290.   Patient M.A. was allegedly involved in a motor vehicle accident on May 8, 2014.

291.   M.A. presented to Premier Orthopedics on June 21, 2014 for an initial evaluation performed by Suleiman and was provided with a prescription for physical therapy.

292.   M.A. presented to Utica PT on November 3, 2014.

293.   Utica PT submitted bills to Allstate through the U.S. Mail for physical therapy that allegedly included therapeutic exercises and manual therapy.

294.   M.A. testified that her treatment never included therapeutic exercises and only occasionally included manual therapy:

> Q.   So, when you went, what kind of therapy did they do for you in that time?
>
> A.   They used these devices, and then they would put something hot on my back, and that's it.
>
> Q.   Would they do any kind of manual therapy or massage to your back?
>
> A.   Not every day.  It depends on the times.

Q.     What do you mean it depends on the time?

A.     For example, today I went, they did the massage.
       The next time I go, there is going to be no massage.

295.   Utica PT submitted claims for payment and accompanying medical records relative to M.A. to Allstate through the U.S. Mail seeking reimbursement for treatment that was not provided, upon which Allstate relied in adjusting the claims.

296.   Allstate is not required to pay Utica PT for treatment that was never rendered to M.A.

### C.     P-STIM TREATMENT NOT RENDERED

297.   Rose Pain and Hakki submitted bills to Allstate through interstate wires and the U.S. Mail seeking payment for the application of P-Stim treatment that was never rendered to patients at issue in this Complaint.

298.   In relation to the application of the P-Stim devices, Rose Pain billed Allstate for one (1) unit of CPT Code 64555, for one (1) to three (3) units of Healthcare Common Procedure Coding System ("HCPCS") Code L8680, and for one (1) unit of CPT Code 95973.

299.   CPT Code 64555 denotes the "percutaneous implantation of neurostimulator electrode array."

300.   HCPCS Code L8680 denotes an "implantable neurostimulator electrode, each."

301.   CPT Code 95973 denotes "complex spinal code, or peripheral (except cranial nerve) neurostimulator pulse generator/transmitter, with inoperative or subsequent programming, each additional 30 minutes after first hour."

302.   The AMA deleted CPT Code 95973 effective January 1, 2017.

303.   Rose Pain and Hakki submitted bills to Allstate seeking reimbursement for the application of P-Stim devices that were never performed on patients at issue in this Complaint or for treatment rendered to patients who were not present at the clinic on the dates of service identified in the bills.

### 1.   Exemplar Claims

#### a.   Patient M.M. (Claim No. 0404104739)

304.   Patient M.M. was allegedly involved in a motor vehicle accident on March 1, 2016.

305.   M.M. presented to Rose Pain on March 31, 2016 for an initial evaluation with Hakki.

306.   During the initial evaluation, Hakki attempted to apply a P-Stim device to M.M.

307.   However, M.M. informed Hakki that she did not want to go three (3) days without washing her hair and therefore did not want him to apply the device.

308.   M.M. informed Allstate that Hakki proceeded to hand her the P-Stim device in its unopened packaging.

309.   Hakki told M.M. that if she needed help applying the device, then she could come back and he would put it on for her.

310.   Patient M.M. never returned to Rose Pain or to Hakki and kept the P-Stim unused in its original packaging, identified below:



*Fig. 1 (photo of unopened P-Stim device taken by Patient M.M.)*



*Fig. 2 (photo of unopened P-Stim device taken by Patient M.M.)*

311.   Rose Pain submitted a bill through interstate wires to Allstate for the purported application of the P-Stim device to Patient M.M for a total of $9,200.

312.   The bill included charges for one (1) unit of CPT Code 64555, one (1) unit of HCPCS Code L8680, and one (1) unit of CPT Code 95973.

313.   Allstate relied on Rose Pain's and Hakki's submissions in adjusting the claims.

314.   Allstate is not required to pay Rose Pain for treatment that was never rendered to M.M.

**b.       Patient M.M. (Claim No. 0397805565)**

315.   Patient M.M. was allegedly involved in a motor vehicle accident on January 9, 2016.

316.   M.M. presented to Rose Pain for an initial evaluation with Hakki on February 18, 2016 and was provided with a disability certificate for transportation services.

317.   M.M. purportedly returned to Rose Pain for five (5) follow-up examinations on March 3, 2016, May 19, 2016, June 23, 2016, July 21, 2016, and August 18, 2016.

318.   Rose Pain submitted bills to Allstate through interstate wires and the U.S. Mail for the supposed application of a P-Stim device on all five (5) of these dates of service.

319.   However, M.M. testified that Hakki provided him with a P-Stim device on only two occasions:

> Q.   How many times did Dr. Hakki give you that P-Stim device?
>
> A.   Twice.

320.   Rose Pain therefore submitted bills to Allstate through interstate wires and the U.S. Mail for three (3) applications of P-Stim devices that were never rendered.

321.   Moreover, M.M. was not available to have a P-Stim device applied on at least one (1) of the dates for which Allstate was billed.

322.   Rose Pain submitted bills to Allstate purporting to apply a P-Stim device to M.M. on August 18, 2016.

323.   However, M.M. was arrested on August 15, 2016 and was not released from prison until 4:20 p.m. on August 18, 2016.

324.   As M.M. required transportation services, it is highly unlikely that he was able to present at Rose Pain on August 18, 2016 after leaving prison at 4:20 p.m.

325.   Rose Pain and Hakki submitted claims for payment and accompanying medical records relative to M.M. to Allstate through interstate wires and the U.S. Mail seeking reimbursement for treatment that was not provided, upon which Allstate relied in adjusting the claims.

326.   Allstate is not required to pay Rose Pain or Hakki for treatment that was never rendered to M.M.

### D.   BLUEBIRD BILLED ALLSTATE FOR TRANSPORTATION SERVICES NEVER PROVIDED TO PATIENTS

327.   Bluebird submitted bills and records to Allstate seeking payment for transportation services that were never provided to patients at issue in this Complaint.

328.   Patients and former employees provided testimony to Allstate confirming that Bluebird billed for transportation services that it never provided to patients.

329.   Patient J.A. (Claim No. 0326050457) testified that she received treatment at Utica PT four (4) to six (6) times per month for about two (2) months.

330. This level of treatment results in a minimum of eight (8) and a maximum of twelve (12) treatment sessions.

331. Allstate received bills through interstate wires from Bluebird related to J.A. for 103 transportation trips at a total of $18,956 billed.

332. J.A. testified that she did not receive 103 trips from Bluebird.

333. When informed of the number of trips that Bluebird allegedly provided her, J.A. testified: "Crooks.  My daughter did mention that they're not to be trusted."

334. Bluebird created template transportation logs to mask its fraudulent scheme.

335. Bluebird sent Allstate documents through interstate wires and the U.S. Mail purporting to identify the date, time, and miles driven for each patient.

336. The document included a place to insert the patient's name, the pick-up address, the destination address, the mileage, and the times when service was purportedly rendered.  *See* Exhibit 15.

337. However, Bluebird manufactured these documents in an attempt to hide the fact that it was not providing the alleged transportation services.

338. When reviewed cumulatively, it is clear that the information allegedly written on the documents is identical for multiple dates of service.  *See* id.

339. The mileage, pick-up address, destination address, and, more importantly, patient's signature are identical for every document.  *See* id.

340.   Only the date and time of the purported service changes.  *See* id.

341.   Moreover, two former Bluebird employees testified to the fraudulent nature of the transportation logs.

342.   Nabil Sadeq ("Sadeq") testified that he would write down the exact time spent waiting on the log.

343.   However, upon reviewing the transportation logs, Sadeq testified that the logs appeared to be altered:

> Q.   Did you write that in or did Mr. Ishaq write that in?
>
> A.   I'm kind of confused.  Is this my handwriting or not?  It doesn't look like my handwriting, all of it. These numbers are not mine.  This is mine, but these numbers are not mine.  Listen.  We used to record in pencil.  It looks like it got erased and whatever is recorded is recorded.

344.   Sadeq testified further that Ishaq provided him instructions on filling out some portions of the logs in pen and using pencil for other areas:

> Q.   When you would fill out these forms, would they all be in pencil, or were you instructed to put certain parts in pencil?
>
> A.   Instructions were the bottom half of the form that include location picked up, location dropped off, the name and signature are in pen.  The top half, the time of dropoff, the wait, the time of pickup, that was in pencil.

345.   Upon seeing additional transportation logs containing his name and signature at the bottom, Sadeq testified that the documents were forged:

Q.    Do you recognize your handwriting?  Do you know
       if Exhibit B, you're the one who filed [sic] that out?

A.    This is not my handwriting.

Q.    I'm going to show you another bunch of forms.  It
       looks like there's a driver signature required on
       those.  Would you be able to tell if any of those are
       your signature; and, if so, which ones?

A.    None of those is my handwriting.

346.   Najeb Yousif ("Yousif"), another former Bluebird employee, reviewed

transportation logs with his name and signature and testified that it was forged:

Q.    Is that your signature?

A.    The handwriting is not mine, but the signature says
       my name on it, that's all.

347.   Yousif testified further that transportation logs he initially completed

were altered to include wait times and mileage numbers that he never provided:

Q.    The information in these boxes on the top of
       exhibits 3, 4 – 2, 3 and 4, did you ever fill out any
       of the information in those boxes?

A.    No.

Q.    So you can see there's a client pick up and a
       destination drop off?

A.    Yes.

Q.    There's a mileage indicated in there.  Did you ever
       fill those out?

> A.   No.  No, I just put that the pick up time and drop off time.
>
> Q.   So you can see on each box there's a time for client pick up and a time for client drop off, you would write that in?
>
> A.   I write them down, yes, but this is not mine.  I never wrote down waiting time.

348.   Sadeq also testified that he was not the one to write the mileage driven on the transportation logs that he completed:

> I have not recorded mileage.  Other drivers may have.  The only thing I record is the time.  I don't know about other drivers.

349.   The falsity of these documents is exacerbated by the fact that Bluebird claimed to simultaneously transport multiple passengers to different locations on the same date of service despite lacking the means to do so.

350.   Ishaq testified that Bluebird uses only one (1) vehicle for transporting patients:

> Q.   Does the company own vehicles?
>
> A.   Yes.
>
> Q.   How many vehicles does the company own?
>
> A.   I have one vehicle, Dodge Grand Caravan, 2015.
>
> Q.   Is that the only vehicle that Bluebird Transportation owns?
>
> A.   Yes.

> . . .
>
> Q.      So that's the only vehicle that's used in transporting patients from one place to another, is the Dodge Caravan?
>
> A.      Yes, sir.

351.   Ishaq also testified that Bluebird does not simultaneously transport multiple patients:

> Q.      You always transport clients by themselves?
>
> A.      Yes.
>
> Q.      You never have other clients in the vehicle at the same time?
>
> A.      No.

352.   Despite owning and operating only one vehicle and only transporting one patient at a time, Bluebird submitted transportation logs to Allstate demonstrating numerous instances where the company allegedly provided transportation services to multiple patients at the same time.

353.   The following table provides examples of two (2) dates of service where Bluebird billed for services not rendered based on its representations that it only transports one patient at a time, only has one vehicle, and billed for wait time:

| Claim Number | Patient Initials | Date of Service | Pick-Up Time | Billed-for Wait Time | Drop-Off Time |
|---|---|---|---|---|---|
| 0326050457 | M.A. | 11/3/2014 | 9:30 a.m. | 9:50 a.m. to 11:05 a.m. (75 minutes) | 11:30 a.m. |
| 0326050457 | J.A. | 11/3/2014 | 9:20 a.m. | 9:49 a.m. to 11:28 a.m. (100 minutes) | 11:50 a.m. |
| 0305094146 | A.S. | 11/3/2014 | 10:30 a.m. | 10:55 a.m. to 12:30 p.m. (95 minutes) | 12:59 p.m. |
| | | | | | |
| 0326050457 | M.A. | 11/7/2014 | 2:00 p.m. | 2:25 p.m. to 3:28 p.m. (63 minutes) | 3:49 p.m. |
| 0326050457 | J.A. | 11/7/2014 | 9:27 a.m. | 9:49 a.m. to 11:28 a.m. (99 minutes) | 11:50 a.m. |
| 0305094146 | A.S. | 11/7/2014 | 3:10 p.m. | 3:40 p.m. to 5:20 p.m. (100 minutes) | 5:50 p.m. |

354.   For example, Bluebird submitted a transportation log to Allstate purporting to pick up M.A. at 9:30 a.m. on November 3, 2014.  *See* Exhibit 16.

355.   Bluebird claims that it arrived at Utica PT at 9:50 a.m.  *See* id.

356.   Bluebird allegedly waited for M.A. at Utica PT until 11:05 a.m.  *See* id.

357.   Bluebird then dropped M.A. off at her home at 11:30 a.m.  *See* id.

358.   Bluebird provided a transportation log to Allstate for the same date, November 3, 2014, regarding Patient A.S. (Claim No. 0305094146).  *See* Exhibit 17.

359.   Bluebird purported to pick up A.S. at 10:30 a.m.  *See* id.

360.    The transportation log for M.A., however, states that the driver was still waiting at Utica PT at the same time that A.S. was being picked up at his home. *Compare* Exhibit 16 *with* Exhibit 17.

361.    According to the log for A.S., Bluebird then arrived at the Sterling Medical Center at 10:55 a.m. *See* Exhibit 17.

362.    The transportation log for M.A. shows that the driver was still waiting at Utica PT for M.A. to conclude her purported treatment at the same time A.S. was allegedly being dropped off at the Sterling Medical Center. *Compare* Exhibit 16 *with* Exhibit 17.

363.    The transportation log for A.S. states that the driver waited at the Sterling Medical Center from 10:55 a.m. to 12:30 p.m. *See* Exhibit 17.

364.    This is not possible, however, as Bluebird purportedly returned M.A. home at 11:30 a.m., despite Bluebird billing Allstate for allegedly waiting for A.S. at the Sterling Medical Center at this time. *Compare* Exhibit 16 *with* Exhibit 17.

365.    As Bluebird operates only one (1) vehicle and does not simultaneously transport multiple patients, it is impossible for Bluebird to have provided transportation to Patient M.A. and A.S. at the times indicated on the transportation logs.

366.    Moreover, Bluebird purported to provide transportation to Patient J.A. (Claim No. 0326050457) that conflicts with the pick-up, wait, and drop-off times of

both Patient M.A. and Patient A.S. on November 3, 2014, as set out in the chart above.

367.   These conflicting transportation logs demonstrate that Bluebird manufactured false documents and submitted them to Allstate through interstate wires and the U.S. Mail seeking payment for services never rendered.

368.   Another example of the false nature of these transportation logs is the conflict between the information on the documents and the actual distance traveled.

369.   For example, Patient M.A. (Claim No. 0326050457) testified that she lived very close to Utica PT:

> Q.   How long of a ride was it from your house to physical therapy – to Utica Physical Therapy?
>
> A.   Five minutes, something like that.

370.   However, transportation logs reflecting services purportedly provided to Patient M.A. indicate that it took twenty (20) to thirty (30) minutes to drive M.A. from her home to Utica PT.  *See* Exhibit 16.

371.   Bluebird also submitted bills to Allstate through interstate wires and the U.S. Mail for mileage that exceeds the distance actually driven to transport patients.

372.   Bluebird consistently billed Allstate for HCPCS Code S0215 ("*non-emergency transportation; mileage, per mile*") at $3.77 per mile.

373.   However, the distance purportedly traveled far exceeds the actual distance between the pick-up address and destination address.

374.   Bluebird intentionally inflated the mileage numbers solely to increase its profits.

375.   Bluebird submitted bills to Allstate through interstate wires and the U.S. Mail for wait times that drivers never actually waited.

376.   Bluebird consistently billed Allstate using HCPCS Code T2007 ("*transportation waiting time, air ambulance and non-emergency vehicle, one-half (1/2) hour increments*") at as much as $30 per hour of wait time.

377.   Sadeq testified that Bluebird's records were falsified regarding wait time:

> Q.   On all four of these it indicates that there was wait time. You would have written in the wait time each time, and you would have written in an hour each time?
>
> A.   I don't want to lie. That's not true.

378.   Sadeq testified further that Ishaq instructed him to pick up other patients rather than stay and wait:

> Q.   How many times would you wait for a patient after you dropped them off – wait for the entire time they're at their appointment, as opposed to leaving and picking up someone else?
>
> A.   It's not up to me if I sit and wait or not. Sometimes I wait, I have to wait. Some times I don't have to wait.
>
> Q.   And that's Mr. Ishaq who tells you whether to wait or not?

> A.    Yes, for sure.

379.    Yousif testified that he also would transport other patients when he was supposed to be waiting for a patient:

> Q.    Was there a couple times at least that you went and drove other patients around then?
>
> A.    Yes, I took them, if they're close, close by there, then I come back for him and take him home.

380.    Allstate is not required to pay Bluebird for services that were never rendered to the patients at issue in this Complaint and is entitled to the return of all money paid to Bluebird related to its fraudulent claims.

### 1.    Exemplar Claims

#### a.    Patient E.G. (Claim No. 0353734114)

381.    Patient E.G. was allegedly involved in a motor vehicle accident on January 6, 2015.

382.    E.G. presented to Orthopedic, P.C. on January 20, 2015 to Muhammad Awaisi, M.D. ("Awaisi") for an initial evaluation and was provided with a disability certificate for transportation services and a prescription for physical therapy.

383.    Bluebird submitted bills and transportation logs documenting transportation services purportedly provided to E.G.

384.    Bluebird reported providing E.G. with 79 trips to Utica PT from January 30, 2015 to July 31, 2015.

385.   However, Utica PT never mailed bills or documents to Allstate purporting to render treatment to E.G.

386.   Therefore, E.G. never received treatment at Utica PT.

387.   Bluebird sent Allstate transportation logs through interstate wires for all 79 dates of service. *See* Exhibit 15.

388.   Each transportation log included E.G.'s home address as the pick-up address and Utica PT as the destination address. *See* id.

389.   Bluebird submitted claims for payment and accompanying transportation logs to Allstate through interstate wires for transportation services that were not provided, upon which Allstate relied in adjusting the claims.

390.   Allstate is not required to pay Bluebird for services that were never rendered to E.G.

### b.   Patient A.S. (Claim No. 0305094146)

391.   Patient A.S. was allegedly involved in a motor vehicle accident on September 24, 2013.

392.   A.S. presented to Stefan Glowacki, M.D., P.C. on October 23, 2013 for an initial evaluation with Glowacki and was provided with a disability certificate for transportation services.

393.   Glowacki also referred Patient A.S. to Utica PT for physical therapy.

394. Bluebird provided transportation services for A.S.'s purported treatment at Utica PT.

395. A.S. lives 12.2 miles from Utica PT.

396. Round-trip transportation between A.S.'s residence and Utica PT therefore totals 24.4 miles.

397. Bluebird submitted bills to Allstate through the U.S. Mail seeking reimbursement for 50 miles per date of service.

398. Bluebird charged more than twice the actual mileage driven to provide transportation services to A.S.

399. Allstate relied upon Bluebird's submissions in adjusting the claims.

400. In reasonable reliance upon the documentation and bills submitted by Bluebird through the U.S. Mail, Allstate paid money to Bluebird relative to A.S.

401. Allstate would not have tendered payment had it known the truth of Bluebird's billing for services that were never rendered to A.S.

### E.   DUPLICATIVE BILLING

402. Utica PT, Rose PT, Rose Pain, Computerized Joint, Mini Invasive, and Hakki consistently submitted bills to Allstate through interstate wires and the U.S. Mail for services that were never rendered because the patients at issue in this Complaint were receiving treatment at another location at that time.

403.   Utica PT, Rose PT, Rose Pain, Computerized Joint, Mini Invasive, and Hakki submitted bills to Allstate through interstate wires and the U.S. Mail on Health Insurance Claim Forms ("HICF") (also known as "CMS-1500" claim forms) approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

404.   The back of all HICFs contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

405.   The NUCC has established guidelines on the proper methods of completing HICFs, as outlined in the NUCC Instruction Manual.

406.   Item 32 on the HICF designates the "Service Facility Location Information."

407.   According to the NUCC, treatment providers must enter the name and address of the facility where services were rendered.

408.   The NUCC states that "[t]he name and address of facility where services were rendered identifies the site where service(s) were provided."

409.   Utica PT, Rose PT, Rose Pain, Computerized Joint, Mini Invasive, and Hakki submitted bills for the same or similar services on the same date of service that were purportedly being provided at different locations.

410.   Moreover, Computerized Joint and Hakki submitted bills using a fraudulent address.

411.   Computerized Joint and Hakki sent HICFs to Allstate through the U.S. Mail listing the "Service Facility Location" as 42383 Garfield Road in Clinton Township. *See* Exhibit 18.

412.   This address belongs to a U.S. Postal Service office.

413.   Upon information and belief, Computerized Joint and Hakki did not provide medical treatment at a post office.

414.   In fact, patients purportedly treated by Computerized Joint and Hakki also received treatment at Mini Invasive on the same date of service.

415.   Hakki consistently provided patients treating at Mini Invasive with disability certificates and prescriptions on Computerized Joint letterhead.

416.   The disability certificates and prescriptions identified Computerized Joint and included the 42383 Garfield Road address. *See* Exhibit 11.

417.   Mini Invasive and Hakki submitted bills to Allstate through the U.S. Mail for treatment purportedly rendered at 28037 Dequindre Road in Madison Heights for the same date of service as the Computerized Joint bills. *Compare* Exhibit 11 *with* Exhibit 19.

418.   The Computerized Joint Patient Intake Form and prescription pads list the same address as Mini Invasive. *See* Exhibit 20.

419.   Placing a fraudulent address on the HICF further demonstrates that Hakki fraudulently billed multiple encounters on the same date and made it appear as though patients were seen at different locations by different clinics.

420.   Moreover, Rose Pain and Hakki engaged in a practice of improperly submitting bills containing multiple codes charging for both an initial office visit and an initial office consultation performed by the same physician on the same date of service.

421.   The AMA states that a physician may report only one code from a range of codes describing an initial service on a single date of service.

422.   Rose Pain and Hakki submitted bills that included a CPT Code for an initial office visit/examination in addition to a CPT Code for an initial office consultation on the same date of service.

423.   A bill containing charges for both an initial office visit/examination and an initial consultation violates AMA standards because it includes multiple codes describing an initial service on a single date of service.

424.   Rose Pain and Hakki also submitted bills that included a CPT Code for a follow-up visit/examination in addition to a CPT Code for an initial office consultation for the same patient on the same date of service.

425.   A bill containing charges for both a follow-up visit/examination and an initial office consultation violates AMA standards because it includes multiple codes describing an initial and follow-up service on a single date of service.

426.   Moreover, the charge for the follow-up visit/examination demonstrates that the patient is established with the provider.

427.   Therefore, an initial office consultation charge is inappropriate because the patient is already established and it is therefore not an initial consultation.

428.   Allstate is not required to pay Utica PT, Rose PT, Rose Pain, Computerized Joint, Mini Invasive, or Hakki for office visits that were never rendered to the patients at issue in this Complaint.

1.   **Exemplar Claims**

a.   **Patient E.A. (Claim No. 0367399069)**

429.   Patient E.A. was allegedly involved in a motor vehicle accident on May 1, 2015.

430.   E.A. presented to Metro Pain Clinic on May 21, 2015 for an initial evaluation with Nazih Iskander, M.D. ("Iskander") and was provided with a prescription for physical therapy.

431.   E.A. purportedly presented to Utica PT on July 10, 2015 to initiate physical therapy.

432.   Utica PT submitted bills to Allstate through the U.S. Mail for purportedly providing physical therapy treatment to E.A. on thirty-four (34) visits between July 10, 2015 and September 30, 2015.

433.   E.A. purportedly presented to Rose PT on August 28, 2015 to initiate physical therapy.

434.   E.A. was still receiving physical therapy treatment at Utica PT at that time.

435.   In fact, E.A. was purportedly receiving physical therapy at Utica PT that very same day.  *Compare* Exhibit 21 *with* Exhibit 22.

436.   Rose PT submitted bills to Allstate through interstate wires for purportedly providing physical therapy treatment to E.A. on thirty-eight (38) visits between August 28, 2015 and November 24, 2015.

437.   According to the documents submitted by Utica PT and Rose PT, E.A. purportedly received physical therapy at both locations on the same day at least six (6) times.

438.   Moreover, Utica PT and Rose PT submitted charges for the same purported treatment on all six (6) duplicative dates of service.

439.   For example, on August 28, 2015, Utica PT billed for CPT Codes 97010 (*"application of a modality to 1 or more areas; hot or cold packs"*), 97110 (*"therapeutic procedure, 1 or more areas, each 15 minutes; therapeutic exercises*

*to develop strength and endurance, range of motion and flexibility"*), 97124 (*"massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)"*), and 97140 (*"manual therapy techniques (eg, mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes"*), and HCPCS Code G0283 (*"electrical stimulation (unattended)"*) relative to E.A.

440.   On August 28, 2015, Rose PT billed for CPT Codes 97010 (*"application of a modality to 1 or more areas; hot or cold packs"*), 97110 (*"therapeutic procedure, 1 or more areas, each 15 minutes; therapeutic exercises to develop strength and endurance, range of motion and flexibility"*), 97124 (*"massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)"*), 97140 (*"manual therapy techniques (eg, mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes"*), and 97014 (*"electrical stimulation (unattended)"*) relative to E.A.

441.   It is highly unlikely that E.A. received the exact same treatment from two (2) separate clinics on the same date of service.

442.   Utica PT and Rose PT submitted claims for payment and accompanying medical records relative to E.A. to Allstate through interstate wires and the U.S. Mail

seeking reimbursement for treatment that was not provided, upon which Allstate relied in adjusting the claims.

443.   Allstate is not required to pay Utica PT or Rose PT for treatment that was never rendered to E.A.

### b.      Patient S.E. (Claim No. 035237708)

444.   Patient S.E. was allegedly involved in a motor vehicle accident on December 23, 2014.

445.   S.E. purportedly presented to Rose Pain on February 25, 2016 for an initial evaluation with Hakki.

446.   Rose Pain submitted a bill to Allstate through interstate wires charging both CPT Code 99205 (level 5 initial office visit/examination) and CPT Code 99242 (level 2 initial consultation) for date of service February 25, 2016.  *See* Exhibit 23.

447.   A charge for an initial office visit/examination and an initial consultation on the same date of service is duplicative and violates AMA standards.

448.   The Rose Pain bill for February 25, 2016 lists Hakki as the treating provider and Rose Pain as the service facility location.  *See* id.

449.   Rose Pain is located in Sterling Heights.

450.   S.E. purportedly also presented to Mini Invasive on February 25, 2016 for an initial evaluation with Hakki.

451.   This is the same day that S.E. was allegedly receiving an initial evaluation by Hakki at Rose Pain.

452.   Mini Invasive submitted a bill to Allstate through the U.S. Mail charging CPT Code 99204 (level 4 initial office visit/examination) on February 25, 2016.  *See* Exhibit 24.

453.   The Mini Invasive bill for February 25, 2016 lists Hakki as the treating provider and Mini Invasive as the service facility location.  *See* id.

454.   Mini Invasive is located in Madison Heights.

455.   Rose Pain and Mini Invasive therefore submitted bills to Allstate through interstate wires and the U.S. Mail purporting to provide the same or similar treatment on the same date of service to the same patient at two (2) different locations.  *Compare* Exhibit 23 *with* Exhibit 24.

456.   However, the medical records submitted to Allstate through the U.S. Mail for February 25, 2016 identify the service location as Michigan Surgical Hospital.  *See* Exhibit 25.

457.   Michigan Surgical Hospital is located in Warren.

458.   Rose Pain, Mini Invasive, and Hakki therefore submitted bills from two (2) different service facility locations on the same date and submitted medical records identifying a third, distinct location where the services were purportedly rendered.

459.   In addition to being unnecessary and unreasonable, it is also highly unlikely that Hakki performed an initial evaluation of S.E. at one location and then both Hakki and S.E. relocated to another office to conduct yet another initial evaluation on the same day.

460.   S.E. purportedly returned to Rose Pain on March 31, 2016 for a follow-up visit with Hakki.

461.   Rose Pain submitted a bill to Allstate through interstate wires for an initial office visit, an initial office consultation, and the application of a P-Stim device.  *See* Exhibit 26.

462.   Rose Pain and Hakki purportedly treated S.E. previously on February 25, 2016.

463.   Therefore, the charge for CPT Code 99205 (level 5 initial office visit/examination) is improper as March 31, 2016 was not S.E.'s initial examination with Hakki.

464.   Moreover, the charge for an initial office visit and an initial consultation on the same date of service is duplicative and violates AMA standards.

465.   The Rose Pain bill for March 31, 2016 lists Hakki as the treating provider and Rose Pain as the service facility location.  *See* id.

466.   S.E. purportedly also presented to Mini Invasive on March 31, 2016 for a follow-up examination with Hakki.

467.   Mini Invasive submitted a bill to Allstate through the U.S. Mail for a follow-up visit/examination.  *See* Exhibit 27.

468.   The Mini Invasive bill for March 31, 2016 lists Hakki as the treating provider and Mini Invasive as the service facility location.  *See* id.

469.   Rose Pain, Mini Invasive, and Hakki therefore submitted bills to Allstate through interstate wires and the U.S. Mail purporting to provide the same or similar treatment on the same date of service to the same patient at two (2) different locations.  *Compare* Exhibit 26 *with* Exhibit 27.

470.   However, the medical records submitted to Allstate through the U.S. Mail for March 31, 2016 identify the service location as Michigan Surgical Hospital. *See* Exhibit 28.

471.   Michigan Surgical Hospital is located in Warren.

472.   Rose Pain, Mini Invasive, and Hakki therefore submitted bills from two (2) different service facility locations on the same date and submitted medical records identifying a third, distinct location where the services were purportedly rendered.

473.   In addition to being unnecessary and unreasonable, it is also highly unlikely that Hakki performed an initial evaluation of S.E. at one location and then both Hakki and S.E. relocated to another office to conduct a follow-up evaluation on the same day.

474.   Rose Pain, Mini Invasive, and Hakki submitted claims for payment and accompanying medical records relative to S.E. to Allstate through interstate wires and the U.S. Mail seeking reimbursement for treatment that was not provided.

475.   Allstate relied on Rose Pain's, Mini Invasive's, and Hakki's submissions in adjusting claims.

476.   Allstate is not required to pay Rose Pain, Mini Invasive, or Hakki for treatment that was never rendered to S.E.

### c.   Patient J.Q. (Claim No. 0402879456)

477.   Patient J.Q. was allegedly involved in a motor vehicle accident on February 21, 2016.

478.   J.Q. allegedly presented to Computerized Joint on February 24, 2016 for an initial evaluation with Hakki.

479.   Computerized Joint submitted a bill to Allstate through the U.S. Mail charging CPT Code 99204 (level 4 initial office visit/examination) on February 24, 2016.  *See* Exhibit 29.

480.   The Computerized Joint bill lists Hakki as the treating provider and Computerized Joint as the service facility location.  *See* id.

481.   The service facility address provided by Computerized Joint is 42383 Garfield Road in Clinton Township.  *See* id.

482.   This address belongs to a U.S. Postal Service office.

483.   Mini Invasive also submitted a bill to Allstate through the U.S. Mail charging CPT Code 99204 (level 4 initial office visit/examination) on February 24, 2016.  *See* Exhibit 30.

484.   The Mini Invasive bill lists Hakki as the treating provider and Mini Invasive as the service facility location.  *See* id.

485.   Mini Invasive is located in Madison Heights.

486.   Therefore, Mini Invasive and Computerized Joint charged for the same service being provided by the same physician on the same date for the same patient in two (2) different locations.  *Compare* Exhibit 29 *with* Exhibit 30.

487.   Moreover, Computerized Joint and Mini Invasive attempted to mask the duplicative billing by using different claim numbers for this one patient.

488.   Computerized Joint submitted its bill to Allstate through the U.S. Mail using claim number 0402879456.  *See* Exhibit 29.

489.   Mini Invasive submitted its bill to Allstate through the U.S. Mail relative to patient J.Q. without a claim number in an attempt to conceal the duplicative billing.  *See* Exhibit 30.

490.   Computerized Joint, Mini Invasive, and Hakki repeated this duplicative billing endeavor again on April 20, 2016.  *Compare* Exhibit 31 *with* Exhibit 32.

491.   Computerized Joint, Mini Invasive, and Hakki submitted claims for payment and accompanying medical records relative to J.Q. to Allstate through the

U.S. Mail seeking reimbursement for treatment that was not provided, upon which Allstate relied in adjusting the claims.

492.   Allstate is not required to pay Mini Invasive or Computerized Joint for treatment that was never rendered to J.Q. and is entitled to return of money paid to Computerized Joint in reliance on the defendants' fraudulent bills.

## VII.   UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

### A.   UNLICENSED MASSAGE THERAPY

493.   Utica PT rendered treatment, if it provided treatment at all, by unlicensed individuals.

#### 1.   Michigan Massage Therapy License Requirements

494.   Prior to November 29, 2014, massage therapists had to adhere to local licensing requirements.

495.   The City of Utica (where defendant Utica PT is located) required massage therapists to obtain a license through the city clerk.   Utica, Mich., Ordinances § 14-126(c).

496.   Since November 29, 2014, Michigan requires massage therapists to have a license issued by the State.  Mich. Comp. Laws §§ 333.17957, 17959; Mich. Admin. Code R. 338.703.

## 2. Utica PT Rendered Unlicensed Massage Therapy Before November 29, 2014

497. Steinhoff worked at Utica PT as a massage therapist from November 2013 until January 2014.

498. Steinhoff testified that she never obtained a massage therapy license from the City of Utica:

> Q.   Now, what about the – during the time, that short period of time that you worked at Utica PT, was there any local license requirement?
>
> A.   I wasn't told.
>
> Q.   And you never had any kind of local license during the time that you worked at Utica PT?
>
> A.   A local license?
>
> Q.   Yes, ma'am.
>
> A.   No.  I wasn't told that I needed to get one, so I didn't get one for that city.

499. Utica PT submitted bills for massage therapy treatment purportedly rendered by Steinhoff.

500. Steinhoff therefore provided unlicensed massage therapy treatment at Utica PT during her tenure at Utica PT.

501. Treatment rendered without a license is not compensable under the Michigan No-Fault Act.  *See* Mich. Comp. Laws § 500.3157.

502.   Allstate is not required to compensate Utica PT for treatment rendered without a license and is entitled to reimbursement of monies paid.

### 3.   Utica PT Rendered Unlicensed Massage Therapy After November 29, 2014

503.   Denisha Pugh ("Pugh") purportedly rendered massage therapy treatment at Utica PT.

504.   Pugh received her massage therapy license on November 30, 2015.

505.   Utica PT submitted charges to Allstate for treatment purportedly rendered by Pugh prior to November 30, 2015.

506.   Pugh therefore rendered massage therapy without the required license.

507.   Treatment rendered without a license is not compensable under the Michigan No-Fault Act.  *See* Mich. Comp. Laws § 500.3157.

508.   Allstate therefore is not required to compensate Utica PT for treatment rendered without a license and is entitled to reimbursement of monies paid.

### B.   DEFENDANTS FAILED TO OBTAIN THE REQUIRED LICENSURE TO ISSUE DME IN THE STATE OF MICHIGAN

509.   Utica PT, Computerized Joint, and Mini Invasive unlawfully dispensed DME to patients without obtaining the required licensure from the State of Michigan.

510.   The Michigan Board of Pharmacy governs the "practice of pharmacy" in the State of Michigan.  Mich. Comp. Laws § 333.1722.

511.   The Michigan Board of Pharmacy's duties include the "regulat[ion], control, and inspect[ion] [of] the character and standard of pharmacy practice and of drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** and procure samples and limit or prevent the sale of drugs and devices that do not comply with this part."   Mich. Comp. Laws § 333.17722 (emphasis added).

512.   "Device" means "an instrument, apparatus, or contrivance, including its components, parts, and accessories, intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or other animals, or to affect the structure or function of the body of human beings or other animals." Mich. Comp. Laws § 17703(2).

513.   One of the ways in which the Michigan Board of Pharmacy regulates, controls, and inspects the issuance of devices in the State of Michigan is to require an individual or entity issuing the device to obtain a license from the Board.   Mich. Comp. Laws § 333.17722(c).

514.   The issuance of a license for an activity within the scope of the Michigan Board of Pharmacy's governance determines whether the activity is lawful. Mich.  Comp. Laws § 333.16106(2).

515. The Michigan Public Health Code defines a "license" as "an authorization issued under this article to practice **where practice would otherwise be unlawful**." Id. (emphasis added).

516. Michigan Compiled Laws 333.17705(3) indicates that the definition of a license under § 16106 is applicable to the Michigan Board of Pharmacy: "'License' **in addition to the definition in section 16106** means a pharmacy license, drug control license, or a manufacturer or wholesale distributor of drugs or devices license." (Emphasis added).

517. Therefore, the State of Michigan requires a license issued by the Michigan Board of Pharmacy in order to issue medical equipment/devices to individuals.

518. Utica PT submitted bills to Allstate through the U.S. Mail for the purported issuance of DME to patients at issue herein, even though Utica PT never possessed a license to issue DME in the State of Michigan.

519. Computerized Joint submitted bills to Allstate through the U.S. Mail for allegedly issuing DME to patients at issue herein, even though Computerized Joint never possessed a license to issue DME in the State of Michigan.

520. Mini Invasive submitted bills to Allstate through the U.S. Mail for allegedly issuing DME to patients at issue herein, even though Mini Invasive never possessed a license to issue DME in the State of Michigan.

521.   Utica PT, Computerized Joint, and Mini Invasive each failed to obtain a license from the Board of Pharmacy and therefore unlawfully issued DME to patients at issue herein.

522.   Unlawfully provided services are not compensable under the Michigan No-Fault Act.

523.   Allstate is not required to pay Utica PT, Computerized Joint, or Mini Invasive for the unlawful issuance of DME and is entitled to restitution for monies paid.

### C.   UNREGISTERED TRANSPORTATION SERVICES

524.   Bluebird provided medical transportation services without registering with the State of Michigan.

525.   Prior to March 21, 2017, the State of Michigan required non-emergency medical transport vehicles to obtain a Certificate of Authority through the Department of Transportation.

526.   Beginning on March 21, 2017, the State of Michigan requires that medical transportation companies register with the Department of Licensing and Regulatory Affairs ("LARA").  Mich. Comp. Laws § 257.2104(1).

527.   A review of records held by LARA demonstrates that Bluebird never registered with the State of Michigan.

528.   Bluebird therefore lacks the requisite registration to operate as a medical transportation company in the State of Michigan.

529.   Allstate is not required to compensate Bluebird for unregistered transportation services.

## VIII.   ILLEGAL SOLICITATION

### A.   MICHIGAN'S ANTI-SOLICITATION LAWS

530.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

531.   Other conduct prohibited under Michigan law includes identification and solicitation of potential patients of medical providers, the use of agents to solicit patients, and the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

532.   It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, or use police reports to solicit any person identified in the report, Mich. Comp. Laws § 750.429.

533.   Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157.

534. As set forth more fully below, the defendants participated in and knowingly benefited from schemes to solicit patients through conduct prohibited under Michigan law.

### B. IMPROPER AND UNLAWFUL METHODS USED TO SOLICIT PATIENTS

535. Despite Michigan's prohibition on patient solicitation, the defendants actively employed a number of unlawful and improper methods to obtain patients.

536. For example, Ishaq used police reports to identify persons involved in motor vehicle accidents.

537. Ishaq approached the motor vehicle accident victims he identified and instructed them to seek treatment with the defendants in his network.

538. As another example, Mukhlis Tooma used runners to find motor vehicle accident victims and refer them to Utica PT for medically unnecessary physical therapy treatment.

### 1. Defendants Personally Solicited Patients

539. As noted *supra*, it is unlawful in Michigan to access a police motor vehicle accident report within thirty (30) days of the accident for the purposes of soliciting any individual, vehicle owner, or property owner listed in the report. Mich. Comp. Laws § 257.503.

540.   It is also unlawful to contact any person injured in a motor vehicle accident within thirty (30) days of the accident with a direct solicitation to provide a service.  Mich. Comp. Laws § 750.410b.

541.   Nonetheless, Ishaq specifically solicited motor vehicle accident victims whom he identified in police reports within thirty (30) days of their respective accidents.

542.   Ishaq contacted the motor vehicle accident victims by telephone and in person at their homes to instruct them to obtain legal representation and to seek medical treatment.

543.   Ishaq also explained that he could arrange for transportation to take patients to and from medical appointments.

544.   Ishaq, a layperson, scheduled appointments for medical examinations with the defendant clinics and physicians without the motor vehicle accident victim first being found to be in need of medical treatment.

545.   Ishaq arranged for Bluebird to take patients to their initial appointments with the defendant clinics and physicians.

546.   Ishaq even personally drove the motor vehicle accident victims to appointments with the defendant clinics and physicians, where they received bogus disability certificates and prescriptions for physical therapy in furtherance of the defendants' scheme to defraud.

547.   Ishaq referred the victims to obtain physical therapy at his clinics Utica PT or Rose PT and arranged for Bluebird to take patients to their physical therapy treatment.

548.   These patients did not request to be treated at or by the defendant clinics or physicians, but were delivered to them by Bluebird nonetheless.

549.   Allstate is not required to compensate the defendants for medically unnecessary treatment originating from illegal solicitation.

## 2.   Use of Runners

550.   Mukhlis Tooma dispatched runners to solicit persons involved in motor vehicle accidents to refer them to Utica PT for unnecessary physical therapy treatment.

551.   These runners acted as agents for Utica PT and referred the victims to Utica PT.

552.   Saif Matti ("Matti") and Andrew Kakos ("Kakos") are former Utica PT patients who operated as runners for Mukhlis Tooma and Utica PT.

553.   A Utica Police Department police report documents an incident where Matti and Kakos assaulted Mukhlis Tooma for failure to pay for their services.  *See* Exhibit 33.

554.   According to a witness of the incident, Matti and Kakos yelled at Tooma, saying "where is my money" and "asking where the money is."  *See* id.

555.   Kakos informed the police detective that "he was promised money to bring in clients for therapy" and that he brought four (4) clients to Utica PT.  *See* id.

556.   Kakos said that Mukhlis Tooma owed him $700 for his services.  *See* id.

557.   Kakos also stated that Mukhlis Tooma billed his insurance company for transportation to and from Utica PT, but Kakos was not receiving transportation.  *See* id.

558.   Mukhlis Tooma acknowledged that he used Matti and Kakos as runners.  *See* id.

559.   Mukhlis Tooma informed the police that he did not like or trust Matti, "as Saif is supposed to be a marketer" for Utica PT, "and he brought customers that were probably falsifying their insurance claims."  *See* id.

560.   When the police asked Mukhlis Tooma why he owed anyone money, he said that "he owed Kakos money, but was not paying Kakos, because [Mukhlis Tooma] believes the clients that Kakos brought to him [are] making false insurance claims."  *See* id.

### 3.    Referrals of Solicited Patients to the Defendant Clinics

561.   Ishaq's and Mukhlis Tooma's unlawful solicitation and unqualified referrals to the defendants negate the validity of the medical treatment purportedly provided by the defendant clinics.

562.   Ishaq's and Mukhlis Tooma's referrals to the defendant clinics and physicians bore no relation to actual medical necessity, as the patients at issue in this Complaint would not have sought treatment but for the unlawful solicitation.

563.   Ishaq and Mukhlis Tooma directed patients at issue in this Complaint to the defendant clinics and physicians because both knew that the patients would then be referred to the defendant physical therapy and MRI clinics that they owned.

564.   By steering the patients to the defendant clinics and physicians, Ishaq and Mukhlis Tooma knew that the patients would receive excessive and medically unnecessary treatment according to a predetermined treatment protocol, as set forth more fully below, to maximize the charges for medical treatment.

565.   Accordingly, the defendants' treatment of the solicited patients was unlawful and led directly to unreasonable and unnecessary care.

### C.   SPECIFIC EXAMPLES OF PATIENT SOLICITATION

566.   Patients at issue in this Complaint have confirmed that they were solicited to treat by and with the defendants.

567.   The following patients exemplify the fact and extent of the defendants' illegal solicitation efforts.

### 1.   Patient J.A. (Claim No. 0326050457)

568.   Patient J.A. was allegedly involved in a motor vehicle accident on May 8, 2014.

569. Patient J.A. testified that she was approached at her home by Ishaq:

> Q.   Now, how do you know that his name was Arak or
>      Mr. Ishaq?

> A.   The way I learned about him, he came to my house.
>      He had learned I had an accident, and he came to
>      introduce himself and offer his help.

570. Ishaq approached J.A. within two (2) weeks of her motor vehicle accident.

571. Ishaq recommended that J.A. receive medical treatment with defendant Glowacki:

> Q.   Okay.  And how did you get to Dr. Glowacki?

> A.   It was – he was recommended by the gentleman
>      from the therapy place, and his name is Arak.

572. Bluebird billed Allstate for transporting J.A. to Stefan Glowacki, M.D., P.C. on June 16, 2014.

573. Arak personally drove J.A. to see Glowacki:

> Q.   Okay.  To your knowledge did you ever make any
>      phone calls to treat with Dr. Glowacki?

> A.   Which physician?

> Q.   Dr. Stefan – Stefan Glowacki.

> A.   No, I never called him.  It was Arak who took me
>      there.

574.   J.A. presented to Stefan Glowacki, M.D., P.C. on June 16, 2014 for an initial evaluation with Glowacki and was provided with a prescription for physical therapy and a disability certificate.

575.   J.A. testified that Ishaq referred her to Utica PT for her physical therapy:

> Q.   So Arak referred you to Dr. Stefan Glowacki, correct?
>
> A.   Yes.
>
> Q.   And did Arak also refer you to Utica Physical Therapy?
>
> A.   Yes, it was he, and maybe he is associated with that place.

576.   J.A. received transportation to and from Utica PT through Bluebird.

577.   When shown a picture of Mukhlis Tooma, J.A. identified him as a receptionist for Utica PT and Ishaq's brother-in-law.

578.   Utica PT, Bluebird, Stefan Glowacki, M.D., P.C., and Glowacki submitted claims for payment and medical records relative to J.A. to Allstate through interstate wires and the U.S. Mail, upon which Allstate relied in adjusting the claims.

579.   Allstate is not required to pay Utica PT, Bluebird, Stefan Glowacki, M.D., P.C., or Glowacki for unnecessary treatment that derived from illegal solicitation.

## 2.    Patient M.A. (Claim No. 0326050457)

580.   Patient M.A. was allegedly involved in a motor vehicle accident on May 8, 2014.

581.   M.A. testified that she was approached at her home by Ishaq:

Q.    So how is it you started going there?  Did someone from Utica Therapy call you?

A.    Yes.  Somebody came to the house knocking on the door.  He said we heard about your accident, we are this physical therapy, come and get treatment there.

Q.    Do you know the name of that person?

A.    I only know his first name.  It's either Eric or Arak.

582.   Ishaq approached M.A. within thirty (30) days of her motor vehicle accident.

583.   Ishaq directed M.A. to receive medical treatment with Suleiman:

Q.    At some point did you ever go to see a doctor named Jiab Suleiman?

A.    Yes.  I went to doctors by them that they send me to, and they did MRI.

Q.    Did Mr. Ishaq send you to Dr. Suleiman?  Did he refer you to Dr. Suleiman, or did someone at Utica Physical Therapy refer you?

A.    He did himself.

584.   Bluebird billed Allstate for transporting M.A. on June 21, 2014.

585.   M.A. presented to Suleiman on June 21, 2014 for an initial evaluation and was provided with a prescription for physical therapy and a disability certificate.

586.   M.A. presented at Utica PT for purported physical therapy treatment as a result of Suleiman's prescription.

587.   M.A. testified that she did not schedule her appointments at Utica PT, but that Ishaq informed her and her mother of the date and time for their appointments:

> Q.   And when you would get to the physical therapy place, did you have a set appointment time, or could you just go in anytime you wanted?
>
> A.   Specific appointment.   He would schedule the appointment for us and we would go to get treatments.
>
> Q.   By he, you mean Mr. Ishaq would schedule the appointment for you?
>
> A.   Yes.  He would call me and my mom and tell us you have appointment at so-and-so time.
>
> Q.   And so for those few months you went for physical therapy, Mr. Ishaq was the one who set up all of your appointments, correct?
>
> A.   Yes.   Yes, all of it.   He was the one that was handling the case.

588.   Bluebird transported M.A. to and from Utica PT.

589.   Utica PT and Bluebird submitted claims for payment and medical records relative to M.A. to Allstate through interstate wires and the U.S. Mail, upon which Allstate relied in adjusting the claims.

590.   Allstate is not required to pay Utica PT or Bluebird for unnecessary treatment that was the result of illegal solicitation.

## IX.   FRAUDULENT UNREASONABLE AND UNNECESSARY TREATMENT

591.   The defendants' willingness to bill Allstate for services that were (1) never rendered and (2) unlawfully provided demonstrates their willingness to also bill for treatment that was unnecessary, unreasonable, and excessive.

592.   Moreover, but for the solicitation of patients, as discussed *supra*, these individuals would not have sought treatment with or by the defendants.

593.   The defendants' goal in treating patients was to perform as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills submitted to Allstate.

594.   As set out below, the defendants grossly overutilized physical therapy, injections, P-Stim treatment, MRI scans, urine drug testing, and transportation services in wanton disregard for standards of care.

595.   The defendants' treatment violated established standards of care in the medical community, as the vast majority of testing, diagnostics, referrals, and

treatment were not indicated, redundant, excessive, and repeated without any objective documented benefit to patients.

596.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

597.   The unnecessary treatment rendered by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 9.

598.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for unnecessary, unlawful, and unreasonable treatment are fraudulent.

### A.   PREDETERMINED TREATMENT PROTOCOL

599.   Allstate's investigation revealed a strikingly similar pattern of alleged diagnoses and treatment across all patients, including the discovery of a pattern by the defendants in (1) routinely recording substantially similar diagnoses regardless of each patient's reported injuries; (2) providing mirrored treatment plans further indicating that patients were subjected to a predetermined treatment protocol; and (3) failing to indicate short- and/or long-term goals for patients.

600.   Each patient was assessed as having extremely similar reports of complaints, objective findings, and assessments regardless of the type of accident and regardless of each patient's age, sex, and pre-accident condition.

601.   For example, Hakki's medical records for nearly every patient at issue in this Complaint indicate that the patient measured sixty (60) degrees in the straight leg test.

602.   As another example, Glowacki's medical records for nearly every patient at issue in this Complaint indicate that the patient tested positive for Laseque test and measured either forty-five (45) or sixty (60) degrees in the straight leg test.

603.   Considering the differences in accident, age, health, and levels of fitness for the patients at issue in this Complaint, it is extremely unlikely that nearly every patient measured at the same level in the straight leg test.

604.   Glowacki testified that he does not document measurements in his follow-up visits with patients because "it's too much time":

> A.    Because I didn't write it.
>
> Q.    Because what?
>
> A.    Because I didn't want to.  I didn't write it.
>
> Q.    Okay.
>
> A.    It would take me two hours for each patient.  It's too much time.
>
> Q.    And you had better things to do?

A.     Oh, yes.

605.   Despite any assessment regarding whether patients were progressing or regressing, Hakki and Glowacki continued to refer their patients for physical therapy.

606.   Allstate is not required to compensate the defendants for treatment that was rendered based on a predetermined treatment protocol that was not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraudulent bills.

## 1.     Symptom Magnification

607.   Hakki, by and through Rose Pain, Mini Invasive, and Computerized Joint, and Glowacki, by and through Stefan Glowacki, M.D., P.C., magnified symptoms and differences in presentation of symptoms when comparing initial evaluations performed by emergency room physicians with the patients' subsequent evaluations.

608.   For example, the emergency room records almost always indicate that the patient suffered a minor, fairly localized injury, whereas the defendants indicate that the patients suffered more serious injuries in diffuse regions of the body.

609.   Similarly, Glowacki often prepared extensive patient symptom lists, at times listing as many as eight (8) different issues instead of one or more unifying conditions.

610.  Utica PT, Rose PT, Crystal Clear, and Bluebird benefitted from Glowacki's exaggerated symptoms because he then referred patients to them for unnecessary services and treatment.

611.  Moreover, the use of more severe, extensive diagnoses often preceded the use of invasive therapy by Rose Pain, Mini Invasive, Computerized Joint, and Hakki, thereby confirming that the defendants inflated symptoms and diagnoses to falsely justify aggressive treatment.

612.  By way of example, Patient A.B. (Claim No. 0275769479) presented to Providence Hospital on February 8, 2013 after his alleged motor vehicle accident.

613.  The Providence Hospital records indicate that A.B. denied any loss of consciousness.

614.  However, when A.B. presented to Stefan Glowacki, M.D., P.C. on April 3, 2013, Glowacki reported "headaches, head pain over the right side of the head, left orbit, difficulty with vision," in addition to "neck pain going down to his hands, [and] low back pain down more to the left than the right leg."

615.  Glowacki also noted in his initial evaluation that A.B. "has loss of consciousness, he does not remember what has happened."

616.  By magnifying symptoms, Glowacki sought to justify referrals to Utica PT and Rose PT for unnecessary physical therapy treatment.

## 2.    **Unnecessary Prescription Medication**

617.  Glowacki, by and through Stefan Glowacki, M.D., P.C., prescribed narcotic medications to a disproportionately high number of patients at issue in this Complaint.

618.  Glowacki testified that he rarely prescribed medication:

> Q.    Are you telling us you don't prescribe your active patients medication?
>
> A.    Very rare.

619.  Glowacki further testified that he would not prescribe medication because of its addictive qualities:

> I am [an] enemy of pain medication because pain medication in [sic] her age will make a hundred percent sure drug addict.  Pain medication is no good, unfortunately.

620.  However, Glowacki prescribed narcotics to fifty percent (50%) of the patients that he treated at issue in this Complaint, including the following representative patients:

| Claim No. | Patient Initials | Prescribed Medications |
|---|---|---|
| 0305094146 | A.S. | Norco; Xanax; Ambien |
| 0319694377 | R.P. | Norco; Advil; Aleve |
| 0257938415 | S.I. | Lorcet; Flexeril; Indocin; Voltaren |
| 0274206556 | M.T. | Mobic; Xanax; Vicodin |
| 0275769479 | A.B. | Xanax; Zolpidem; Lorcet; Ambien; Motrin |
| 0275769479 | M.B. | Indocin; Flexeril; Vicodin |
| 0240954065 | G.M. | Lorcet |

621.   Many of these medications are known for their highly-addictive qualities.

622.   Therefore, despite his testimony that "[p]ain medication is no good," Glowacki provided narcotic medications to several patients at issue in this Complaint.

**B.   UNNECESSARY AND EXCESSIVE PHYSICAL THERAPY**

623.   The physical therapy prescribed by Glowacki and Hakki and performed by Utica PT and Rose PT violated established standards of care.

624.   Physical therapy must be objectively indicated.

625.   That is, a patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy.

626.   However, Hakki, by and through Rose Pain, Mini Invasive, and Computerized Joint, and Glowacki, by and through Stefan Glowacki, M.D., P.C., often prescribed and Utica PT and Rose PT performed extensive physical therapy based upon a patient's subjective symptoms alone.

627.   Rose Pain, Mini Invasive, Computerized Joint, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki played an indispensable role in the defendants' ability to refer for excessive physical therapy.

628.   Under Michigan law for dates of service before January 1, 2015, physical therapy had to be prescribed by an individual licensed to practice dentistry,

medicine, osteopathic medicine and surgery, or podiatric medicine and surgery. Mich. Comp. Laws. § 333.17820(1).

629.   Under Michigan law for dates of service on or after January 1, 2015, physical therapy treatment lasting more than twenty-one (21) days or ten (10) treatment sessions (whichever occurs first) must be prescribed by an individual licensed to practice dentistry, medicine, osteopathic medicine and surgery, or podiatric medicine and surgery. Id.

630.   Rose Pain, Mini Invasive, Computerized Joint, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki repeatedly made misrepresentations regarding the necessity for physical therapy, including almost every time each wrote a prescription for physical therapy, to perpetuate unnecessary and expensive treatment that falsely bolstered the appearance of the claim.

631.   Numerous patients at issue in this Complaint received physical therapy treatment that lasted far beyond twenty-one (21) days or ten (10) treatment sessions and received numerous prescriptions for physical therapy from Hakki and Glowacki to continue treatment far beyond a reasonable time.

632.   These false statements, including Hakki's and Glowacki's prescriptions for physical therapy, were submitted to Allstate through interstate wires and the U.S. Mail along with demands for payment.

633.   Hakki and Glowacki typically wrote the physical therapy prescription during the initial evaluation for each patient at issue in this Complaint.

634.   In approximately ninety percent (90%) of all motor vehicle accident cases, mild injuries will resolve themselves within a few weeks without any treatment whatsoever.

635.   This fact supports that the immediate resort to physical therapy, as often happened due to Rose Pain, Mini Invasive, Computerized Joint, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki writing physical therapy prescriptions as a matter of course, was not related to the care, recovery, or rehabilitation of the patient, thus rendering such physical therapy medically unnecessary and not compensable under Michigan's No-Fault Act.

636.   Further, Rose Pain, Mini Invasive, Computerized Joint, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki routinely renewed prescriptions for physical therapy for several months.

637.   The defendants did not use information in reports of physical therapy treatment to alter or manage their patients' care.

638.   Instead, the defendants' repeated renewals of physical therapy prescriptions were merely part of their predetermined treatment protocol.

639.   The treatment rendered at Utica PT and Rose PT rarely varied from patient to patient, evidencing that treatment was rendered pursuant to a

predetermined protocol that was not individualized to each patient's clinical symptoms and needs.

640.   Moreover, the documents used by Utica PT confirm the use of a predetermined treatment template, and a poor one at that.

641.   Utica PT used a template form titled "Evaluation & Treatment Plan for Physical Therapy" as the standard assessment form for patients.

642.   Over the course of three (3) pages, this template document contains thirty-three (33) typographical and grammatical errors.  *See* Exhibit 34.

643.   The high frequency of errors contained in this document illustrates that Utica PT formulated documents with the intention of maximizing payment from insurance companies and not in improving the health of the individuals purportedly receiving treatment or even accurately documenting treatment.

644.   Patients at issue in this Complaint were prescribed and rendered the same physical therapy program regardless of the patient's age.

645.   It is highly unlikely that a patient who is less than ten (10) years old would require the same physical therapy as a patient who is thirty (30) years old or older.

646.   Nonetheless, the defendants rendered, if at all, the same treatment to all patients for the sole purpose of increasing the amount of bills submitted to Allstate.

647.   Allstate is not required to pay Utica PT or Rose PT for unnecessary and unreasonable physical therapy treatment.

### C.   UNNECESSARY INJECTIONS

648.   Hakki, by and through Mini Invasive and Computerized Joint, subjected his patients to a battery of unnecessary injection-related services.

649.   The performance of invasive procedures (such as injections) for the relief of pain must be based upon adequate diagnosis and legitimate medical necessity.

650.   Hakki consistently reported performing three (3) different types of injections and procedures at the same time.

651.   First, Hakki purportedly performed an injection of steroid and anesthetic into the subacromial space of the shoulder.

652.   A subacromial injection is often used to treat an inflamed bursae, supraspinatus impingement, or tears.

653.   Second, Hakki purportedly performed an injection of steroid and anesthetic into the glenohumeral joint of the shoulder.

654.   A glenohumeral injection is often used to calm an inflamed shoulder capsule or osteoarthritis.

655.   Third, Hakki purportedly performed manipulation under anesthesia ("MUA") of the shoulder, which attempts to improve loss of motion from adhesive capsulitis.

656.   Subacromial injections are never done at the same time as a glenohumeral injection and MUA because they each treat different areas of the shoulder.

657.   Performing all three (3) procedures simultaneously prevents a physician from assessing the effectiveness of each treatment.

658.   Nonetheless, Computerized Joint, Mini Invasive, and Hakki submitted bills and medical records to Allstate through the U.S. Mail for simultaneously performing a subacromial injection, a glenohumeral injection, and MUA.

659.   Moreover, Hakki violated the medical standard of care by repeating injections.

660.   The standard of care for injections states that a physician shall not perform injections more often than once every three (3) to four (4) months in the same joint.

661.   However, Hakki performed repeated injections in the same patient's joint within a matter of weeks.

662.   Mini Invasive, Computerized Joint, and Hakki also resorted to injections before patients completed more conservative treatment modalities.

663.   A physician should resort to injections only after a patient does not respond to more conservative forms of care.

664.   However, Mini Invasive Computerized Joint, and Hakki performed injections on patients while they continued physical therapy treatment.

665.   In fact, Mini Invasive, Computerized Joint, and Hakki purportedly performed injections on patients on the same date of service that they received physical therapy treatment.

666.   Conducting injections before providing a patient with an opportunity to respond to conservative treatment modalities demonstrates the fraudulent and medically unnecessary nature of the injections.

667.   Allstate is not required to pay Computerized Joint, Mini Invasive, or Hakki for medically unnecessary injections that were only recommended and performed to bolster claims submitted to Allstate.

### D.   UNNECESSARY AND EXCESSIVE APPLICATION OF USELESS P-STIM DEVICES

668.   Hakki's scheme included repeated applications of the clinically worthless P-Stim device to patients without any clinical indications or signs of improvement from treatment.

669.   Hakki, by and through Rose Pain, Computerized Joint, and Mini Invasive, sought to apply P-Stim devices to as many patients as possible as many times as possible without regard for any patient's individual medical needs.

### 1.   P-Stim Is Not Generally Accepted by the Medical Community

670.   As an initial matter, P-Stim is not widely accepted in the medical community.

671.   The P-Stim device is a miniaturized, battery-powered, transcutaneous electrical nerve stimulator with pre-programed frequency, pulse, and duration for the stimulation of auricular acupuncture points.

672.   The P-Stim device provides a form of acupuncture combined with the electrical stimulation where all of the acupuncture points are located behind a patient's ear.

673.   The P-Stim device is held behind the patient's ear by an adhesive dressing.

674.   The P-Stim device connects via three (3) stainless steel wires to acupuncture needles that have been applied to three (3) points behind a patient's ear.

675.   The P-Stim device operates until its battery runs out of power, typically about three (3) to four (4) days after application, at which point the patient removes the P-Stim device and throws it away.

676.   P-Stim treatment has not been shown to be beneficial or more beneficial than traditional forms of treatment modalities.

677.   P-Stim is not considered reimbursable by the Centers for Medicare & Medicaid Services ("CMS") under any Medicare Benefit Category.

678.   Rose Pain, Computerized Joint, Mini Invasive, and Hakki applied P-Stim devices to the patients at issue herein despite a dearth of reputable clinical studies supporting the use of P-Stim.

679.   In fact, Hakki testified that he applied P-Stim devices to patients despite the lack of evidence to support the efficacy of P-Stim treatment relating to chronic pain:

> Q.   I'm focusing purely on are you familiar with literature that has concluded the P-STIM device is experimental?
>
> A.   I have not read in any peer review journal that word, but I have heard about this and there are some people who consider this experimental.   I sympathize with those who say that because you really need a proper double-blind study to measure the efficacy and the percentage, and that's what I want – I'm thinking maybe I should be doing in the future to see what's the efficiency, efficacy of it.   It is like 70 percent like I'm thinking or maybe 5 percent or certainly it's not 100 percent.

680.   Notwithstanding his testimony acknowledging that P-Stim is not clinically supported, Hakki repeatedly applied P-Stim devices to patients at issue in this Complaint.

## 2.   Hakki Misrepresented the Nature of P-Stim Treatment

### a.   Hakki Falsely Represented that P-Stim Is FDA-Approved for Chronic Pain Treatment

681.   In support of claims by Rose Pain, Computerized Joint, and Mini Invasive for reimbursement for P-Stim treatment rendered to the patients at issue herein, Hakki misrepresented that the P-Stim device had been approved by the U.S. Food and Drug Administration ("FDA") for pain management treatment.

682.   In medical records mailed to Allstate, Hakki cited FDA approval of the device: "The FDA approved, minimally invasive, auricular procedure of Pulse Stimulation was discussed with the patient" and "[t]he P-Stim is designated to reduce pain and in some cases discontinue medication."   *See* Exhibit 35.

683.   Notwithstanding these representations, the FDA has made no such substantive review of the P-Stim device's efficacy in treatment of chronic pain.

684.   The FDA has only reviewed the P-Stim device under the "Premarket Notification" 510(k) review program.

685.   Under the 510(k) program, a device manufacturer submits a premarket notification submission to the FDA at least 90 days before a device is introduced into interstate commerce for commercial distribution.   21 U.S.C. § 360(k).

686.   The FDA determines whether devices meet the criteria for market clearance within 90 days, on the basis of whether the device is "substantially equivalent" to a legally marketed "predicate" device.   21 U.S.C. §§ 360(n), 360c(i).

687.   The FDA reviews whether the new device has the same technological characteristics as the predicate device, or whether despite any technological differences the new device is as safe and effective as the predicate device.

688.   The FDA determined that the P-Stim device was "substantially equivalent" to a legally marketed predicate device called the Acu-Stim.  *See* Exhibit 36.

689.   The FDA's determinations were not based on any clinical or scientific data submitted in relation to the P-Stim device.  *See* id.

690.   Further, the FDA's 510(k) determination in relation to Acu-Stim makes clear that the P-Stim's predicate device was not reviewed for treatment of pain at all. *See* Exhibit 37.

691.   Instead, the "Acu-stim" identified by the FDA as a predicate device to the P-Stim is in fact the "Acuslim" electro-acupuncture device, which is intended for weight loss. *See* id.

692.   During a sworn deposition, Hakki acknowledged that the FDA had not made any determination with regard to the P-Stim device's effectiveness for treatment of pain:

Q.   So what I'm handing you as Exhibit 3, Dr. Hakki –

A.   Sure.

Q.   -- this is a document, it's called a P-STIM 510(K) Summary, and it talks about this is the submission

or the applicant's submitting information to the
FDA for approval of the P-STIM device.

   And it describes the P-Stim device as
substantially equivalent to the Acu-Stim, which is
later referred to in this submission as consistent with
what you said, an acupuncture type therapy. Is that
all a fair statement of what your understanding of
what P-STIM is?

A.   Yes.

Q.   And also, in this document they describe the P-
STIM device as transcutaneous, correct?

A.   Yes.

Q.   And the – so the approval of this device, you
understand doesn't mean that they were making any
conclusions on the efficacy of the device, correct?

A.   Yes.

693.   Despite his testimony, Hakki continued to state falsely that the FDA

approved the P-Stim device and that the device is designed for pain management.

### b.   Hakki Falsely Represented P-Stim as an Operative Implantation Procedure

694.   Notwithstanding its lack of medical acceptance and the FDA's

description of P-Stim as only an "electro-acupuncture device," Hakki, by and

through Rose Pain, Computerized Joint, and Mini Invasive, held out P-Stim

treatment as an operative procedure.

695.    Application of the P-Stim device takes mere minutes, and does not require a physician.

696.    Hakki testified that a nurse could apply a P-Stim device after completing a course:

> Q.    Could the person applying the device be a nurse?
>
> A.    Yes.  Provided –
>
> Q.    Did that ever –
>
> A.    Not – in my practice, if I get a nurse to do it, I have on my computer the course, they take the course.  It has – one of them has about 100 questions, they pass the course under me, I let them do it.

697.    Nonetheless, at all times relevant to this Complaint, Rose Pain, Computerized Joint, Mini Invasive, and Hakki routinely described the attachment of the P-Stim device behind the patient's ear as an "operation" or "procedure."  *See* Exhibit 35.

698.    The "P-Stim Procedure" notes describe the process of attaching the P-Stim device to the patient as a surgical operation, including that the ear was "prepped with alcohol solution," that the P-Stim was "applied in a series on the ear lobe," that the "area was covered and secured with opsite," and that the "patient tolerated the procedure."  *See* id.

699.   In relation to the application of P-Stim devices, Computerized Joint billed Allstate between one (1) and three (3) units of CPT Code 64555, between one (1) and three (3) units of HCPCS Code L8680, and one unit of CPT Code 95972.

700.   In relation to the application of P-Stim devices, Mini Invasive billed Allstate between one (1) and three (3) units of CPT Code 64555, for one (1) unit of CPT Code 63650, and for one (1) unit of CPT Code 95972.

701.   In relation to the application of P-Stim devices, Rose Pain billed Allstate for one (1) unit of CPT Code 64555, between one (1) and three (3) units of HCPCS Code L8680, and for one (1) unit of CPT Code 95973.

702.   CPT Code 64555 denotes the "percutaneous implantation of neurostimulator electrode array."

703.   HCPCS Code L8680 denotes an "implantable neurostimulator electrode, each."

704.   CPT Code 95972 denotes "complex spinal code, or peripheral (ie, peripheral nerve, sacral nerve, neuromuscular) (except cranial nerve) neurostimulator pulse generator/transmitter, with inoperative or subsequent programming."

705.   CPT Code 95973 denotes "complex spinal code, or peripheral (except cranial nerve) neurostimulator pulse generator/transmitter, with inoperative or subsequent programming, each additional 30 minutes after first hour."

706.   The AMA deleted CPT Code 95973 effective January 1, 2017.

707.   Hakki has testified that P-Stim is not percutaneous:

> Q.   It's transcutaneous, right, not percutaneous?

> A.   No, it's not percutaneous.

> Q.   And let me break this down.

> A.   I mean, it's, to be – it has a sharp end and you put it on the skin, and it's – it sits on the skin itself, and we put a tape on it and sometimes it pierces the skin. Sometimes patient gets excited, they sleep on, sometimes it goes subcutaneous and sometimes it goes even deeper and they have a drop or two of blood with it, so the use of it is – has a variation in it.

708.   Indeed, Hakki testified that the application of the P-Stim device could be performed by a nurse and is less invasive than having an ear pierced.

709.   Hakki testified that the "risks" of the P-Stim procedure are minimal:

> Q.   But would you agree with me that there's no – well, let me ask it this way.  Are there any risks associated with the placement of the P-STIM device?

> A.   Well, there are minimum.  You know, you could have bleeding from it.  You could have problems – I mean if you use it for what it's indicated, sometimes it might trigger electric impulses you don't want it to be triggered, so, you know, you have to be careful if you use it in the right indication, the minimum – the complications is [sic] minimal.  You just have to be selective in choosing the patients.

710.   Such mild "risks" are inconsistent with the representations of Rose Pain, Computerized Joint, Mini Invasive, and Hakki that application of the P-Stim device is an operation resulting in a surgical "percutaneous implantation."

711.   Accordingly, the use of billing codes denoting a "percutaneous implantation" and "implantable neurostimulator electrode" by these defendants misrepresented the nature of the P-Stim treatment.

712.   Rose Pain, Mini Invasive, Computerized Joint, and Hakki used these misrepresentations to justify exorbitant charges submitted to Allstate for reimbursement.

713.   Rose Pain charged $8,400 for HCPCS Code L8680, $500 for CPT Code 64555, and $300 for CPT Code 95973, which amounted to $9,200 per application of a P-Stim device.

714.   Computerized Joint charged between $600 and $735.61 for HCPCS Code L8680, between $675 and $677.33 for CPT Code 64555, and between $3,750 and $4,224.23 for CPT Code 95972, which amounted to between $5,025 and $5,637.17 per application of a P-Stim device.

715.   Mini Invasive charged $4,224.24 for CPT Code 63650, $677.33 for CPT Code 64555, and $721.16 for CPT Code 95972, which amounted to $5,622.73 per application of a P-Stim device.

716.   Thus, Allstate was billed a minimum of $5,025 and up to $9,200 for a single application of a P-Stim device, an unreasonable and grossly excessive amount for a device that is not supported in the medical community.

### 3.   Defendants Applied P-Stim Devices to Patients Without Regard for Their Individual Medical Needs

717.   The purported P-Stim treatment performed by Hakki through Rose Pain, Computerized Joint, and Mini Invasive was without regard to patients' respective individual medical needs.

718.   Further, to the extent Hakki purported to examine the patients at issue in this Complaint, such examinations were cursory and failed to justify application of the P-Stim device.

719.   Indeed, Hakki routinely applied P-Stim devices as early as his initial examination with the patient.

720.   Application of P-Stim at such an early date afforded insufficient time to determine whether the patient responded positively to alternative treatment protocols, including the physical therapy Hakki routinely prescribed (as discussed *supra*).

721.   Hakki has confirmed in sworn testimony that P-Stim is an immediate default in his treatment protocol:

> I'll say what I do.  When a patient comes in, he has multiple pains, he has an accident, neck pain, back pain, whatever, so I take [a] full history, I do [a] full exam, I check different

modalities of how to control the pain. And the first phase usually basically is medication, physical therapy, and sometimes we add TENS unit, P-STIM, stimulators, whatever, massage, traction, something that's noninvasive.

722. In accordance with his predetermined treatment protocol, Hakki routinely applied P-Stim devices immediately and concurrently with other forms of treatment, including physical therapy and ordering MRIs.

723. Hakki testified that he will apply the P-Stim device as many as five (5) times to the same patient and without evaluation between each application in the series.

724. Thus, Rose Pain, Computerized Joint, Mini Invasive, and Hakki used the P-Stim device *pro forma* and without regard for their patients' individual medical needs.

### E.    UNNECESSARY MRI SCANS

725. As discussed *supra*, Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki engaged in a scheme to increase the profitability of each patient purportedly treated by prescribing medically unnecessary ancillary services such as MRI scans to the patients at issue in this Complaint.

726. The MRI referrals made by Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki to defendant Crystal Clear were unnecessary and fraudulent because the referrals were made in

furtherance of the scheme to bill Allstate for as many services as possible and not based on the individual and actual needs of the patient.

727.   Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki often ordered MRI scans of areas of the body that were not evaluated or mentioned in the medical records as being an area of pain or concern by the patient.

728.   Hakki included language in his template medical records stating "MRI ordered for the CX TX LX to rule out any bony or soft tissue injury," indicating that he ordered MRI scans for the cervical, thoracic, and lumbar spine.

729.   This language consistently appears in the medical records for the patients at issue in this Complaint, regardless of whether they complained of back pain (and many did not).

730.   It is unnecessary and unreasonable to order an MRI scan of an area of the body for which the patient does not require treatment.

731.   This *pro forma* language also appears for patients when Hakki never ordered an MRI scan.

732.   Hakki also wrote in his boilerplate medical records a request that the patient bring the MRI scans "on recall visit."

733.   Hakki included this request even when an MRI scan was never ordered for the patient.

734.   Hakki even kept this language in the medical record after having purportedly received and reviewed the MRI scan when one was actually ordered.

735.   The frequency at which this language appears demonstrates that the MRIs, when ordered, were unnecessary and part of the predetermined treatment protocol.

736.   Glowacki, by and through Stefan Glowacki, M.D., P.C., consistently ordered MRI scans during the initial evaluation of a patient as part of his predetermined treatment protocol.

737.   In the instances when Hakki or Glowacki actually ordered an MRI scan, the medical records rarely, if ever, make mention of the MRI scan results.

738.   Moreover, the treatment provided to the patient rarely, if ever, changed as a result of the MRI scan.

739.   This is not surprising as the MRI referrals were not based on medical necessity.

740.   Rather, the defendants used Crystal Clear as part of their network to maximize their profits by increasing the amount of fraudulent services to bill Allstate.

741.   As discussed *supra*, Ishaq solicited patients and used Bluebird to transport the patients to Stefan Glowacki, M.D., P.C. and Glowacki, who then referred patients to Crystal Clear for medically unnecessary MRI scans.

742.   Crystal Clear's excessive charges further demonstrate the fraudulent nature of its services.

743.   As part of its application for a Certificate of Need, Crystal Clear told the State of Michigan that its average charge per MRI scan would be $1,200 in the first three (3) years (which would be 2015, 2016, and 2017).

744.   However, during that period of time, Crystal Clear billed Allstate a minimum of $4,600 and as much as $5,700 per MRI scan.

745.   Crystal Clear's billing nearly five (5) times more than its declared average MRI charge shows that the purpose of the MRI scans was to maximize the profits of the defendants and not to provide medically necessary services.

746.   Allstate is not required to pay Crystal Clear for fraudulent, unnecessary, and unreasonable MRI scans and it is entitled to the return of money paid in reasonable reliance on the defendants' fraudulent bills.

### F.   UNNECESSARY URINE DRUG TESTING

747.   Advanced Central Labs billed Allstate for definitive urine drug testing that was medically unnecessary, unreasonable, excessive, and was not performed in accordance with established standards of care for urine drug testing, if performed at all.

748.   Definitive urine drug testing is used, when medically necessary, to identify specific medications, illicit substances, and metabolites in a specimen.

749. Definitive urine drug testing methods include, but are not limited to, gas chromatography–mass spectrometry ("GC-MS") and liquid chromatography-tandem mass spectrometry ("LC-MS/MS").

750. Gas Chromatography coupled with Mass Spectrometry (GC-MS) and Liquid Chromatography coupled with Mass Spectrometry (LC-MS/MS) are complex technologies that use the separation capabilities of gaseous or liquid chromatography with the analytical capabilities of mass spectrometry.

751. While these tests require different sample preparation and analytical runs, they identify specific drugs, metabolites, and most illicit substances and report the results as absent or present typically in concentrations of ng/mL.

752. For example, when several opioids are present in the urine of a patient prescribed a single opioid, definitive urine drug testing is used to determine whether the presence of the other opioids is consistent with metabolism of the prescribed opioid, opioid contamination during manufacturing, or if more than one drug within a class is present.

753. Therefore, CPT Codes for definitive urine drug testing are usually specific to the drug being measured in a specimen.

754. Definitive testing is almost always more expensive than presumptive testing and results in higher reimbursement to the laboratory (Advanced Central Labs) because (1) presumptive codes are ordinarily bundled and only one code is

billed regardless of the number of drugs tested while definitive codes are billed for each individual drug tested and (2) definitive tests have higher reimbursement.

755.   Advanced Central Labs submitted bills to Allstate through interstate wires and the U.S. Mail seeking payment for definitive urine drug testing purportedly performed regarding patients at issue in this Complaint.

756.   However, the definitive urine drug testing, if performed at all, was medically unnecessary, unreasonable, excessive, and was not performed in accordance with established standards of care for urine drug testing.

757.   The testing purportedly performed by Advanced Central Labs was always based upon panel testing identified as a "Complete Pain Management Panel" in the requisition form.

758.   By way of example, Hakki allegedly submitted a urine specimen collected from Patient M.M. (Claim No. 0417961661) to Advanced Central Labs on April 5, 2017 along with a requisition form that indicated the testing to be performed was based upon the "Complete Pain Management Panel" and identifying the following drugs/analytes to be tested by Advanced Central Labs: Analgesics, Antidepressants serotonergic class, Antiepileptics, Barbiturates, Benzodiazepines, Buprenorphine, Cocaine, Fentanyl, Gabapentin, Heroin metabolite, Ketamine and Norketamine, Methadone, Methylenedioxyamphetamines, Methylphenidate,

Opioids, Oxycodone, Pregabalin, Skeletal Muscle-Relaxants, Synthetic Stimulants, Tapentadol, and Tramadol. *See* Exhibit 38.

759. Advanced Central Labs submitted a bill to Allstate through the U.S. Mail for definitive urine drug testing encompassed by the following twenty-one (21) billing codes: 80331 (Analgesics, non-opioid; 6 or more); 80333 (Antidepressants, serotonergic class; 3-5); 80341 (Antiepileptics, not otherwise specified; 7 or more); 80345 (Barbiturates); 80346 (Benzodiazepines, 1-12); 80348 (Buprenorphine); 80353 (Cocaine); 80354 (Fentanyl); 80355 (Gabapentin, non-blood); 80356 (Heroin metabolite); 80357 (Ketamine and norketamine); 80358 (Methadone); 80359 (Methylenedioxyamphetamines); 80360 (Methylphenidate); 80363 (Opiods and opiate analogs; 3 or 4); 80365 (Oxycodone); 80366 (Pregabalin); 80369 (Skeletal muscle relaxants; 1 or 2); 80371 (Stimulants, synthetic); 80372 (Tapentadol); and 80373 (Tramadol). *See* Exhibit 39.

760. Allstate was billed $4,723.51 relative to these twenty-one (21) definitive testing CPT Codes that were unnecessarily performed by Advanced Central Labs, evidenced by Hakki's failure to document Patient M.M.'s medical record with patient-specific indications supporting the necessity to test for twenty-one (21) drugs/analytes via definitive drug testing. *See* id.

761. The Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has formulated a compliance program providing clear

guidance to clinical laboratories to reduce fraud and abuse within their organizations and "assist clinical laboratories in developing effective internal controls that promote adherence to applicable Federal and State law, and the program requirements of Federal, State, and private health plans." *See* Exhibit 40 at 45077.

762.   With respect to testing panels, the OIG has stated that "standing orders . . . too often . . . have led to abusive practices." Id. at 45081.

763.   Specifically, the OIG has stated that "[l]aboratories routinely offer customized profiles and panels to physicians.  Physicians often order the profile/panel containing the test they need rather than specifying just the needed test(s).  Profiles and panels desensitize physician concerns about the medical necessity of the laboratory tests they are ordering.  Moreover, panels and profiles contribute to unbundling billing schemes and contribute to the ordering of medically unnecessary laboratory tests." *See* Exhibit 41.

764.   With respect to requisition forms, the OIG has stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill." *See* Exhibit 40 at 45079.

765.   The rationale for frequently performing such fraudulent and unnecessary definitive urine drug testing stems from Hakki's interest in Advanced Central Labs, as Hakki benefits financially for each drug test billed to Allstate.

766.   Hakki referred over 98% of the urine specimens received by Advanced Central Labs relating to patients at issue in this Complaint.

767.   Urine drug testing that is performed solely for pecuniary benefit and not based on medical necessity is not compensable under the Michigan No-Fault Act.

768.   Allstate is not required to compensate Advanced Central Labs for urine drug testing that was performed, if at all, solely to increase the amount of profit Advanced Central Labs and Hakki could collect per patient.

## G.   UNNECESSARY TRANSPORTATION SERVICES

769.   Bluebird billed Allstate for unnecessary medical transportation services.

770.   To receive medical transportation, a licensed healthcare provider must determine that an individual is disabled.

771.   This determination by the licensed healthcare provider must be documented in the patient's medical record.

772.   The licensed healthcare provider often provides the patient with a disability certificate that identifies the forms of necessary assistance, including medical transportation.

773. Bluebird repeatedly provided transportation services to individuals prior to any determination by a licensed healthcare provider that the patient required transportation services.

774. As discussed above, the real motivation for transport by Bluebird was (1) so it could directly bill Allstate as much as possible and (2) to facilitate excessive billing by the other defendants in the network described herein by delivering patients.

### H. **EXEMPLAR PATIENTS**

775. The defendants' fraudulent billing for unnecessary physical therapy, injections, application of P-Stim devices, MRI scans, urine drug testing, and transportation services is exemplified by the following representative patients.

### 1. **Patient A.A. (Claim No. 0257938415)**

776. Patient A.A. was allegedly involved in a motor vehicle accident on September 2, 2012.

777. On September 7, 2012, A.A. presented to Stefan Glowacki, M.D., P.C. for an initial evaluation with Glowacki.

778. A.A. was eighteen (18) months old at the time of the initial evaluation.

779. Glowacki diagnosed A.A. with a contusion of the cervical and lumbosacral spine and a contusion of the chest and head.

780.   Despite her age, Glowacki wrote a prescription for A.A. to receive physical therapy three (3) times a week for six (6) weeks.

781.   It is unnecessary and unreasonable to prescribe six (6) weeks of physical therapy for a toddler.

782.   That same day, A.A. presented to Utica PT to initiate physical therapy.

783.   Utica PT's "Evaluation & Treatment Plan" indicates that A.A. rated her pain at six (6) out of ten (10) when at rest and a five (5) out of ten (10) when at movement.

784.   However, it is highly unlikely that an eighteen (18) month old understood the concept of pain scales, let alone knew how to distinguish the difference in pain when moving compared to when at rest.

785.   Utica PT submitted bills to Allstate through the U.S. Mail for treatment purportedly provided during seventeen (17) visits.

786.   Purportedly providing physical therapy treatment to an eighteen (18) month old supports that Glowacki prescribed and Utica PT performed physical therapy as a matter of course and did not consider each patient's unique needs.

787.   Moreover, the physical therapy notes written by the physical therapist about A.A.'s treatment are substantially similar, if not identical, to the notes written about A.A.'s siblings, ages five (5) and eight (8), and A.A.'s mother, age thirty-four (34).  *See* Exhibit 42.

788.   Any treatment protocol provided to an eighteen (18) month old toddler should differ substantially from older children, let alone from a grown woman, after considering the history, height, weight, age, abilities, and injuries of the patient.

789.   The fact that the treatment and A.A.'s alleged response to that treatment is so similar to her family members further demonstrates that A.A. received treatment as part of a predetermined protocol that was not tailored to her specific medical needs.

790.   Utica PT, Stefan Glowacki, M.D., P.C., and Glowacki submitted claims for payment and accompanying medical records relative to A.A. to Allstate through the U.S. Mail for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

791.   Allstate is not required to pay Utica PT, Stefan Glowacki, M.D., P.C., or Glowacki for the fraudulent, unnecessary, and unreasonable treatment rendered to A.A.

## 2.   Patient E.D. (Claim No. 0326050457)

792.   Patient E.D. was allegedly involved in a motor vehicle accident on May 8, 2014.

793.   E.D. presented to Premier Orthopedics on June 21, 2014 for an initial evaluation performed by Suleiman and was provided with a prescription for physical therapy.

794.   E.D. presented to Utica PT on June 25, 2014 to initiate physical therapy treatment.

795.   E.D. was nine (9) years old when receiving physical therapy at Utica PT.

796.   Utica PT submitted bills and accompanying treatment records to Allstate through the U.S. Mail for 82 visits relative to E.D.

797.   It is unnecessary and unreasonable to have a nine (9) year old perform 82 sessions of physical therapy.

798.   The treatment records submitted by Utica PT demonstrate that the treatment received by E.D., if actually provided, was a predetermined protocol that was not tailored to his particular needs.

799.   The record for E.D.'s third treatment date—July 2, 2014—is identical to his last treatment date five (5) months later on December 31, 2014.  *See* Exhibit 43.

800.   When reviewed cumulatively, it is clear that the information allegedly written on the documents is identical for multiple dates of service.  *See* id.

801.   Only the date of the purported service changes.  *See* id.

802.   The modality, patient comments, treatment provided, response to treatment, and, more importantly, the treatment plan are identical for every date of service.  *See* id.

803. The physical therapy E.D. received, if at all, was not based upon his particular needs but rather as part of a predetermined protocol to maximize the amount Utica PT could bill to Allstate.

804. Utica PT submitted claims for payment and accompanying medical records relative to E.D. to Allstate through the U.S. Mail for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

805. Allstate is not required to pay Utica PT for the fraudulent, unnecessary, and unreasonable treatment rendered to E.D.

### 3. Patient S.I. (Claim No. 0257938415)

806. Patient S.I. was allegedly involved in a motor vehicle accident on September 2, 2012.

807. S.I. presented to the Oakland Hospital emergency room that same day.

808. Oakland Hospital reported that S.I. presented with pain in her neck, left arm, and left hand, and that she denied having any pain in her chest, back, or legs.

809. On September 5, 2012, S.I. presented to Stefan Glowacki, M.D., P.C. for an initial evaluation with Glowacki.

810. Glowacki reported that S.I. "injured her left hand, broke her left thumb, injured left knee, ruptured her medial collateral ligament, anterior cruciate ligament, possible meniscus, both shoulders, neck, back and her chest."

811.   Glowacki's assessment significantly conflicts with the records of the Oakland Hospital emergency room, where S.I. was seen just three (3) days prior.

812.   On September 5, 2012, Glowacki wrote a prescription for six (6) weeks of physical therapy.

813.   That same day, S.I. purportedly presented to Utica PT to initiate physical therapy.

814.   The six-week physical therapy prescription provided to S.I. by Glowacki expired on October 16, 2012.

815.   However, Utica PT continued providing physical therapy treatment to S.I. without a prescription.

816.   S.I. returned to Stefan Glowacki, M.D., P.C. on November 7, 2012 and received a new prescription for six (6) weeks of physical therapy.

817.   S.I. therefore did not have a prescription for physical therapy between October 16, 2012 and November 7, 2012.

818.   However, Utica PT submitted bills to Allstate through the U.S. Mail purporting to provide physical therapy treatment on nine (9) occasions between October 16, 2012 and November 7, 2012.

819.   This violated Michigan law at the time, which required a prescription in order to receive any physical therapy treatment.

820.   In total, Utica PT submitted bills and medical records to Allstate through the U.S. Mail purporting to provide S.I. with physical therapy over the course of 82 visits between September 5, 2012 and June 21, 2014.

821.   Utica PT, Stefan Glowacki, M.D., P.C., and Glowacki submitted claims for payment and accompanying medical records relative to S.I. through the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

822.   Allstate is not required to pay Utica PT, Stefan Glowacki, M.D., P.C., or Glowacki for the fraudulent, unnecessary, and unreasonable treatment rendered to S.I.

### 4.   Patient T.S. (Claim No. 0262135213)

823.   Patient T.S. was allegedly involved in a motor vehicle accident on July 11, 2015.

824.   On December 8, 2015, Hakki (by and through Computerized Joint) performed a right shoulder arthroscopy to purportedly repair T.S.'s rotator cuff tendon.

825.   Hakki never mentioned T.S. suffering a labrum tear.

826.   Computerized Joint billed Allstate using CPT Codes 29805, 29825, 29826, and 29877 for a total of $33,168.10 related to T.S.'s surgery.

827.   However, T.S. continued to suffer pain and complications in his right shoulder.

828.   On April 28, 2016, T.S. presented to Gary Gilyard, M.D. of the Detroit Medical Center for an evaluation of his right shoulder.

829.   Dr. Gilyard noted that Hakki's procedure was not a rotator cuff repair but was "just a decompression which was just removing some of the torn pieces and not actually repairing the labrum or the rotator cuff."

830.   Dr. Gilyard testified that Hakki's procedure was not a rotator cuff tear but rather a decompression:

> [H]e had what sounded to me, and later when I went in to operate on him, proved to be probably just a decompression.  They didn't really do much of anything with the labrum, with the ligaments.  So, his shoulder remained unstable and he tore his rotator cuff.

831.   On May 5, 2016, Dr. Gilyard performed surgery on T.S.'s right shoulder to repair the subsequent damage caused by Hakki's failure to previously repair the rotator cuff.

832.   Dr. Gilyard also testified that he had to remove Hakki's sutures from the shoulder because they had failed.

833.   Dr. Gilyard testified that the labrum was seventy to seventy-five percent (70 – 75%) detached, and that the tear would have been noticeable during the December 18, 2015 procedure performed by Hakki.

834.   Dr. Gilyard testified further that the standard of care for an orthopedic surgeon noticing a tear during an operation would be to order an MRI scan with contrast and to address the labrum tear during the surgery.

835.   However, Hakki never ordered an MRI scan of the labrum and never mentioned or addressed the labrum tear.

836.   Computerized Joint and Hakki submitted claims for payment and accompanying medical records relative to T.S. to Allstate through the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

837.   Allstate is not required to pay Computerized Joint or Hakki for fraudulent, unnecessary, and unreasonable treatment provided to T.S.

### 5.   Patient M.J. (Claim No. 0416217867)

838.   Patient M.J. was allegedly involved in a motor vehicle accident on June 5, 2016.

839.   On June 9, 2016, M.J. presented to Mini Invasive for an initial evaluation with Hakki.

840.   On September 8, 2016, M.J. returned to Mini Invasive for a follow-up visit with Hakki.

841.   On September 8, 2016, Hakki purportedly performed MUA and injections to the right shoulder.

842.   MUA may be appropriate for a patient diagnosed with adhesive capsulitis.

843.   Hakki diagnosed M.J. with "rotator cuff tendinitis," along with generic terms such as "shoulder region joint pain, "arthropathy," and "bursitis."

844.   However, Hakki never diagnosed M.J. with adhesive capsulitis.

845.   Therefore, performing MUA on M.J. was unnecessary and unreasonable.

846.   Moreover, Hakki never measured M.J.'s range of motion after completion of MUA.

847.   Hakki simply noted that M.J. "has significant mobility post-procedure."

848.   Not providing a post-procedure measurement is inappropriate, as there is no way of objectively measuring subsequent improvement.

849.   On September 8, 2016, Hakki also performed an injection of both the subacromial space and the glenohumeral joint at the same time as performing MUA.

850.   Performing all three (3) procedures simultaneously is inappropriate and excessive because a physician cannot assess the effectiveness of any one of the treatments.

851.   Moreover, performing MUA at the same time as a subacromial space injection presents a risk of causing more damage to the patient's shoulder.

852.   Mini Invasive and Hakki submitted claims for payment and accompanying medical records relative to M.J. to Allstate through the U.S. Mail seeking reimbursement for fraudulent, unnecessary, and unreasonable treatment, upon which Allstate relied in adjusting the claims.

853.   Allstate is not required to pay Mini Invasive or Hakki for the fraudulent, unnecessary, and unreasonable treatment rendered to M.J.

**6.   Patient N.Y. (Claim No. 0411447428)**

854.   Patient N.Y. was allegedly involved in a motor vehicle accident on April 27, 2016.

855.   On May 10, 2016, N.Y. received an MRI scan of her right shoulder by M1 Imaging.

856.   According to the May 10, 2016 MRI scan, N.Y. suffered a partial tear of the supraspinatus tendon.

857.   N.Y. presented to Mini Invasive on August 17, 2016 for an initial evaluation with Hakki.

858.   On August 17, 2016, Hakki noted the findings of the MRI scan with a note "RIGHT SHOULDER RCT AND A/C DISEASE".

859.   "RCT" stands for rotator cuff tear.

860.   The May 10, 2016 MRI scan includes no findings of A/C disease.

861.   Despite the rotator cuff tear, Hakki found N.Y. to have full range of motion in her upper extremities.

862.   The Mini Invasive medical records lack any mention of Hakki performing an examination of N.Y.'s shoulder.

863.   Mini Invasive submitted bills and documents to Allstate through the U.S. Mail seeking reimbursement for CPT Codes 23700 (*"manipulation under anesthesia, shoulder joint, including application of fixation apparatus (dislocation excluded)"*), 20550 (*"injection(s); single tendon sheath, or ligament, aponeurosis (eg, plantar "fascia)"*), and 20610 (*"arthrocentesis, aspiration and/or injection, major joint or bursa (eg, shoulder, hip, knee, subacromial bursa); without ultrasound guidance"*).

864.   A physician should not perform MUA for a patient with a rotator cuff tear, even a partial tear, as MUA numbs the shoulder and numbing the shoulder of a patient with a torn tendon would cause the patient to potentially create more damage to the torn tendon.

865.   Despite his awareness of the torn tendon, Hakki nonetheless ordered MUA for N.Y.'s right shoulder.

866.   On August 17, 2016, Hakki marked the CPT Codes purportedly associated with the medical treatment with an "xx."

867.   Hakki marked an "xx" next to CPT Code "20610 Injection Major Joint," and wrote "KNEE."

868.   No injections were performed on N.Y.'s knee.

869.   The procedures and injections purportedly performed on N.Y. on August 17, 2016 were fraudulent, unnecessary, and unreasonable.

870.   On September 22, 2016, N.Y. returned to Mini Invasive for a follow-up visit with Hakki.

871.   The September 22, 2016 medical records make no mention of Hakki performing injections or MUA.

872.   However, Mini Invasive submitted bills and documents to Allstate through the U.S. Mail seeking reimbursement for CPT Codes 23700 (MUA of shoulder joint), 20550 (injection, tendon sheath, ligaments), and 20610 (injection, joint).

873.   Performing an injection into a joint more than once within three (3) months violates the medical standard of care.

874.   No justification exists for repeating MUA of the shoulder five (5) weeks later.

875.   N.Y. returned to Mini Invasive on November 21, 2016 for a follow-up visit with Hakki.

876.   On November 21, 2016, Hakki provided N.Y. with a prescription for Tramadol and Naprosyn.

877.   Hakki did not perform urine drug testing on November 21, 2016.

878.   However, Hakki's medical records on November 21, 2016 included a note to "do drug screening urine analysis to all patients receiving narcotics from us" and to "check results before dispensing narcotics."

879.   Tramadol is a narcotic with a high risk for addiction and dependence.

880.   Hakki therefore provided a prescription to N.Y. in contradiction to his note in the medical record to "do drug screening urine analysis to all patients receiving narcotics from us."

881.   N.Y. returned to Mini Invasive on January 2, 2017 for a follow-up visit with Hakki.

882.   The medical records for January 2, 2017 stated "[n]o active medications recorded" for N.Y.

883.   However, this contradicts Hakki's prescription for Tramadol and Naprosyn during the November 21, 2016 visit.

884.   On January 2, 2017, Hakki ordered urine drug testing for N.Y. from Advanced Central Labs

885.   Advanced Central Labs submitted bills to Allstate through the U.S. Mail seeking reimbursement for the performance of urine drug testing consisting of twenty-three (23) different charges.

886.   The January 2, 2017 urine drug testing performed by Advanced Central Labs was medically unnecessary and excessive as Hakki already prescribed medication two (2) months before the urine drug testing.

887.   N.Y. returned to Mini Invasive on January 30, 2017 for a follow-up visit with Hakki.

888.   Hakki did not reference or utilize the results of the urine drug testing performed on January 2, 2017.

889.   On January 30, 2017, Hakki again ordered urine drug testing from Advanced Central Labs

890.   Advanced Central Labs submitted bills to Allstate through the U.S. Mail seeking reimbursement for the performance of urine drug testing consisting of the exact same charges as those performed on January 2, 2017.

891.   Conducting the same urine drug testing twice within twenty-eight (28) days is unnecessary and unreasonable.

892.   On March 29, 2017, N.Y. returned to Mini Invasive for a follow-up visit with Hakki.

893.   Hakki again did not reference or utilize the urine drug testing performed on January 2, 2017 or January 30, 2017, confirming that the urine drug testing had no clinical utility and was unnecessary.

894.   On March 29, 2017, Hakki provided N.Y. with another prescription for Naprosyn and Tramadol.

895.   On April 3, 2017, N.Y. returned to Mini Invasive for a follow-up visit with Hakki.

896.   On April 3, 2017, Hakki ordered urine drug testing to be performed by Advanced Central Labs.

897.   On May 1, 2017, N.Y. returned to Mini Invasive for a follow-up visit with Hakki.

898.   On May 1, 2017, Hakki again ordered urine drug testing to be performed by Advanced Central Labs.

899.   Advanced Central Labs tested for the same substances on April 3, 2017 and May 1, 2017.

900.   Conducting the same urine drug testing twice within thirty (30) days is unnecessary and unreasonable.

901.   Moreover, performing definitive urine drug testing four (4) times within four (4) months without any rationale demonstrates that the tests were

performed to maximize the amount billed to Allstate and not to provide proper care and treatment to N.Y.

902.   Mini Invasive, Advanced Central Labs, and Hakki submitted claims for payment and accompanying medical records relative to N.Y. to Allstate through the U.S. Mail seeking reimbursement for treatment that was fraudulent, unnecessary, and unreasonable, upon which Allstate relied in adjusting the claims.

903.   Allstate is not required to pay Mini Invasive, Advanced Central Labs, or Hakki for the fraudulent, unnecessary, and unreasonable treatment rendered to N.Y.

### 7.   Patient I.H. (Claim No. 0402879456)

904.   Patient I.H. was allegedly involved in a motor vehicle accident on February 22, 2016.

905.   I.H. purportedly presented to Computerized Joint on February 23, 2016 for an initial evaluation with Hakki.

906.   On this same date, Hakki applied a P-Stim device to I.H.

907.   Hakki therefore applied a P-Stim device one (1) day after the alleged motor vehicle accident.

908.   In the "P-Stim Procedure Note," Hakki wrote "intractable spine pain not responding to regular pain meds and rehab."

909.    I.H. lacked any opportunity to respond to "regular pain meds and rehab" because the alleged motor vehicle accident occurred the day before Hakki applied the P-Stim device.

910.    Moreover, I.H. initiated physical therapy the same day as the alleged initial evaluation with Hakki based on a prescription for physical therapy written by Hakki.

911.    Hakki signed and dated the physical therapy prescription on February 23, 2016.

912.    Hakki dated his medical records as February 24, 2016 in an attempt to make the application of the P-Stim device appear further after the alleged motor vehicle accident.

913.    I.H.'s treatment reflected an immediate resort to unnecessary P-Stim treatment before any trial of conservative care.

914.    On March 23, 2016, I.H. purportedly returned to Computerized Joint for a follow-up visit with Hakki.

915.    The March 23, 2016 medical records make no reference to the previous P-Stim procedure or how I.H. responded to the treatment.

916.    Computerized Joint, Mini Invasive, and Hakki submitted claims for payment and accompanying medical records relative to I.H. to Allstate through the

U.S. Mail seeking reimbursement for fraudulent, unnecessary, and unreasonable treatment, upon which Allstate relied in adjusting the claims.

917.   Allstate is not required to pay Computerized Joint, Mini Invasive, or Hakki for the fraudulent, unnecessary, and unreasonable treatment rendered to I.H.

### 8.   Patient L.G. (Claim No. 0422076711)

918.   L.G. was allegedly involved in a motor vehicle accident on July 22, 2016.

919.   On August 2, 2016, L.G. presented to Mini Invasive for an initial evaluation with Hakki.

920.   On August 2, 2016, Hakki applied a P-Stim device to L.G. during the initial evaluation.

921.   In the "P-Stim Procedure Note," Hakki wrote "intractable spine pain not responding to regular pain meds and rehab."

922.   Hakki applied the P-Stim device on the first day he saw L.G., before L.G. had any opportunity to respond to "regular pain meds and rehab."

923.   On August 2, 2016, Hakki provided L.G. with a prescription for Norco, Naproxen, and Ultram.

924.   Hakki therefore did not provide an opportunity to determine whether L.G. responded to pain meds.

925.   Hakki's "P-Stim Procedure Note" was a template entry that did not reflect the specific symptoms or needs of L.G.

926.   L.G.'s treatment reflected magnified symptoms, and an immediate resort to unnecessary P-Stim treatment before any trial of conservative care.

927.   Mini Invasive and Hakki submitted claims for payment and accompanying medical records relative to L.G. to Allstate through the U.S. Mail for fraudulent, unnecessary, and unreasonable treatment, upon which Allstate relied in adjusting the claims.

928.   Allstate is not required to pay Mini Invasive or Hakki for the fraudulent, unnecessary, and unreasonable treatment rendered to L.G.

### 9.   Patient A.M. (Claim No. 0399323807)

929.   Patient A.M. was allegedly involved in a motor vehicle accident on January 20, 2016.

930.   On January 27, 2016, A.M. presented to Computerized Joint for an initial evaluation with Hakki.

931.   Hakki recorded that A.M. had headaches and pain in his neck, back, left wrist, and right knee.

932.   However, Hakki never conducted an examination of A.M.'s neck, wrist, or knee.

933.   On January 27, 2016, Hakki applied a P-Stim device to A.M. at the initial evaluation.

934.   A.M. signed a "Consent to Operation and Treatment" document identifying the "operation or procedure" as P-Stim.

935.   As discussed *supra*, the application of a P-Stim device does not constitute an operation.

936.   Hakki utilized this form as a means to fraudulently bill Allstate for the application of the P-Stim device as an operative procedure and to inflate the charge.

937.   Hakki's "diagnosis" was "intractable spine pain not responding to regular pain meds and rehab."

938.   However, A.M. did not initiate physical therapy until February 11, 2016.

939.   Therefore, A.M. had not yet initiated or attempted "rehab" when Hakki applied the P-Stim device on January 27, 2016.

940.   Moreover, Hakki provided A.M. with a prescription for physical therapy at that initial evaluation.

941.   Hakki also noted that he provided A.M. with Motrin.

942.   Hakki therefore applied a P-Stim device before attempting conservative treatment methods such as physical therapy or medication.

943.   Application of a P-Stim device seven (7) days after the motor vehicle accident and prior to any other treatment modalities is unnecessary and unreasonable.

944.   Moreover, application of a P-Stim device before determining whether the patient responds to medication or physical therapy contradicts Hakki's own testimony.

945.   On March 2, 2016, A.M. purportedly went to Mini Invasive for a follow-up visit with Hakki

946.   Mini Invasive billed Allstate for a level four (4) follow-up evaluation (CPT Code 99214) for the March 2, 2016 visit.

947.   However, A.M. never received an initial evaluation at Mini Invasive.

948.   The initial evaluation allegedly conducted by Hakki took place at Computerized Joint.

949.   This demonstrates that Hakki used Mini Invasive and Computerized Joint interchangeably as a means to maximize the amount that he billed Allstate by making it appear that the patient was treating at several different clinics.

950.   On March 2, 2016, Hakki acknowledged that A.M. was responding to physical therapy, medication, and P-Stim.

951.   Hakki has testified that P-Stim is not necessary if a patient responds to other modalities.

952.   In contradiction to his own testimony, Hakki applied another P-Stim device to A.M. during the March 2, 2016 visit purportedly because A.M. had "intractable spine pain not responding to regular pain meds and rehab."

953.   However, this contradicts Hakki's previous note stating that A.M. was responding to physical therapy and medication.

954.   This demonstrates that Hakki continued to use the same template language from the initial evaluation allegedly performed on January 27, 2016.

955.   On April 11, 2016, A.M. purportedly returned to Computerized Joint for a follow-up visit with Hakki.

956.   On April 11, 2016, Hakki noted that A.M.'s "LEFT KNEE IS WORSE."

957.   However, Hakki never previously examined or discussed A.M.'s left knee.

958.   On April 11, 2016, Hakki purportedly examined A.M.'s back and right knee.

959.   Hakki again acknowledged that A.M.'s back was improving after "PT PSTIM AND MEDS."

960.   Again contradicting his own testimony, Hakki applied a third P-Stim device to A.M. on April 11, 2016 purportedly because A.M. had "intractable spine pain not responding to regular pain meds and rehab."

961.   However, this contradicts Hakki's previous note stating that A.M. was responding to physical therapy and medication.

962.   Hakki's medical records for April 11, 2016 include the template language: "MRI ordered for the CX TX LX to rule out any bony or soft tissue injury."

963.   However, the MRI Referral Form contradicts the medical records.

964.   On the MRI Referral Form, Hakki listed the diagnosis as "CX, LX Hip."

965.   CX refers to the cervical spine.

966.   LX refers to the lumbar spine.

967.   However, Hakki ordered an MRI of the cervical spine, lumbar spine, thoracic spine, right hip, right knee, right ankle, and right foot.

968.   During the course of his treatment of A.M., Hakki never examined or addressed A.M.'s right hip, foot, or ankle.

969.   Ordering an MRI scan of areas of the body that were never examined demonstrates the fraudulent, unreasonable, and unnecessary nature of the MRI referral.

970.   On April 29, 2016, A.M. presented to Crystal Clear for MRI scans of the cervical and lumbar spine.

971.   On April 30, 2016, A.M. purportedly returned to Crystal Clear for MRI scans of the thoracic spine, as well as his right knee, hip, foot, and ankle.

972.   On May 12, 2016, A.M. purportedly returned to both Computerized Joint and Mini Invasive for a follow-up examination with Hakki.

973.   Both Computerized Joint and Mini Invasive submitted bills to Allstate through the U.S. Mail for a follow-up visit for A.M. on the same date of service.

974.   Computerized Joint purported to perform a level five (5) (CPT Code 99215) follow-up examination.

975.   Computerized Joint identified Hakki as the treating provider.

976.   Mini Invasive purported to perform a level four (4) (CPT Code 99214) follow-up examination.

977.   Mini Invasive identified Hakki as the treating provider.

978.   This is a clear example of billing for services not rendered as Hakki did not provide two (2) exams to A.M. on the same date of service.

979.   The medical records for May 12, 2016 make no mention of the MRI scan results and Hakki did not modify or alter A.M.'s treatment protocol based on the MRI scan results.

980.   Crystal Clear, Computerized Joint, Mini Invasive, and Hakki submitted claims for payment and accompanying medical records relative to A.M. to Allstate through interstate wires and the U.S. Mail seeking reimbursement for fraudulent,

unnecessary, and unreasonable treatment, upon which Allstate relied in adjusting the claims.

981.   Allstate is not required to pay Crystal Clear, Computerized Joint, Mini Invasive, or Hakki for the fraudulent, unnecessary, and unreasonable treatment rendered to A.M. and it is entitled to the return of money paid to Computerized Joint in reliance on the defendants' fraudulent bills.

### 10.   Patient H.S. (Claim No. 0395599276)

982.   Patient H.S. was allegedly involved in a motor vehicle accident on December 18, 2015.

983.   That same day, H.S. presented to St. John Oakland Hospital.

984.   St. John Oakland Hospital reported that H.S. complained of pain in his right leg.

985.   On January 27, 2016, H.S. purportedly presented to Computerized Joint for an initial evaluation with Hakki.

986.   Hakki recorded H.S.'s chief complaints as pain in his right leg, right knee, neck, back, and both shoulders.

987.   This contradicts the emergency room diagnoses and complaints.

988.   In fact, the chief complaints recorded for H.S. are identical to those reported by Hakki in the medical records of Patient M.Y. (Claim No. 0395599276).

989.   M.Y. was involved in the same motor vehicle accident as H.S. and also purportedly presented to Computerized Joint for an initial evaluation on January 27, 2016.

990.   Hakki's assessment of M.Y. and H.S. is identical, including the same diagnoses.

991.   This contradicts the fact that M.Y. and H.S. reported different injuries at the emergency room.

992.   The duplicative nature of the purported treatment provided to M.Y. and H.S. indicates that the treatment was fraudulent, unnecessary, and unreasonable.

993.   Hakki's January 27, 2016 evaluation of H.S. did not include any assessment of the left knee or neck.

994.   Hakki's note includes the boilerplate language "MRI ordered for the CX TX LX to rule out any bony or soft tissue injury," indicating that Hakki ordered MRI scans of the cervical, thoracic, and lumbar spine.

995.   Hakki provided H.S. with a prescription for an MRI scan of the left knee and right knee.

996.   Hakki did not order an MRI scan of the cervical, thoracic, and lumbar spine, in contradiction to Hakki's own recommendations and notes.

997.   On March 12, 2016, H.S. presented to Crystal Clear based on Hakki's prescription.

998.   Crystal Clear performed MRI scans of H.S.'s right knee and left knee.

999.   Crystal Clear mailed a bill to Allstate through the U.S. Mail for MRI scans of the right knee (CPT Code 73721-RT) and the left knee (CPT Code 73721-LT).

1000. H.S. never complained of pain in his left knee and Hakki never performed an assessment of H.S.'s left knee.

1001. The MRI scan of H.S.'s left knee was therefore unreasonable and unnecessary.

1002. Crystal Clear, Computerized Joint, and Hakki submitted claims for payment and accompanying medical records relative to H.S. to Allstate through the U.S. Mail seeking reimbursement for fraudulent, unreasonable, and unnecessary treatment, upon which Allstate relied in adjusting the claims.

1003. Allstate is not required to pay Crystal Clear, Computerized Joint, or Hakki for the fraudulent, unreasonable, and unnecessary treatment that was rendered to H.S. and is entitled to the return of money paid to Computerized Joint in reliance on the defendants' fraudulent bills.

## 11.   Patient N.M. (Claim No. 0432412377)

1004. Patient N.M. was allegedly involved in a motor vehicle accident on October 6, 2016.

1005. On November 1, 2016, N.M. presented to Mini Invasive for an initial evaluation with Hakki, who did not document that N.M. was taking any prescribed medications.

1006. Hakki noted that N.M. did not consume alcohol and did not take any drugs.

1007. Hakki provided N.M. with a prescription for Tramadol.

1008. On November 1, 2016, Hakki ordered urine drug testing for N.M.

1009. Advanced Central Labs sent bills to Allstate through the U.S. Mail for alleged testing of twenty-three (23) different drugs totaling $6,036.60.

1010. There was no medical basis for ordering or performing definitive urine drug testing on November 1, 2016, as the urine drug tests did not aid Hakki's clinical decision making.

1011. On December 14, 2016, N.M. returned to Mini Invasive for a follow-up visit with Hakki.

1012. The medical records from December 14, 2016 make no mention of the results from the urine drug testing performed on November 1, 2016.

1013. On February 6, 2017, N.M. returned to Mini Invasive for a follow-up visit with Hakki.

1014. The medical records for the February 6, 2017 visit make no mention of the results from the urine drug testing performed on November 1, 2016.

1015. On March 22, 2017 and March 30, 2017, Advanced Central Labs submitted bills to Allstate through the U.S. Mail purporting to perform urine drug testing on N.M.

1016. There are no medical records documenting that Hakki (or anyone else) ordered this urine drug testing.

1017. Nonetheless, Advanced Central Labs sent bills to Allstate through the U.S. Mail for alleged presumptive testing in the amount of $511.32 and alleged definitive testing of twenty-one (21) different drugs in the amount of $4,723.51.

1018. Twelve (12) of the charges for the March 30, 2017 definitive urine drug testing are identical to the testing performed on November 1, 2016.

1019. On April 20, 2017, N.M. returned to Mini Invasive for a follow-up visit with Hakki.

1020. The medical records make no mention of the urine drug testing allegedly performed on March 22, 2017 or March 30, 2017.

1021. Mini Invasive, Advanced Central Labs, and Hakki submitted claims for payment and accompanying medical records relative to N.M. to Allstate through the U.S. Mail seeking reimbursement for fraudulent, unnecessary, and unreasonable treatment, upon which Allstate relied in adjusting the claims.

1022. Allstate is not required to pay Mini Invasive, Advanced Central Labs, or Hakki for fraudulent, unreasonable, and unnecessary treatment rendered to N.M.

## 12.   **Patient M.M. (Claim No. 0397805565)**

1023. Patient M.M. was allegedly involved in a motor vehicle accident on January 9, 2016.

1024. Bluebird submitted bills to Allstate through the U.S. Mail purporting to provide transportation services for M.M. on January 5, 7, and 8, 2016.

1025. On January 5, 7, and 8, 2016, M.M. had not yet been involved in an alleged motor vehicle accident.

1026. Any service purportedly provided on January 5, 7, and 8, 2016 was provided fraudulently and was not connected to any injuries allegedly received as a result of a motor vehicle accident.

1027. On January 15, 2016, M.M. presented to Stefan Glowacki, M.D., P.C. for an initial evaluation with Glowacki.

1028. Glowacki provided M.M. with a prescription for physical therapy and a disability certificate for transportation services.

1029. That same day, M.M. purportedly presented to Rose PT to initiate physical therapy.

1030. Bluebird submitted bills to Allstate through the U.S. Mail for transportation services purportedly provided on January 12 and 14, 2016.

1031. M.M. did not present to Stefan Glowacki, M.D., P.C. for an initial evaluation until January 15, 2016.

1032. M.M. did not receive a disability certificate for transportation services until January 15, 2016.

1033. M.M. did not initiate physical therapy until January 15, 2016.

1034. Therefore, the transportation services allegedly provided on January 12 and 14, 2016 were fraudulent, unreasonable, and unnecessary.

1035. On February 18, 2016, M.M. presented to Rose Pain for an initial evaluation with Hakki.

1036. Hakki provided M.M. with a prescription for Norco, a prescription for physical therapy, and a disability certificate noting his need for transportation services.

1037. M.M. testified that he continued to drive, but would use the transportation services due to how his prescribed medication made him feel:

> Q.   Were you using a transportation company to get to your doctors' appointments?
>
> A.   Yes.
>
> Q.   Why did you need to use a transportation company?
>
> A.   I didn't like driving on the medication, and I couldn't drive either.   But, you know, sometimes I did drive when I needed to even though I was told not to.   I don't know if I should be saying this to Allstate or not, but you know, I have to be somewhere, I will drive to do it even though I'm not supposed to, you know.   Nothing will stop me from having to go to work or somewhere, but for the most part, they dropped me to and from those places, especially when I was on medication.

1038.  M.M. never cited his injuries or purported pain as a reason for requiring medical transportation services.

1039.  Rose PT, Bluebird, Rose Pain, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki submitted claims for payment and accompanying medical records relative to M.M. to Allstate through interstate wires and the U.S. Mail seeking reimbursement for fraudulent, unreasonable, and unnecessary treatment, upon which Allstate relied in adjusting the claims.

1040.  Allstate is not required to pay Rose PT, Bluebird, Rose Pain, Stefan Glowacki, M.D., P.C., Hakki, or Glowacki for the fraudulent, unreasonable, and unnecessary treatment rendered to M.M.

## 13.   Patient G.M. (Claim No. 0240954065)

1041.  Patient G.M. was allegedly involved in a motor vehicle accident on April 8, 2012.

1042.  Bluebird submitted a bill and transportation log to Allstate through interstate wires purporting to provide transportation services for G.M. on April 3, 2012.

1043.  On April 3, 2012, G.M. had not yet been involved in an alleged motor vehicle accident.

1044. Any service purportedly provided on April 3, 2012 was provided fraudulently and was not connected to any injuries allegedly received as a result of a motor vehicle accident.

1045. On July 25, 2012, G.M. presented to Stefan Glowacki, M.D., P.C. for an initial evaluation with Glowacki.

1046. On July 25, 2012, Glowacki provided G.M. with a disability certificate indicating that G.M. required transportation services.

1047. Glowacki backdated the date of the disability certificate to April 8, 2012.

1048. Glowacki had not seen G.M. on April 8, 2012.

1049. Therefore, Glowacki was not in a position to determine whether G.M. required transportation services on April 8, 2012.

1050. Bluebird submitted bills and transportation logs to Allstate through interstate wires purporting to provide transportation services for a total of twelve (12) trips between April 8, 2012 and July 25, 2012.

1051. These twelve (12) trips were not medically necessary and therefore fraudulently provided to G.M.

1052. On January 3, 2013, an independent medical evaluation of G.M. was performed.

1053. The independent medical examiner found that G.M. was at maximum medical improvement with respect to his injuries related to the motor vehicle accident and that G.M. was not disabled.

1054. However, Bluebird purportedly provided G.M. with transportation services for 50 trips after January 3, 2013.

1055. Therefore, these 50 trips were fraudulently provided and were unreasonable and unnecessary.

1056. Bluebird, Stefan Glowacki, M.D., P.C., and Glowacki submitted claims for payment and accompanying medical records relative to G.M. to Allstate through interstate wires and the U.S. Mail seeking reimbursement for fraudulent, unreasonable, and unnecessary treatment and services, upon which Allstate relied in adjusting the claims.

1057. Allstate is not required to pay Bluebird, Stefan Glowacki, M.D., P.C., or Glowacki for the fraudulent, unreasonable, and unnecessary treatment and services provided to G.M.

## X.      FRAUDULENT BILLING PRACTICES

1058. Providers like Utica PT, Rose PT, Rose Pain, Mini Invasive, Computerized Joint, Advanced Central Labs, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki have a responsibility to select and submit the billing code that

accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

1059. Utica PT, Rose PT, Rose Pain, Mini Invasive, Computerized Joint, Advanced Central Labs, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki failed to meet this responsibility and instead submitted demands for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

### A.   FRAUDULENT PRACTICE OF UNBUNDLING

1060. The National Correct Coding Initiative ("NCCI") was established to promote national correct coding methodologies and to control improper coding leading to inappropriate payment.

1061. There are two NCCI edit tables: "Column One/Column Two Correct Coding Edit Table" and "Mutually Exclusive Edit Table."

1062. Each NCCI edit table has a Column One and Column Two billing code.

1063. Each NCCI edit table contains edits, which are pairs of billing codes that cannot be reported together because the services (and reimbursement) for the Column Two code is subsumed by the services (and reimbursement) for the Column One code.

1064. Violation of the edits (billing a Column One code and a Column Two code on the same day for the same patient) is known as "unbundling," which occurs

when a provider bills separately for individual components of a procedure that are included in another billing code also billed for the same date of service.

1065. Each NCCI edit has a modifier indicator assigned to it.

1066. A modifier indicator of "0" indicates a modifier cannot be used to bypass the edit.

1067. A modifier indicator of "1" indicates that a properly-codified modifier can be used to allow submitted services or procedures if certain criteria are met.

1068. Many procedure codes cannot be reported together because they are mutually exclusive of each other and mutually exclusive procedures cannot be performed at the same anatomic site or during the same patient encounter.

1069. Pairs of billing codes that are mutually exclusive of one another are identified as code pair edits in the NCCI Mutually Exclusive edit table.

1070. Utica PT and Rose PT submitted bills to Allstate seeking payment for CPT Codes paired with other billing codes that have NCCI Modifier Indicator "0" listed.

1071. As discussed above, any CPT Code pairs with Modifier Indicator "0" listed means the CPT Codes can never be billed on the same date of service for the same patient, regardless of the use of a properly-codified modifier.

1072. Utica PT and Rose PT routinely submitted bills to Allstate seeking payment for unbundled services.

156

1073. For each violation of the Column One and Column Two Edit Table, it is the procedure in Column Two that is unbundled from Column One and therefore is non-compensable.

1074. By way of example, Utica PT and Rose PT submitted bills to Allstate for CPT Code 97124 ("*massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)*") and CPT Code 97140 ("*manual therapy techniques (eg, mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes*") for the same patient on the same date of service.

1075. CPT Code 97124 is a Column Two code and CPT Code 97140 is a Column One code when billed on the same date of service for the same patient.

1076. For a significant number of the patients at issue in this Complaint, Utica PT and Rose PT submitted bills to Allstate through interstate wires and the U.S. Mail seeking payment for unbundled services billed on the same date of service, as detailed in Exhibit 44.

1077. Utica PT and Rose PT fraudulently unbundled charges to Allstate totaling over $66,660. *See* id.

1078. Moreover, the billing procedures performed by Utica PT demonstrate the steps taken to conceal the unbundled charges.

157

1079. Utica PT submitted bills to Allstate containing the CPT Codes charged for an individual date of service.

1080. These bills consistently included a charge for CPT Code 97140 (the Column One code), but did not include a charge for CPT Code 97124 (the Column Two code).

1081. Utica PT then separately submitted bills containing only CPT Code 97124 regarding multiple dates of service.

1082. The breadth, depth, and frequency of Utica PT's fraudulent billing confirms that these billing practices were intentional.

1083. Allstate is not obligated to pay Utica PT or Rose PT for fraudulently billed procedures.

### B.   FRAUDULENTLY UPCODED OFFICE VISITS

1084. Certain treatment and procedures are billed using CPT Codes that reflect the level of complexity involved.

1085. It is the responsibility of the medical provider to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

1086. As discussed above, the defendants made misrepresentations to Allstate by submitting documents that included CPT Codes for medical services that (1) were

not actually performed, (2) were not performed consistent with the AMA's requirements, and/or (3) were wholly unwarranted and unnecessary.

1087. Moreover, the billing codes submitted to Allstate by, and on behalf of, Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

1088. Most prominently, Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki submitted bills to Allstate seeking reimbursement for high-level office visits and office consultations that did not occur as billed.

1089. When an individual has been in a motor vehicle accident and complains of pain, a licensed healthcare professional must obtain a history and perform an examination to arrive at a legitimate diagnosis.

1090. The licensed healthcare professional must also engage in medical decision making to design a legitimate treatment plan tailored to the unique needs of each patient.

1091. Examination, evaluation, and the establishment of a diagnosis are all part of the process that helps healthcare providers determine an appropriate treatment plan specifically designed to aid each individual patient's care, recovery, and rehabilitation.

1092. The evaluation and management of a patient is usually billed through CPT Codes for office visits/examinations or office consultations.

1093. A legitimate examination has three (3) components: (1) the patient history; (2) the systems review; and (3) tests and measures.

1094. The "patient history" is defined as a systematic gathering of past and current information related to why the patient is seeking medical services and includes data obtained (i.e., through an interview, a review of the patient's records, or from other sources) from, among other things, family history, general health status, medical/surgical history, current conditions, and chief complaints.

1095. The "systems review" is an examination of the anatomical and physiological status of a patient's systems (e.g., cardiovascular/pulmonary, musculoskeletal, and neuromuscular systems).

1096. After an appropriate examination and questioning process, the healthcare provider determines the patient's needs, and generates diagnostic hypotheses that may be further investigated by utilizing specific tests and measures.

1097. "Tests and measures" are used to: (1) rule in (or rule out) causes of impairment and functional limitations; (2) establish a diagnosis, prognosis, and plan of care; and (3) select interventions.

1098. There are five (5) levels at which an office visit/examination or office consultation can be billed using CPT Codes: levels one (1) through five (5), with

level one (1) being the least involved examination and level five (5) being the most complex.

1099. Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920."

1100. The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

1101. The criteria developed by the AMA to properly assign the CPT Code for an initial visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99201 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99202 | Expanded problem focused | Expanded problem focused | Straight forward | 10 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

1102. Reevaluation or follow-up visits/examinations are billed using a CPT Code that starts with the numbers "9921."

1103. The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the re-examination.

1104. The criteria developed by the AMA to properly assign the CPT Code for a reevaluation or follow-up visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99211 | Minimal presenting problem(s) | Minimal presenting problem(s) | Minimal presenting problem(s) | 5 minutes |
| 99212 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99213 | Expanded problem focused | Expanded problem focused | Low complexity | 15 minutes |
| 99214 | Detailed | Detailed | Moderate complexity | 25 minutes |
| 99215 | Comprehensive | Comprehensive | High complexity | 40 minutes |

1105. Initial office consultations are billed using a CPT Code that starts with the numbers "9924."

1106. The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

1107. The criteria developed by the AMA to properly assign the CPT Code for an initial consultation include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99241 | Problem focused | Problem focused | Straight forward | 15 minutes |
| 99242 | Expanded problem focused | Expanded problem focused | Straight forward | 30 minutes |
| 99243 | Detailed | Detailed | Low complexity | 40 minutes |
| 99244 | Comprehensive | Comprehensive | Moderate complexity | 60 minutes |
| 99245 | Comprehensive | Comprehensive | High complexity | 80 minutes |

1108. The factors considered to determine the "complexity" of medical decision making in arriving at a proper CPT Code assignment for initial visits/examinations include:

| | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| **Straight forward decision making (CPT Code 99201-99202)** | Minimal | Minimal or none | Minimal |
| **Low complexity decision making (CPT Code 99203)** | Limited | Limited | Low |
| **Moderate complexity medical decision making (CPT Code 99204)** | Multiple | Moderate | Moderate |
| **High complexity medical decision making (CPT Code 99205)** | Extensive | Extensive | High |

1109. The AMA has published examples of office visits that are appropriately billed using CPT Code 99205, including:

- "Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension."

- "Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis."

*CPT Assistant, Spring 1992.*

1110. The AMA has published examples of office visits that are appropriately billed using CPT Code 99204, including:

- "Office visit for initial evaluation of a 63-year-old male with chest pain on exertion."

- "Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion."

163

- "Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization three times."

*CPT Assistant, Spring 1992.*

1111. The AMA has published examples of office visits that are appropriately billed using CPT Code 99215, including:

- "Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly."

- "Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient."

*CPT Assistant, Spring 1992.*

1112. The AMA has published examples of office visits that are appropriately billed using CPT Code 99214, including:

- "Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency to urination and weight loss, blood sugar of 320 and negative ketones on dipstick."

- "Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication."

*CPT Assistant, Spring 1992.*

1113. The AMA has published examples of office visits that are appropriately billed using CPT Code 99245, including:

- "Initial office consultation of a 35-year-old multiple trauma male patient with complex pelvic fractures, for evaluation and formulation of management plan."

- "Office consultation for independent medical examination of a patient with a history of complicated low back and neck problems with previous multiple failed back surgeries."

*CPT 2015: Professional Edition Codebook.*

1114. The AMA has published examples of office visits that are appropriately billed using CPT Code 99244, including:

- "Initial office consultation for a patient with a failed total hip replacement with loosening and pain upon walking."

- "Office consultation for 66-year-old female, history of colon restriction for adenocarcinoma six years earlier, now with severe mid-back pain; X-rays showing osteoporosis and multiple vertebral compression fractures."

*CPT 2015: Professional Edition Codebook.*

1115. The patients at issue in this Complaint almost never presented with symptoms or diagnoses similar in severity or complexity to any of the examples set out above.

1116. Instead, the defendants' patients were involved in low-level motor vehicle accidents and presented with soft-tissue injuries and complaints, to the extent patients had symptoms at all (as most patients presented because they were solicited to do so and not because they sought out medical treatment).

1117. Soft-tissue injuries usually resolve themselves without medical intervention.

1118. Yet, Rose Pain, Mini Invasive, Computerized Joint, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki almost always billed Allstate for level four (4) and

five (5) examinations for the initial office visit (i.e., CPT Codes 99204 and 99205) or initial office consultation (i.e., CPT Code 99244 and 99245).

1119. Rose Pain, Mini Invasive, Computerized Joint, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki almost always billed Allstate for level (4) four and five (5) examinations for the follow-up visits (i.e., CPT Codes 99214 and 99215).

1120. Computerized Joint billed Allstate for level four (4) and five (5) office visits and consultations more than ninety-four percent (94%) of the time with respect to the patients at issue in this Complaint.

1121. Mini Invasive billed Allstate for level four (4) and five (5) office visits and consultations more than ninety-four percent (94%) of the time with respect to the patients at issue in this Complaint.

1122. Rose Pain billed Allstate for level four (4) and five (5) office visits and consultations more than forty-seven percent (47%) of the time with respect to the patients at issue in this Complaint.

1123. Hakki billed Allstate for level four (4) and five (5) office visits and consultations more than ninety percent (90%) of the time with respect to the patients at issue in this Complaint.

1124. Glowacki, by and through Stefan Glowacki, M.D., P.C., billed Allstate for level four (4) and five (5) office visits and consultations more than eighty-eight percent (88%) of the time with respect to the patients at issue in this Complaint.

1125. The documentation submitted by the defendants to Allstate falls woefully short of meeting the threshold standard to bill for level four (4) or five (5) office visits.

1126. Indeed, with respect to each patient for whom Allstate was billed for a level four (4) or five (5) initial examination, the defendants failed to document the necessary history required by CPT Codes 99204 and 99205.

1127. With respect to each patient for whom Allstate was billed for a level four (4) or five (5) initial examination, the defendants failed to document the necessary examination required by CPT Codes 99204 and 99205.

1128. With respect to each patient for whom Allstate was billed for a level four (4) or five (5) initial examination, the defendants failed to document the necessary complexity of medical decision making required by CPT Codes 99204 and 99205.

1129. The defendants' own records demonstrate the billing for level four (4) and five (5) office visits constitutes a fraudulent misrepresentation of the services actually rendered.

1130. Indeed, these records, and the lack of detail and specificity therein, evidence that Hakki and Glowacki rarely performed anything more than a perfunctory examination that often did not consist of anything more than asking patients a few questions.

1131. The records also demonstrate that the defendants' patients, almost all of whom were involved in minor motor vehicle accidents and were fully ambulatory, rarely presented with serious symptoms and injuries.

1132. The frequency at which Rose Pain, Mini Invasive, Computerized Joint, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki billed Allstate for level four (4) or five (5) examinations is particularly egregious when considering the amount that the defendants billed for these purported examinations.

1133. As discussed *supra*, a higher-level evaluation requires further analysis and more of the treating physician's time than performing a lower-level evaluation.

1134. Therefore, physicians and medical clinics charge a greater amount for a higher level evaluation.

1135. Despite not providing treatment that warranted level four (4) or five (5) evaluations, the defendants charged excessive amounts for their purported evaluations.

1136. Rose Pain submitted bills to Allstate for $700 for each level five (5) initial evaluation.

1137. Mini Invasive and Computerized Joint submitted bills to Allstate of $700 for each level four (4) initial evaluation.

1138. Rose Pain submitted bills to Allstate of $500 for each level four (4) initial evaluation.

1139. Glowacki, by and through Stefan Glowacki, M.D., P.C., submitted bills to Allstate of $500 for each level four (4) and five (5) initial evaluation.

1140. Computerized Joint submitted bills to Allstate of $600 for each level four (4) and five (5) follow-up visit.

1141. Mini Invasive submitted bills to Allstate of $500 and $650 for each level four (4) and five (5) follow-up visit, respectively.

1142. The excessive rates charged by these defendants further demonstrate that the purpose of their scheme was to maximize the amount they billed to auto insurers like Allstate.

1143. By creating medical bills that included CPT Codes for office visits and then causing such bills to be faxed and mailed to Allstate, the defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

1144. However, all of the bills prepared and submitted by the defendants were submitted using fraudulent and deceptive examination CPT Codes.

1145. As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

C. **CRYSTAL CLEAR BILLED ALLSTATE USING A DELETED CPT CODE**

1146. Relevant to this Complaint, the AMA deleted CPT Code 73542 ("*radiological examination, sacroiliac joint arthrography, radiological supervision and interpretation*") as of January 1, 2012.

1147. Notwithstanding this fact, Crystal Clear fraudulently billed Allstate using deleted CPT Code 73542 in the year 2016, four (4) years after the CPT Code was deleted.

1148. Despite the deletion of CPT Code 73542 at least four (4) years earlier, Crystal Clear submitted bills to Allstate through interstate wires and the U.S. Mail seeking payment for CPT Code 73542 at a rate of $4,900.00 each time the code was billed.

1149. Allstate is not required to compensate Crystal Clear for its fraudulent billing of a deleted CPT Code as of January 1, 2012.

## XI. **EXCESSIVE AND UNREASONABLE CHARGES**

### A. **MICHIGAN LAW REGARDING REASONABLE AND CUSTOMARY CHARGES**

1150. As discussed *supra*, the defendants billed for services that, if performed at all, were unlawful, unnecessary, and were performed only to financially benefit the defendants and not to aid in the treatment of patients.

1151. In addition to being unlawful, unnecessary, and unwarranted for the reasons discussed above, the defendants also charged such unreasonable and

excessive amounts for massage therapy, MRIs, transportation services, and other treatment to be fraudulent within the meaning of Mich. Comp. Laws § 500.3148(2).

1152. Michigan courts have stated explicitly that "medical care providers are prohibited from charging more than a reasonable fee."  McGill v. Auto. Ass'n, 207 Mich. App. 402, 405 (1994).

1153. The Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses thereunder.  Mich. Comp. Laws § 500.3107(1)(a).

1154. "[T]he 'customary charge' limitation in § 3157 and the 'reasonableness language in § 3107 constitute separate and distinct limitations on the amount health-care providers may charge and what insurers must pay with respect to victims of automobile accidents who are covered by no-fault insurance." AOPP v. Auto Club Ins. Ass'n, 257 Mich. App. 365, 376 (2003).

1155. The "customary fee" of a medical provider under Mich. Comp. Laws § 500.3157 does not establish a "reasonable charge" under Mich. Comp. Laws § 500.3107.  Id. at 381.

1156. The "customary fee" under Mich. Comp. Laws § 500.3157 is "simply the cap on what health-care providers can charge, and is not, automatically, a 'reasonable' charge requiring full reimbursement under § 3107."  Id. at 377.

1157. Michigan law is clear that the burden of proving the reasonableness of charges submitted for No-Fault benefits lies with the provider and that insurers have an obligation to police and challenge unreasonable charges.

1158. For the reasons discussed, *infra*, the defendants cannot meet their burden, thereby vitiating Allstate's obligation to pay any of the unreasonable charges for office visits, massage therapy, P-Stim, MRIs, and transportation services, and entitling Allstate to reimbursement for those amounts paid that are in excess of a reasonable amount for the services purportedly rendered.

### B.    EXCESSIVE AND UNREASONABLE MASSAGE THERAPY CHARGES

1159. For the reasons discussed *infra*, Utica PT and Rose PT cannot meet their burden of proving that their charges for massage therapy are reasonable.

1160. Utica PT and Rose PT billed Allstate using CPT Code 97124 ("*massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)*").

1161. One (1) unit of CPT Code 97124 accounts for fifteen (15) minutes of treatment.

1162. Utica PT billed Allstate a minimum of $130.00 and as much as $150.00 for one (1) unit of CPT Code 97124.

1163. Rose PT billed Allstate a minimum of $150.00 and as much as $180.00 for one (1) unit of CPT Code 97124.

1164. Maria Steinhoff, a massage therapist for twenty-two (22) years and a former Utica PT employee, testified that the customary charge for one (1) unit of CPT Code 97124 is $1 per one (1) minute of treatment:

> Q.    What would be?  What is customary –
>
> A.    $15, a dollar per minute, is the ongoing rate for 15 minutes; but if you're charging the insurance company, it should not.  It should probably be about the same; definitely not 130.
>
> Q.    Right.  And the $1 per minute is what you've seen in your twenty-something years of experience?
>
> A.    Yes.  Wow, $130 for 15 minutes.
>
> Q.    Correct.  That's on every page.
>
> A.    Yes.  That's a lot of money.

1165. Utica PT and Rose PT therefore charged an excessive rate for massage therapy and cannot sustain their burden of proving otherwise.

## C.    EXCESSIVE AND UNREASONABLE MRI CHARGES

1166. Crystal Clear submitted bills to Allstate using CPT Codes.

1167. In the years 2015, 2016, and 2017 to present, Crystal Clear submitted the following charges to Allstate for its MRI services:

| MRI CPT Code Billed | CPT Code Description | Amount Billed Per MRI |
|---|---|---|
| 70551 | Brain MRI, without contrast | $5,700.00 |
| 72141 | Cervical MRI, without contrast | $4,600.00 |
| 72146 | Thoracic MRI, without contrast | $4,900.00 |
| 72148 | Lumbar MRI, without contrast | $4,900.00 |
| 73221 | Upper extremity joint MRI, without contrast | $4,600.00 |
| 73718 | Lower extremity MRI, without contrast | $4,900.00 |
| 73721 | Lower extremity joint MRI, without contrast | $4,900.00 |

*See* Exhibit 4 *annexed hereto for a chart of bills submitted to Allstate by Crystal Clear for MRIs performed in 2015, 2016, and 2017 to present, itemized by patient claim number, patient initials, date of service, MRI CPT Code billed, CPT Code description, and amount billed.*

1168. Thus, Crystal Clear billed Allstate a minimum of $4,600 and as much as $5,700 for each MRI it performed in the years 2015, 2016, and 2017 to present.

1169. Ishaq testified that he established the rates at Crystal Clear:

> Q.    So how much do you charge per MRI?

> A.    4,900 per area.

> Q.    How did you come up with that rate?

> A.    I have a lot of reasons.  I believe the standard price, I believe because we [are] not getting our money right away, then we are not charging interest to get our money when they be [sic] late.

> Q.    Did you come up with that rate or did somebody else come up with that rate?

A.    Me, I did come up with that.

Q.    When did you do that?

A.    When I established the business.

Q.    So in November of 2015, you determined that you would charge 4,900 per MRI, is that right?

A.    Right.

1170. When asked how he decided on that amount, Ishaq testified that the decision stemmed from hearing MRI patients discuss the alleged cost of an MRI:

Q.    Why did you believe that was the standard price?

A.    Because I know most all the facilities [are] charging [the] same.

Q.    How do you know that?

A.    I'm sorry.  They charge more than what I do.

Q.    How do you know that?

A.    I'm a businessman, I have heard about that a lot.

Q.    Who did you hear that from?

A.    A lot, patients, when I was working –

Q.    So you surveyed patients and asked them what they were being charged for MRIs?

A.    I heard that from them.  I didn't ask.

1171. It is highly unlikely that a patient would know the cost of an MRI scan.

1172. Moreover, evidence confirms that the usual cost to perform an MRI scan is less than $500.

1173. Crystal Clear's charges are grossly excessive when compared to other prominent Michigan payors.

1174. For example, Medicare reimbursed for MRIs performed in Macomb, Oakland, and Wayne counties at the following amounts for MRIs performed from 2015 through 2017 to present:

|  | 2015A | 2015B | 2016 | 2017 |
|---|---|---|---|---|
| **CPT Code 70551** | $230.15 | $231.30 | $232.01 | $234.22 |
| **CPT Code 72141** | $244.06 | $224.52 | $225.73 | $228.00 |
| **CPT Code 72146** | $223.40 | $224.52 | $225.73 | $228.35 |
| **CPT Code 72148** | $223.33 | $223.44 | $224.66 | $227.29 |
| **CPT Code 73221** | $235.81 | $236.99 | $237.80 | $240.78 |
| **CPT Code 73718** | $364.47 | $366.29 | $366.28 | $368.59 |
| **CPT Code 73721** | $325.45 | $236.63 | $238.16 | $240.42 |

1175. Michigan Medicaid reimbursed for MRIs performed from 2015 through 2017 to present:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| **CPT Code 70551** | $127.77 | $128.37 | $129.16 |
| **CPT Code 72141** | $124.01 | $124.80 | $125.60 |
| **CPT Code 72146** | $124.01 | $124.80 | $125.79 |
| **CPT Code 72148** | $123.22 | $124.21 | $125.20 |
| **CPT Code 73221** | $130.75 | $131.54 | $132.73 |
| **CPT Code 73718** | $202.46 | $203.05 | $203.84 |
| **CPT Code 73721** | $130.75 | $131.74 | $132.53 |

1176. The Michigan worker's compensation program reimburses MRIs performed from 2015 through 2017 to present:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| **CPT Code 70551** | $230.15 | $232.01 | $234.22 |
| **CPT Code 72141** | $324.04 | $225.73 | $228.00 |
| **CPT Code 72146** | $223.40 | $225.73 | $228.35 |
| **CPT Code 72148** | $222.33 | $224.66 | $227.29 |
| **CPT Code 73221** | $235.81 | $237.80 | $240.78 |
| **CPT Code 73718** | $364.47 | $366.28 | $368.59 |
| **CPT Code 73721** | $235.45 | $238.16 | $240.42 |

1177. Allstate is not suggesting that it should pay only what other Michigan payors pay for MRIs.

1178. However, the reimbursement amounts from other payors are indicative of the range of what constitutes a reasonable charge.

1179. Crystal Clear's charges are well outside this range and the spectrum of reasonableness and Crystal Clear cannot sustain its burden of proving otherwise.

### D.   EXCESSIVE AND UNREASONABLE TRANSPORTATION CHARGES

1180. The transportation charges submitted by Bluebird to Allstate are unreasonable and excessive.

1181. The charges for transportation services provided by Bluebird are excessive when compared to pricing from taxicab or ridesharing services for the same distance.

1182. Bluebird submitted bills to Allstate through interstate wires and the U.S. Mail charging a $35 pick-up fee, a $30 wait time fee per hour, and a mileage charge of $3.77 per mile.

1183. These rates far exceed, and in many instances more than triple, the amount of a taxicab and vastly surpass the amount the cost to take an application-based ride-hailing service, such as Uber or Lyft.

1184. For example, Patient A.S. (Claim No. 0305094146) lives 12.2 miles away from Utica PT.

1185. Bluebird submitted bills to Allstate for purportedly providing transportation services on 114 dates of service to A.S.

1186. The average cost per date of service billed by Bluebird was $268.12.

1187. A round-trip taxicab ride for the same distance, including a fifteen percent (15%) tip, costs approximately $80, or less than one-third the amount charged to Allstate by Bluebird.

1188. A round-trip Uber or Lyft ride for the same distance costs approximately $31.40, or less than one-ninth the amount charged to Allstate by Bluebird.

1189. Bluebird therefore charges an excessive rate for transportation services and cannot sustain its burden of proving otherwise.

## XII.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

1190. To induce Allstate to pay promptly their fraudulent charges for unnecessary medical and transportation services, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred for and provided were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

1191. Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

179

1192. Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

1193. There are no less than thirteen (13) separate reasons why the defendants' alleged treatment was not in fact necessary or lawful (and, therefore, was fraudulently billed to Allstate):

    a.    Utica PT, Rose Pain, Bluebird, Computerized Joint, Mini Invasive, Ishaq, Mukhlis Tooma, Lolo Tooma, and Hakki billed Allstate for treatment and services that were not actually provided. Multiple patients at issue in this Complaint denied receiving the treatment or services that the defendants purported to provide or testified that they were not present at the defendants' facility on the date or time that they purportedly received treatment or services.

    b.    Utica PT, Rose Pain, Bluebird, Computerized Joint, Mini Invasive, Ishaq, Mukhlis Tooma, Lolo Tooma, and Hakki administered massage therapy, issued DME, and provided medical transportation services without the necessary licensure or registration to and for patients at issue in this Complaint. Allstate is not required under the Michigan No-Fault Act to compensate the defendants for unlawfully rendered services.

    c.    The defendants benefitted from illegally soliciting patients for unnecessary treatment and engaging in *quid pro quo* relationships with each other. The defendants utilized runners to recruit patients to receive unnecessary treatment and personally sought out patients that did not require medical care. The defendants' method of obtaining patients did not include considerations of medical necessity. The defendants participated in numerous *quid pro quo* relationships that derived profit for

themselves without regard for the necessity and lawfulness of medical treatment.

d.     The defendants used an unlawful predetermined treatment protocol, as indicated by the use of physical therapy over the course of numerous months without any change to the treatment plan, as well as the repeated application of P-Stim devices and the *pro forma* ordering of urine drug testing and MRIs.  This predetermined protocol is also confirmed by the substantially similar treatment rendered to patients at issue in this Complaint, including treatment plans that have no bearing on medical necessity or any patient-specific considerations.

e.     Almost all of the patients at issue in this Complaint had significant symptom magnification and differences in presentation of symptoms when comparing emergency room evaluations to the initial evaluation performed by Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki.  For example, the emergency room records almost always indicate the patient suffered a minor, fairly localized injury, whereas the defendants' medical records for the same patients indicated that the patients suffered more serious injuries in diffuse regions of the body.  These magnifications are exemplified in the cases of patients where the defendants directly contradicted the findings of the initial treatment provider, as when, for example, they falsely reported that emergency room physicians had reported the patient to have lost consciousness. The defendants also magnified diagnoses in an attempt to justify their unnecessary treatment. The use of more severe diagnoses often preceded the use of invasive therapy by the defendants, thereby confirming that the defendants inflated symptoms and diagnoses to falsely justify aggressive and expensive treatment.

f.     Computerized Joint, Mini Invasive, and Hakki subjected their patients to a battery of unnecessary injections and other injection-related procedures.   The defendants resorted to rendering MUA to several patients at issue in this Complaint as a matter of course.  However, the defendants simultaneously rendered injections and MUA harmful to the patient.  Allstate is not required to pay the defendants for medically unnecessary

injections and procedures that were only recommended and performed to bolster claims submitted to Allstate.

g.  Rose Pain, Computerized Joint, Mini Invasive, and Hakki subjected their patients to series of unnecessary and clinically useless P-Stim treatment. Hakki represented the P-Stim device as an "FDA approved, minimally invasive, auricular procedure of Pulse Stimulation" that "is designed to reduce pain and in some cases discontinue medication," even though the FDA determined only that the P-Stim was substantially equivalent to an earlier electro-acupuncture device and that it operated transcutaneously. Rose Pain, Mini Invasive, Computerized Joint, and Hakki routinely submitted medical records, including so-called "Procedure Notes" and forms signed by the patient titled "Consent to Operation and Treatment" in an attempt to misrepresent the application of the device to be an operative procedure, even though P-Stim is only approved as an acupuncture procedure by the FDA. Allstate is not required to pay the defendants for medically unnecessary and useless procedures such as the application of P-Stim.

h.  The MRI referrals made by Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki to Crystal Clear (which is owned by Ishaq) were unnecessary and fraudulent because the referrals were made in furtherance of the scheme to bill Allstate for as many ancillary services as possible, in furtherance of their *quid pro quo* relationships, and not based on the individual needs of the patient. The MRIs at issue herein were performed solely to increase the profits realized by the defendants per patient and not for any legitimate reason.

i.  Advanced Central Labs billed for performing unnecessary and excessive urine drug testing at the request and referral of Hakki by and through Rose Pain, Computerized Joint, and Mini Invasive. Numerous patients at issue in this Complaint received definitive urine drug testing with no justification or basis for such testing. The template medical notes submitted by Hakki included language stating to "do drug screening urine analysis to all patients receiving narcotics from us" regardless of the patient's medical history. This further demonstrates that the defendants

conducted urine drug testing as part of a predetermined treatment protocol and not based upon the particular needs of the patient.

j.      Nearly universally, Stefan Glowacki, M.D., P.C. and Glowacki wrote disability certificates for unnecessary transportation services and replacement services in order to support the fiction that the patients had endured serious injuries. Moreover, the disability certificates were written at one-month intervals, thereby ensuring patients returned to Utica PT and Rose PT and ensuring a stream of claims for Bluebird in furtherance of the defendants' scheme to benefit from *quid pro quo* referrals.

k.      Bluebird provided transportation that it knew was unnecessary because (1) the transportation was solicited and directed by Ishaq, and not by a qualified healthcare professional; and (2) the transportation ordered by Glowacki was done pursuant to a *quid pro quo* relationship and not because of actual patient need, which Bluebird knew because it was part of its concerted scheme with the other defendants.

l.      Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki fraudulently upcoded office visits, as almost every single office visit billed to Allstate was for level four (4) or level five (5) even though the office visits did not meet the criteria set by the AMA to bill at such high levels. When done intentionally, upcoding constitutes a fraudulent billing practice.

m.      Utica PT, Rose PT, Crystal Clear, Rose Pain, Mini Invasive, Computerized Joint, and Stefan Glowacki, M.D., P.C., by and through the individual defendants, have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services and they failed to meet their responsibility and instead submitted demands for unreasonable payments to Allstate for medically unnecessary and excessive services. Utica PT and Rose PT also submitted claims to Allstate through interstate wires and the U.S. Mail for services billed using the fraudulent billing practice of unbundling, a practice used to increase the amount charged for each patient visit. The

prevalence of the defendants' unbundling evidences that it was a regular practice that was knowingly and intentionally done. Unbundling that is done knowingly and intentionally constitutes a fraudulent billing practice.

1194. As detailed *supra*, the defendants frequently violated established standards of care, magnified symptoms, treated excessively, and rendered treatment without basis or adequate substantiation.

1195. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

1196. The foregoing facts—billing for services not rendered, unlawfully soliciting patients, falsifying diagnoses to justify excessive treatment, and misrepresenting the necessity of procedures performed on submitted bills—were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

1197. Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment allegedly provided by the defendants unnecessary.

1198. The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed hereto at Exhibits 1 through 9 and 44.

1199. Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with

the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

1200. Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

1201. Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the transportation, visits, examinations, injections, screenings, testing, procedures, and ancillary services for which they billed Allstate.

1202. As the defendants did not render lawful and reasonably necessary medical treatment, and misrepresented the procedures purportedly performed, each bill and accompanying documentation submitted by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

1203. As licensed medical professionals, Hakki and Glowacki were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

185

1204. Each misrepresentation made by Hakki and Glowacki was in violation of their legal and ethical obligations as healthcare professionals

**B.     ALLSTATE'S JUSTIFIABLE RELIANCE**

1205. The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

1206. At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of medical services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the Michigan No-Fault Act.

1207. These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment and transportation services in order to seek reimbursement under Michigan's No-Fault Act.

1208. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

1209. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and

could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

1210. In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

1211. Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

1212. As a result, Allstate has paid in excess of $355,759 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XIII.    MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

1213. As discussed above, the referrals, treatment, and services purportedly provided by the defendants were not medically necessary, were unlawful, and were fraudulently billed, to the extent they were performed at all.

1214. The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 9, was to collect No-Fault benefits to which the defendants were not entitled because the medical and transportation services rendered, if at all, were not necessary and were not lawfully rendered, and also because the defendants engaged in fraudulent billing practices.

1215. This objective necessarily required the submission of claims to Allstate.

1216. The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail things to be sent and delivered by the U.S. Postal Service or sent through interstate wires.

1217. All documents, medical records, notes, reports, bills/HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires and/or the U.S. Mail.

1218. All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Georgia until November 2013 and thereafter were faxed to Allstate in Iowa.

1219. Allstate received all medical records and bills faxed to it by the defendants in Georgia until November 2013 and thereafter in Iowa.

1220. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

1221. It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

1222. Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

1223. The fraudulent medical billing scheme detailed herein generated thousands of faxes and mailings.

1224. A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 45.

1225. As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

1226. It was within the ordinary course of business for Utica PT, Rose PT, Rose Pain, Crystal Clear, Bluebird, Computerized Joint, Mini Invasive, Advanced Central Labs, and Stefan Glowacki, M.D., P.C. to submit claims for No-Fault reimbursement to insurance carriers like Allstate through interstate wires and the U.S. Mail.

1227. Moreover, the business of providing medical and transportation services by each of the defendant clinics at issue herein is regularly conducted by fraudulently seeking reimbursement to which each defendant clinic is not entitled through the use of fraudulent communications sent via interstate wires and the U.S. Mail.

1228. In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendant clinics.

1229. All of the defendant clinics, at the direction and with the knowledge of their owners and managers, continue to submit claims for payment to Allstate and, in some instances, continue to commence and perpetuate litigation against Allstate seeking to collect on unpaid claims.

1230. Thus, the defendants' instances of mail and wire fraud continue.

1231. As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

1232. As all of the defendants named herein agreed that they would use (and, in fact, did use) interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

1233.  Allstate reasonably relied on the submissions it received from Utica PT, Rose PT, Rose Pain, Crystal Clear, Bluebird, Computerized Joint, Mini Invasive, Advanced Central Labs, and Stefan Glowacki, M.D., P.C., including the representative submissions set out in Exhibit 45 annexed hereto and identified in the exemplar claims above.

1234. As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIV.   <u>DAMAGES</u>

1235. The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

1236. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $355,759.

1237. Exhibits 46 through 52 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to and for the benefit of the defendants by date, payor, payee, patient claim number, check number, and amount.

1238. Exhibit 46 details payments made by Allstate to Utica PT since 2013.

1239. Exhibit 47 details payments made by Allstate to Rose PT since 2016.

1240. Exhibit 48 details payments made by Allstate to Rose Pain since 2016.

1241. Exhibit 49 details payments made by Allstate to Crystal Clear since 2016.

1242. Exhibit 50 details payments made by Allstate to Bluebird since 2011.

1243. Exhibit 51 details payments made by Allstate to Computerized Joint since 2016.

1244. Exhibit 52 details payments made by Allstate to Stefan Glowacki, M.D., P.C. since 2011.

1245. Every claim identified in Exhibits 46 through 52 derives from an Allstate insurance policy.

1246. Allstate's claim for compensatory damages, as set out in Exhibits 46 through 52, does not include payment made with respect to any Assigned Claim Facility claimant.

1247. Every payment identified in Exhibits 46 through 52 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 46 through 52.

1248. Moreover, every payment identified in Exhibits 46 through 52 derives from a check sent by Allstate to the defendants through the U.S. Mail.

1249. As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and/or mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

1250. Allstate also seeks damages, in an amount to be determined at trial, related to the cost of investigation to uncover the fraudulent activities of the defendants and the cost of claims handling/adjustment for claims submitted by the defendants.

1251. Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XV.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Utica Physical Therapy Inc. Enterprise)
### Against Bluebird Transportation Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo Tooma, Arak Ishaq, and Stefan Glowacki, M.D.

1252. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1253. Utica Physical Therapy Inc. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1254. In connection with each of the claims identified in the within Complaint, Bluebird Transportation Inc., Stefan Glowacki, M.D., P.C. Mukhlis Tooma, Lolo Tooma, Arak Ishaq, and Stefan Glowacki, M.D. ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by Utica Physical Therapy Inc., or knew that such false medical documentation would be mailed in the ordinary course of Utica Physical Therapy Inc.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Utica Physical Therapy Inc. would occur, in furtherance of the Count I defendants' scheme to defraud.

1255. The Count I defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 45.

1256. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1257. Policies of insurance were delivered to insureds through the U.S. Mail.

1258. Payments to Utica Physical Therapy Inc. from Allstate were transmitted through the U.S. Mail.

1259. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Utica Physical Therapy Inc., which they knew would be billed by Utica Physical Therapy Inc. in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1260. Mukhlis Tooma is the President of Utica Physical Therapy Inc.

1261. Bluebird, Ishaq, and Mukhlis Tooma were responsible for soliciting and transporting patients to Utica Physical Therapy Inc.

1262. Lolo Tooma managed and owned Utica Physical Therapy Inc.

1263. Stefan Glowacki, M.D., P.C. and Glowacki referred patients to Utica Physical Therapy Inc. for treatment that Utica Physical Therapy Inc. billed Allstate.

1264. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Utica Physical Therapy Inc. for the benefit of the Count I defendants that would not otherwise have been paid.

1265. The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long

period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

1266. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1267. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1268. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Utica Physical Therapy Inc. for the benefit of the Count I defendants.

1269. The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1270. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

1271. The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1272. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1273. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1274. By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Utica Physical Therapy Inc. Enterprise)
### Against Bluebird Transportation Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo Tooma, Arak Ishaq, and Stefan Glowacki, M.D.

1275. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1276. Bluebird Transportation Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo Tooma, Arak Ishaq, and Stefan Glowacki, M.D. ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Utica Physical Therapy Inc.

1277. The Count II defendants each agreed to further, facilitate, support, and operate the Utica Physical Therapy Inc. enterprise.

1278. As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

1279. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Utica Physical Therapy Inc. even though Utica Physical Therapy Inc. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1280. The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1281. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

1282. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Rose Physical Therapy, Inc. Enterprise)**
**Against Rose Pain Management Inc., Bluebird Transportation Inc.,**
**Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan**
**Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D.,**
**and Stefan Glowacki, M.D.**

1283. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1284. Rose Physical Therapy, Inc. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1285. In connection with each of the claims identified in the within Complaint, Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D. ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Rose Physical Therapy, Inc., or knew that such false medical documentation would be faxed and mailed in the ordinary course of Rose Physical Therapy, Inc.'s business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Rose Physical Therapy, Inc. would occur, in furtherance of the Count III defendants' scheme to defraud.

1286. The Count III defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and/or receive payment from Allstate

on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 45.

1287. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through interstate wires and the U.S. Mail.

1288. Policies of insurance were delivered to insureds through the U.S. Mail.

1289. Payments to Rose Physical Therapy, Inc. from Allstate were transmitted through the U.S. Mail.

1290. As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Rose Physical Therapy, Inc., which they knew would be billed by Rose Physical Therapy, Inc. in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1291. Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki referred patients to Rose Physical Therapy, Inc. for treatment that Rose Physical Therapy, Inc. billed Allstate.

1292. Bluebird and Ishaq were responsible for soliciting and transporting patients to Rose Physical Therapy, Inc.

1293. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Rose Physical Therapy, Inc. for the benefit of Rose Physical Therapy, Inc. and the Count III defendants that would not otherwise have been paid.

1294. The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

1295. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

1296. By faxing or mailing, or agreeing that interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1297. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Rose Physical Therapy, Inc. for the benefit of Rose Physical Therapy, Inc. and the Count III defendants.

1298. The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1299. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

1300. The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1301. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1302. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1303. By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Rose Physical Therapy, Inc. Enterprise)
### Against Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D.

1304. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1305. Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D. ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Rose Physical Therapy, Inc.

1306. The Count IV defendants each agreed to further, facilitate, support, and operate the Rose Physical Therapy, Inc. enterprise.

1307. As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

1308. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Rose Physical Therapy, Inc. even though Rose Physical Therapy, Inc. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1309. The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1310. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

1311. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT V**</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Rose Pain Management Inc. Enterprise)**
**Against Crystal Clear Health Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.**

1312. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1313. Rose Pain Management Inc. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1314. In connection with each of the claims identified in the within Complaint, Crystal Clear Health Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D. ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Rose Pain Management Inc., or knew that such false medical documentation would be faxed and mailed in the ordinary course of Rose Pain Management Inc.'s business, or should have reasonably foreseen that the faxing and

mailing of such false medical documentation by Rose Pain Management Inc. would occur, in furtherance of the Count V defendants' scheme to defraud.

1315. The Count V defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 45.

1316. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through interstate wires and the U.S. Mail.

1317. Policies of insurance were delivered to insureds through the U.S. Mail.

1318. Payments to Rose Pain Management Inc. from Allstate were transmitted through the U.S. Mail.

1319. As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed at and/or by Rose Pain Management Inc., which they knew would be billed by Rose Pain Management Inc. in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1320. Crystal Clear performed unnecessary and unreasonable MRI scans that were used to perpetuate fraudulent treatment at Rose Pain Management Inc.

1321. Hakki was involved in rendering and facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered, at Rose Pain Management Inc.

1322. Computerized Joint and Mini Invasive submitted medical records to Allstate in an attempt to support the unlawful and medically unnecessary treatment rendered at Rose Pain Management Inc.

1323. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Rose Pain Management Inc. for the benefit of the Count V defendants that would not otherwise have been paid.

1324. The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

1325. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

1326. By faxing or mailing, or agreeing that interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1327. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Rose Pain Management Inc. for the benefit of the Count V defendants.

1328. The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1329. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

1330. The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1331. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1332. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1333. By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by

reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT VI
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Rose Pain Management Inc. Enterprise)**
**Against Crystal Clear Health Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.**

1334. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1335. Crystal Clear Health Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D. ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Rose Pain Management Inc.

1336. The Count VI defendants each agreed to further, facilitate, support, and operate the Rose Pain Management Inc. enterprise.

1337. As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

1338. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Rose Pain Management Inc. even though Rose Pain Management Inc. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1339.  The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1340.  Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

1341.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Crystal Clear Health Management Inc. Enterprise)
### Against Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D.

1342.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1343. Crystal Clear Health Management Inc. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1344. In connection with each of the claims identified in the within Complaint, Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D. ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Crystal Clear Health Management Inc., or knew that such false medical documentation would be faxed and mailed in the ordinary course of Crystal Clear Health Management Inc.'s business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Crystal Clear Health Management Inc. would occur, in furtherance of the Count VII defendants' scheme to defraud.

1345. The Count VII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 45.

1346. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through interstate wires and the U.S. Mail.

1347. Policies of insurance were delivered to insureds through the U.S. Mail.

1348. Payments to Crystal Clear Health Management Inc. from Allstate were transmitted through the U.S. Mail.

1349. As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Crystal Clear Health Management Inc., which they knew would be billed by Crystal Clear Health Management Inc. in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1350. Ishaq is the owner of Crystal Clear Health Management Inc.

1351. Rose Pain, Computerized Joint, Mini Invasive, Stefan Glowacki, M.D., P.C., Hakki, and Glowacki referred patients to Crystal Clear Health Management Inc. for MRI scans that Crystal Clear Health Management Inc. billed to Allstate.

1352. Bluebird and Ishaq were responsible for soliciting and transporting patients to Crystal Clear Health Management Inc.

1353. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Crystal Clear Health Management Inc. for the benefit of the Count VII defendants that would not otherwise have been paid.

1354. The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

1355. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

1356. By faxing or mailing, or agreeing that interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1357. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Crystal Clear Health Management Inc. for the benefit of the Count VII defendants.

1358. The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1359. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

1360. The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1361. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1362. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1363. By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Crystal Clear Health Management Inc. Enterprise)
### Against Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D.

1364. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

213

1365. Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D. ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Crystal Clear Health Management Inc.

1366. The Count VIII defendants each agreed to further, facilitate, support, and operate the Crystal Clear Health Management Inc. enterprise.

1367. As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

1368. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Crystal Clear Health Management Inc. even though Crystal Clear Health Management Inc. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1369. The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1370. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim

payments as a result of the Count VIII defendants' unlawful conduct described herein.

1371. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Bluebird Transportation Inc. Enterprise)
### Against Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Crystal Clear Health Management Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Arak Ishaq, and Stefan Glowacki, M.D.

1372. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1373. Bluebird Transportation Inc. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1374. In connection with each of the claims identified in the within Complaint, Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Crystal Clear Health Management Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Arak Ishaq, and Stefan Glowacki, M.D. ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Bluebird

Transportation Inc., or knew that such false medical documentation would be faxed and mailed in the ordinary course of Bluebird Transportation Inc.'s business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Bluebird Transportation Inc. would occur, in furtherance of the Count IX defendants' scheme to defraud.

1375. The Count IX defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 45.

1376. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through interstate wires and the U.S. Mail.

1377. Policies of insurance were delivered to insureds through the U.S. Mail.

1378. Payments to Bluebird Transportation Inc. from Allstate were transmitted through the U.S. Mail.

1379. As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Bluebird Transportation Inc., which they knew would be billed by Bluebird Transportation Inc. in order to collect payment from Allstate under the personal

injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1380. Ishaq is the sole owner of Bluebird Transportation Inc.

1381. Mukhlis Tooma provided transportation services to patients through Bluebird Transportation Inc.

1382. Utica PT and Rose PT purportedly provided treatment to patients transported by Bluebird Transportation Inc.

1383. Stefan Glowacki, M.D., P.C. and Glowacki provided disability certificates for patients to receive transportation services from Bluebird Transportation Inc. that Bluebird Transportation Inc. billed Allstate.

1384. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Bluebird Transportation Inc. for the benefit of the Count IX defendants that would not otherwise have been paid.

1385. The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue his fraudulent scheme without detection.

1386. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

1387. By faxing or mailing, or agreeing that interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1388. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Bluebird Transportation Inc. for the benefit of the Count IX defendants.

1389. The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1390. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendant's fraudulent acts.

1391. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1392. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1393. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1394.  By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Bluebird Transportation Inc. Enterprise)
### Against Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Crystal Clear Health Management Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Arak Ishaq, and Stefan Glowacki, M.D.

1395.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1396.  Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Crystal Clear Health Management Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Arak Ishaq, and Stefan Glowacki, M.D. ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Bluebird Transportation Inc.

1397.  The Count X defendants each agreed to further, facilitate, support, and operate the Bluebird Transportation Inc. enterprise.

1398.  As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

1399. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Bluebird Transportation Inc. even though Bluebird Transportation Inc. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1400. The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1401. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

1402. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
## VIOLATION OF 18 U.S.C. § 1962(c)
## (Computerized Joint Surgery LLC Enterprise)
## Against Rose Pain Management Inc., Mini Invasive Orthopedics LLC,
## and Sam Hakki, M.D.

1403. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1404. Computerized Joint Surgery LLC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1405. In connection with each of the claims identified in the within Complaint, Rose Pain Management Inc., Mini Invasive Orthopedics LLC, and Sam Hakki, M.D. ("Count XI defendants") intentionally caused to be prepared and mailed false medical documentation by Computerized Joint Surgery LLC, or knew that such false medical documentation would be mailed in the ordinary course of Computerized Joint Surgery LLC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Computerized Joint Surgery LLC would occur, in furtherance of the Count XI defendants' scheme to defraud.

1406. The Count XI defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 45.

1407. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1408. Policies of insurance were delivered to insureds through the U.S. Mail.

1409. Payments to Computerized Joint Surgery LLC from Allstate were transmitted through the U.S. Mail.

1410. As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Computerized Joint Surgery LLC, which they knew would be billed by Computerized Joint Surgery LLC in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1411. Hakki owns Computerized Joint Surgery LLC.

1412. Hakki was involved in rendering and facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Computerized Joint Surgery LLC.

1413. Rose Pain and Mini Invasive submitted medical records to Allstate in an attempt to support the unlawful and medically unnecessary treatment rendered at Computerized Joint Surgery LLC.

1414. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Computerized Joint Surgery LLC for the benefit of the Count XI defendants that would not otherwise have been paid.

1415. The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue his fraudulent scheme without detection.

1416. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1417. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1418. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Computerized Joint Surgery LLC for the benefit of the Count XI defendants.

1419. The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1420. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI defendant's fraudulent acts.

1421. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1422. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1423. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1424. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Computerized Joint Surgery LLC Enterprise)
### Against Rose Pain Management Inc., Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.

1425. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1426. Rose Pain Management Inc., Mini Invasive Orthopedics LLC, and Sam Hakki, M.D. ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Computerized Joint Surgery LLC.

1427. The Count XII defendants each agreed to further, facilitate, support, and operate the Computerized Joint Surgery LLC enterprise.

1428. As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

1429. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Computerized Joint Surgery LLC even though Computerized Joint Surgery LLC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1430. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1431. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

1432. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Mini Invasive Orthopedics LLC Enterprise)
### Against Rose Pain Management Inc., Computerized Joint Surgery LLC, and Sam Hakki, M.D.

1433. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1434. Mini Invasive Orthopedics LLC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1435. In connection with each of the claims identified in the within Complaint, Rose Pain Management Inc., Computerized Joint Surgery LLC, and Sam Hakki, M.D. ("Count XIII defendants") intentionally caused to be prepared and mailed false medical documentation by Mini Invasive Orthopedics LLC, or knew that such false medical documentation would be mailed in the ordinary course of Mini Invasive Orthopedics LLC's business, or should have reasonably foreseen that

226

the mailing of such false medical documentation by Mini Invasive Orthopedics LLC would occur, in furtherance of the Count XIII defendants' scheme to defraud.

1436. The Count XIII defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 45.

1437. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1438. Policies of insurance were delivered to insureds through the U.S. Mail.

1439. Payments to Mini Invasive Orthopedics LLC from Allstate were transmitted through the U.S. Mail.

1440. As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Mini Invasive Orthopedics LLC, which they knew would be billed by Mini Invasive Orthopedics LLC in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1441. Hakki owns Mini Invasive Orthopedics LLC.

227

1442. Hakki was involved in rendering and facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Mini Invasive Orthopedics LLC.

1443. Rose Pain and Computerized Joint submitted medical records to Allstate in an attempt to support the unlawful and medically unnecessary treatment rendered at Mini Invasive Orthopedics LLC.

1444. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Mini Invasive Orthopedics LLC for the benefit of the Count XIII defendants that would not otherwise have been paid.

1445. The Count XIII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII defendants to continue his fraudulent scheme without detection.

1446. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1447. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIII defendants

engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1448. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Mini Invasive Orthopedics LLC for the benefit of the Count XIII defendants.

1449. The Count XIII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1450. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII defendant's fraudulent acts.

1451. The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1452. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1453. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1454. By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be

submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Mini Invasive Orthopedics LLC Enterprise)
### Against Rose Pain Management Inc., Computerized Joint Surgery LLC, and Sam Hakki, M.D.

1455. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1456. Rose Pain Management Inc., Computerized Joint Surgery LLC, and Sam Hakki, M.D. ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Mini Invasive Orthopedics LLC.

1457. The Count XIV defendants each agreed to further, facilitate, support, and operate the Mini Invasive Orthopedics LLC enterprise.

1458. As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

1459. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Mini Invasive Orthopedics LLC even though Mini Invasive Orthopedics LLC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1460. The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1461. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XIV defendants' unlawful conduct described herein.

1462. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Advanced Central Laboratory, LLC Enterprise)
### Against Rose Pain Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.

1463. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1464. Advanced Central Laboratory, LLC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1465. In connection with each of the claims identified in the within Complaint, Rose Pain Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D. ("Count XV defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Advanced Central Laboratory, LLC, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Advanced Central Laboratory, LLC's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Advanced Central Laboratory, LLC would occur, in furtherance of the Count XV defendants' scheme to defraud.

1466. The Count XV defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 45.

1467. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through interstate wires and the U.S. Mail.

1468. Policies of insurance were delivered to insureds through the U.S. Mail.

1469. Payments to Advanced Central Laboratory, LLC from Allstate were transmitted through the U.S. Mail.

1470. As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Advanced Central Laboratory, LLC, which they knew would be billed by Advanced Central Laboratory, LLC in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1471. Rose Pain, Computerized Joint, Mini Invasive, and Hakki submitted urine specimens to Advanced Central Laboratory, LLC for unnecessary and unreasonable urine drug testing.

1472. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Advanced Central Laboratory, LLC for the benefit of the Count XV defendants that would not otherwise have been paid.

1473. The Count XV defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for

a long period of time, thus enabling the Count XV defendants to continue his fraudulent scheme without detection.

1474. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

1475. By faxing or mailing, or agreeing that interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XV defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1476. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Advanced Central Laboratory, LLC for the benefit of the Count XV defendants.

1477. The Count XV defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1478. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV defendant's fraudulent acts.

1479. The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1480. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1481. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1482. By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Advanced Central Laboratory, LLC Enterprise)
### Against Rose Pain Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.

1483. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1484. Rose Pain Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D. ("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Advanced Central Laboratory, LLC.

1485. The Count XVI defendants each agreed to further, facilitate, support, and operate the Advanced Central Laboratory, LLC enterprise.

1486. As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

1487. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Advanced Central Laboratory, LLC even though Advanced Central Laboratory, LLC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1488. The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1489. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVI defendants' unlawful conduct described herein.

1490. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Stefan Glowacki, M.D., P.C. Enterprise)
### Against Bluebird Transportation Inc., Arak Ishaq, and Stefan Glowacki, M.D.

1491. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein

1492. Stefan Glowacki, M.D., P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1493. In connection with each of the claims identified in the within Complaint, Bluebird Transportation Inc., Arak Ishaq, and Stefan Glowacki, M.D. ("Count XVII defendants") intentionally caused to be prepared and mailed false medical documentation by Stefan Glowacki, M.D., P.C., or knew that such false medical documentation would be mailed in the ordinary course of Stefan Glowacki, M.D., P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Stefan Glowacki, M.D., P.C. would occur, in furtherance of the Count XVII defendants' scheme to defraud.

1494. The Count XVII defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 45.

1495. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1496. Policies of insurance were delivered to insureds through the U.S. Mail.

1497. Payments to Stefan Glowacki, M.D., P.C. from Allstate were transmitted through the U.S. Mail.

1498. As documented above, the Count XVII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Stefan Glowacki, M.D., P.C., which they knew would be billed by Stefan Glowacki, M.D., P.C. in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1499. Glowacki owns Stefan Glowacki, M.D., P.C.

1500. Glowacki was involved in rendering and facilitating the unlawful and medically unnecessary treatment by Stefan Glowacki, M.D., P.C.

1501. Bluebird and Ishaq were responsible for soliciting and transporting patients to Stefan Glowacki, M.D., P.C.

1502. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts

to Stefan Glowacki, M.D., P.C. for the benefit of the Count XVII defendants that would not otherwise have been paid.

1503. The Count XVII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XVII defendants to continue his fraudulent scheme without detection.

1504. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1505. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XVII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1506. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Stefan Glowacki, M.D., P.C. for the benefit of the Count XVII defendants.

1507. The Count XVII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1508. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XVII defendant's fraudulent acts.

1509. The Count XVII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1510. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1511. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1512. By virtue of the Count XVII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Stefan Glowacki, M.D., P.C. Enterprise)
### Against Bluebird Transportation Inc., Arak Ishaq, and Stefan Glowacki, M.D.

1513. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1514. Bluebird Transportation Inc., Arak Ishaq, and Stefan Glowacki, M.D. ("Count XVIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Stefan Glowacki, M.D., P.C.

1515. The Count XVIII defendants each agreed to further, facilitate, support, and operate the Stefan Glowacki, M.D., P.C. enterprise.

1516. As such, the Count XVIII defendants conspired to violate 18 U.S.C. § 1962(c).

1517. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Stefan Glowacki, M.D., P.C. even though Stefan Glowacki, M.D., P.C. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1518. The Count XVIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1519. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVIII defendants' unlawful conduct described herein.

1520. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count XVIII defendants, and others acting in

concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIX
## COMMON LAW FRAUD
### Against All Defendants

1521. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1522. The scheme to defraud Allstate perpetrated by Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Advanced Central Laboratory, LLC, Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo Tooma, Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D. ("Count XIX defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were lawfully providing services in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

1523. The misrepresentations of fact made by the Count XIX defendants include, but are not limited to, those material misrepresentations discussed in section XII, *supra*.

1524. The Count XIX defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1525. The misrepresentations were intentionally made by the Count XIX defendants in furtherance of their scheme to defraud Allstate.

1526. The Count XIX defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

1527. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

1528. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

<u>**COUNT XX**</u>
**CIVIL CONSPIRACY**
**Against All Defendants**

1529. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1530. Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Advanced Central Laboratory, LLC, Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo

Tooma, Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D. ("Count XX defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were not entitled because: (1) the defendants billed for services that were never rendered, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants did not submit reasonable charges to Allstate.

1531. The Count XX defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

1532. This purpose was known to all of the Count XX defendants and intentionally pursued.

1533. Despite knowing that the defendants were not entitled to reimbursement under the No-Fault Act because they billed for services that were not actually provided, not reasonably necessary, because treatment was not lawfully rendered, and because they charged outrageous and unreasonable prices, the Count XX defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

1534. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

1535. All of the Count XX defendants benefited from the payments wrongfully procured from Allstate.

1536. All of the Count XX defendants directly benefited from the payments made to Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Advanced Central Laboratory, LLC, and Stefan Glowacki, M.D., P.C.

1537. Therefore, the Count XX defendants committed acts that caused damage to Allstate.

1538. All of the Count XX defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XX defendants in the commission of acts done for the benefit of all Count XX defendants and to the unjustified detriment of Allstate.

1539. Accordingly, all of the Count XX defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XXI
### PAYMENT UNDER MISTAKE OF FACT
**Against Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, and Stefan Glowacki, M.D., P.C.**

1540. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1541. Allstate paid the amounts described herein and itemized in Exhibits 46 through 52 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the lawfulness and necessity of services purportedly provided and charged by Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, and Stefan Glowacki, M.D., P.C. ("Count XXI defendants").

1542. Allstate sustained damages by paying under a mistake of fact the claims submitted by or on behalf of the Count XXI defendants, which misrepresented the reasonableness, necessity, and lawfulness of the medical treatment allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

1543. The Count XXI defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

1544. Allstate is entitled to restitution from each of the Count XXI defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

## COUNT XXII
## UNJUST ENRICHMENT
### Against Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, and Stefan Glowacki, M.D., P.C.

1545. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1546. Allstate paid monies, including those amounts set out in Exhibits 46 through 52, in response to the claims submitted, or caused to be submitted, by defendants Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, and Stefan Glowacki, M.D., P.C. ("Count XXII defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

1547. Allstate's payments constitute a benefit which the Count XXII defendants aggressively sought and voluntarily accepted.

1548. The Count XXII defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

1549. The Count XXII defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

1550. The Count XXII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

1551. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1251 set forth above as if fully set forth herein.

1552. Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Advanced Central Laboratory, LLC, Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo Tooma, Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D. ("Count XXIII defendants") routinely provided unnecessary and unlawful services with respect to the patients at issue in this Complaint.

1553. The Count XXIII defendants billed for massage therapy, physical therapy, the application of useless P-Stim devices, and transportation services that were never actually provided, as well as billing for identical services at multiple locations on the same date of service for the same patient.

1554. Utica Physical Therapy Inc., Computerized Joint Surgery LLC, and Mini Invasive Orthopedic LLC issued DME without the necessary license from the State of Michigan, thereby rendering its issuance of DME unlawful within the meaning of the No-Fault Act.

1555. Utica Physical Therapy Inc. rendered massage therapy by unlicensed massage therapists, thereby rendering its services unlawful within the meaning of the No-Fault Act.

1556. Bluebird Transportation Inc. was not registered with the State of Michigan, thereby rendering its alleged provision of services unlawful within the meaning of the No-Fault Act.

1557. The Count XXIII defendants solicited patients for medically unnecessary treatment and then rendered the treatment pursuant to a fraudulent scheme whereby patients were referred within the fraudulent network as part of *quid pro quo* arrangements established for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment.

1558. The Count XXIII defendants rendered unreasonable and unnecessary treatment pursuant to a predetermined protocol that included excessive physical therapy, injections, application of P-Stim devices, MRI scans, urine drug testing, and transportation services.

1559. The Count XXIII defendants engaged in fraudulent billing practices, including unbundling, upcoding office visits, and billing for MRI scans under a deleted CPT Code.

1560. The amount charged by the Count XXIII defendants for services such as massage therapy, MRI scans, and medical transportation far exceeded reasonable

and customary amounts and further demonstrates that the purpose of providing these services was to generate claims to Allstate, and not for the purpose of providing reasonably necessary treatment or services.

1561. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105 and 500.3107.

1562. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

1563. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1564. Further, providers may only charge a reasonable amount for the products, services, and accommodations rendered.  Mich. Comp. Laws § 500.3157.

1565. The Count XXIII defendants continue to submit claims under the No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

1566. The Count XXIII defendants will continue to bill Allstate for No- Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied No-Fault claims submitted by any of the Count XXIII defendants for any or all of the reasons set out in the within Complaint.

1567. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIII defendants provided unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

1568. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIII defendants were engaged in a fraudulent scheme whereby they provided unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

1569. As such, the Count XXIII defendants have no standing to submit, pursue, or receive No-Fault benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIII defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

1570. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIII defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XVI.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Utica Physical Therapy Inc. Enterprise)**
**Against Bluebird Transportation Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo Tooma, Arak Ishaq, and Stefan Glowacki, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Utica Physical Therapy Inc. Enterprise)
### Against Bluebird Transportation Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo Tooma, Arak Ishaq, and Stefan Glowacki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Rose Physical Therapy, Inc. Enterprise)
### Against Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Rose Physical Therapy, Inc. Enterprise)
### Against Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Rose Pain Management Inc. Enterprise)
### Against Crystal Clear Health Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Rose Pain Management Inc. Enterprise)
### Against Crystal Clear Health Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Crystal Clear Health Management Inc. Enterprise)
### Against Rose Pain Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT VIII
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Crystal Clear Health Management Inc. Enterprise)**
**Against Rose Pain Management Inc., Bluebird Transportation Inc.,**
**Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Stefan**
**Glowacki, M.D., P.C., Arak Ishaq, Sam Hakki, M.D.,**
**and Stefan Glowacki, M.D.**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Bluebird Transportation Inc. Enterprise)
### Against Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Crystal Clear Health Management Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Arak Ishaq, and Stefan Glowacki, M.D.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Bluebird Transportation Inc. Enterprise)
### Against Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Crystal Clear Health Management Inc., Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Arak Ishaq, and Stefan Glowacki, M.D.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Computerized Joint Surgery LLC Enterprise)
### Against Rose Pain Management Inc., Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Computerized Joint Surgery LLC Enterprise)
### Against Rose Pain Management Inc., Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Mini Invasive Orthopedics LLC Enterprise)
### Against Rose Pain Management Inc., Computerized Joint Surgery LLC, and Sam Hakki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Mini Invasive Orthopedics LLC Enterprise)
### Against Rose Pain Management Inc., Computerized Joint Surgery LLC, and Sam Hakki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Advanced Central Laboratory, LLC Enterprise)
### Against Rose Pain Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Advanced Central Laboratory, LLC Enterprise)
### Against Rose Pain Management Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, and Sam Hakki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just

## COUNT XVII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Stefan Glowacki, M.D., P.C. Enterprise)
### Against Bluebird Transportation Inc., Arak Ishaq, and Stefan Glowacki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Stefan Glowacki, M.D., P.C. Enterprise)
### Against Bluebird Transportation Inc., Arak Ishaq, and Stefan Glowacki, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just

## COUNT XIX
## COMMON LAW FRAUD
### Against All Defendants

(a)　AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)　AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)　GRANT all other relief this Court deems just.

## COUNT XX
## CIVIL CONSPIRACY
### Against All Defendants

(a)　AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)　AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)　GRANT all other relief this Court deems just.

## COUNT XXI
## PAYMENT UNDER MISTAKE OF FACT
### Against Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, and Stefan Glowacki, M.D., P.C.

(a)　AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)　GRANT all other relief this Court deems just.

## COUNT XXII
## UNJUST ENRICHMENT
**Against Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, and Stefan Glowacki, M.D., P.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XXIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against All Defendants**

(a)     DECLARE that Allstate has no obligation to pay pending and previously denied No-Fault insurance claims submitted by Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Advanced Central Laboratory, LLC, Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo Tooma, Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D. for any or all of the reasons set out in the within Complaint; and

(b)     DECLARE that Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Advanced Central Laboratory, LLC, Stefan Glowacki, M.D., P.C., Mukhlis

Tooma, Lolo Tooma, Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D., jointly and severally, cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)    DECLARE that Utica Physical Therapy Inc., Rose Physical Therapy, Inc., Rose Pain Management Inc., Crystal Clear Health Management Inc., Bluebird Transportation Inc., Computerized Joint Surgery LLC, Mini Invasive Orthopedics LLC, Advanced Central Laboratory, LLC, Stefan Glowacki, M.D., P.C., Mukhlis Tooma, Lolo Tooma, Arak Ishaq, Sam Hakki, M.D., and Stefan Glowacki, M.D., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)    GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVII.    **JURY TRIAL DEMAND**

The plaintiffs hereby demand a trial by jury on all clams.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
John D. Tertan
jtertan@smithbrink.com
Adam G. Gutbezahl
agutbezahl@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Property and Casualty*
*Insurance Company, and*
*Allstate Fire and Casualty Insurance*
*Company*

Dated: November 28, 2017